# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:17-cr-00130 |
| | ) | |
| [1] JAMES WESLEY FRAZIER, | ) | |
| [2] AELIX SANTIAGO, | ) | |
| [3] KYLE HEADE, | ) | |
| [6] JOEL ALDRIDGE, | ) | |
| [7] JAMES HINES, | ) | |
| [8] MICHAEL FORRESTER, JR., | ) | |
| [10] JAMIE HERN, | ) | |
| [12] MICHAEL MYERS, | ) | |
| [13] MICHAEL LEVI WEST, | ) | |
| [14] ADRIANNA FRAZIER, | ) | |
| [15] DEREK LEIGHTON STANLEY, | ) | |
| [16] WILLIAM NELPER, | ) | |
| [17] WILLIAM BOYLSTON, | ) | |
| [18] JASON MEYERHOLZ, | ) | |
| [20] JESSIE MARIE DECKER, | ) | |
| [21] JAMIE LEE | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND OMNIBUS ORDER

On June 29, 2018, a federal grand jury returned a 75-count Third Superseding Indictment against twenty-one Defendants, who are alleged to be members or associates of the Clarksville, Tennessee Chapter of the Mongols Motorcycle Gang. The charges followed a three-year investigation, during which the Government compiled more than 20,000 pages of documents, including more than 350 reports of investigation by federal agents alone.

In addition to the overarching charge contained in Count 1 alleging Conspiracy to Commit Racketeering Activity in violation of 18 U.S.C. § 1962(d), the charges include: Conspiracy to Distribute and Possession with Intent to Distribute Fifty Grams or More of Methamphetamine, in

violation of 21 U.S.C. §§ 841(a)(1) and 846; Conspiracy to Commit Money Laundering, in violation

of 18 U.S.C. § 1956(h); Violent Crimes in Aid of Racketeering, including Murder and Kidnapping

in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(1); Assault with a Dangerous Weapon

in Aid of Racketeering, in violation of 18 U.S.C. § 1959(a)(3); Attempted Murder in Aid of

Racketeering, in violation of 18 U.S.C. § 1959(a)(5); Kidnapping, in violation of 18 U.S.C. §

1201(a)(1); Conspiracy to Commit Robbery, Attempted Robbery and Robbery Affecting Interstate

Commerce, in violation of 18 U.S.C. § 1951(a); Conspiracy to Tamper with a Witness, in violation

of 18 U.S.C. § 1512(k) and Witness Tampering, in violation of 18 U.S.C. § 1512(b)(3); and Causing

Death Through the Use of a Firearm, in violation of 18 U.S.C. § 924(j), and 2. All but one of the

Defendants face the possibility of life imprisonment if convicted.

The case is set for trial beginning April 7, 2020, with an estimated duration of three months.

In anticipation of that trial, and in accordance with this Court's September 5, 2018 Amended

Scheduling Order (Doc. No. 585), Defendants have filed numerous motions,[1] to which the

Government has responded in opposition, and Defendants have replied. Most of those motions can

be decided on the papers. Those that cannot are set for oral argument and/or an evidentiary hearing.

## I. Motions to Join

Several Defendants have filed Motions to Join in Motions filed by other Defendants. These

include: (a) Derek L. Stanley's Motion to Join and Adopt Pretrial Motions Filed by the Defendant

---

[1] Some of the motions are similar, if not identical, to ones addressed in the first Memorandum Opinion and Omnibus Order in United States v. Darden, 346 F. Supp. 3d 1096 (M.D. Tenn. 2018) that was issued less than a year ago. While the Court could incorporate by reference the relevant portions of that opinion, the Court chooses not to do so in order that the record in this case is complete, and so that the parties do not have to look elsewhere for the legal analysis underpinning the Court's conclusions. Moreover, the facts here are different. That said, the Court will not reinvent the wheel by attempting to restate the law in another way so as to make it sound different than that laid out in Darden.

(Doc. No. 864); (b) James Wesley Frazier's Motion to Adopt and Join Pretrial Motions (Doc. No. 890); (c) Michael Meyers Motion to Join and Adopt Pretrial Motions Filed by the Defendants (Doc. No. 880); and (d) Joel Aldridge's Motion to Join and Adopt Pretrial Motions Filed by Co-Defendants (Doc. No. 889). Without objection from the Government, those Motions are **GRANTED.**

However, the Court will limit its discussion to the facts underlying the original motion even though the allegations against a joining Defendant may be different. The onus is on the parties, not the Court to formulate and develop arguments. See United States v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996) (stating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" and "declin[ing] to consider . . . the arguments of codefendants which are fact-specific and are not readily transferable").

## II. <u>Motions for Additional Peremptory Challenges</u>

Frazier, Aelix Santiago, Aldridge, James Hines, and William Boylston have each filed a motion to increase the number of peremptory challenges. Rule 24(b) of the Federal Rules of Criminal Procedure provides that in a non-capital felony case, "the government is entitled to 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory challenges when the defendant is charged with a crime punishable by imprisonment of more than one year." Fed. R. Crim. P. 24(b). The rule goes on to provide that "the court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly." Id. A district court's decision regarding peremptory challenges is reviewed for an abuse of discretion, so long as it "[c]omplies with the minimum requirements of Rule 24[.]" <u>United States v. Gibbs</u>, 182 F.3d 408, 435 (6th Cir. 1999).

Pursuant to Rule 24(b), Aldridge requests that the Court allow defendants, collectively, a total of twenty-five peremptory challenges and the government twelve. Santiago requests defense peremptory challenges be increased to a total of twenty collectively, but does not say whether the Government should receive a proportionate increase. Boylston requests that the Court increase each defendant's peremptory challenges to twenty and that they be exercised separately. Finally, Frazier and Hines request additional peremptory challenges, but do not request a specific number of additional challenges.

The number of peremptory challenges requested is a moving target, however. In their reply brief, Defendants jointly request an "Order granting each defendant a minimum of 20 peremptory challenges to be exercised individually (not jointly) and without consultation with other defendants." (Doc. No. 976 at 3).

It has been said that you get in life what you have the courage to ask for. But requests must be grounded in reality for them to become true. As it now stands, sixteen Defendants are slated for trial. If the Court's math is correct, the figures proposed in the reply brief would result in 320 peremptory challenges for Defendants alone. If proportionality under the Rule is maintained, the Government would be allowed 198 peremptory challenges, and the total number would rise to 518. The Court cannot even conceive of a case where that amount of challenges would be warranted, and it is certainly not warranted here where the entire summoned jury pool is likely to be between 300 and 400 prospective jurors.[2]

---

[2] Hopefully, the Court is misreading Defendants' reply, even though it requests an order allowing "*each defendant* a minimum of 20 peremptory challenge[.]" Elsewhere in the reply, "the defense jointly requests a minimum of 20 peremptory challenges to be exercised individually by each defendant (not jointly among all defendants) (Doc. No. 976 at 2), which could be read to mean a collective total of twenty. This would be more realistic.

As for individual versus joint exercise, Defendants make cogent arguments for individual exercise of their challenges, including that each Defendant has a different background and personal history; several Defendants are charged with crimes that may elicit strong reactions, passions or prejudices by members of the jury venire; and each lawyer is tasked with guarding the interest and constitutional rights of his or her individual client. As for whether the number of peremptory challenges should be proportionately increased for the Government, no arguments have been raised by the Defendants, other than to note that Rule 24 does not specifically require it and "[t]his Court has the discretion to increase the number of peremptory challenges as it sees fit (proportionally or not)[.]"  (Doc. No. 976 at 3).

Given all this, and assuming at least five or so Defendants proceed to trial, the Motions for Additional Peremptory Challenges (Doc. Nos. 833, 851, 857, 872 & 875) are hereby **GRANTED,** although the Court will leave for later the precise number of additional challenges.  Whatever the number, the Government will be accorded additional peremptory challenges, so as to keep intact the ratio anticipated by Rule 24(b).

### III. <u>Motions for Daily Transcripts</u>

Some Defendants have filed Motions for Daily Trial Transcripts.  "[T]he decision to supply daily transcripts to indigent defendants is a matter within the discretion of the trial judge."  <u>United States v. Bari</u>, 750 F.2d 1169, 1181 (2d Cir. 1984).  Indeed, while the Guide to Judicial Policy states that "[t]he furnishing of accelerated transcript services in criminal proceedings should be discouraged," it also "recogniz[es] that there are some circumstances in which such transcript services are necessary and required by either the prosecution or the defense." Guide to Judiciary Policy, Vol. 7, Ch. 3, § 320.30.20.

Though not addressing daily transcripts, the Supreme Court in <u>Britt v. North Carolina</u>, 404 U.S. 226, 227 (1976) stated that "<u>Griffin v. Illinois</u>, [51 U.S. 12 (1956)] and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." The Court in <u>Britt</u> also observed that "[w]hile the outer limits of that principle are not clear," it "has identified two factors that are relevant to the determination of need: (1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript." <u>Id.</u>

Given the anticipated length of the trial, the nature, scope and breadth of the charges, the number of witnesses likely to be called including cooperating witnesses, the voluminous discovery that has been provided, and that many of Defendants are represented by one lawyer, the Court finds that realtime (rough) transcripts may prove to be invaluable for some witnesses. Certainly official transcripts[3] are not necessary for most witnesses, and may not be needed for any witnesses because, just as in <u>Darden</u>, the Court will not require citation to the official transcripts when arguments (written or oral) are presented during trial. Instead, counsel may simply refer to the rough transcripts. To the extent that counsel orders rough transcripts of testimony, CJA vouchers for those transcripts shall be submitted to the Court for its approval.

Based on the foregoing, the Motions for Daily Transcripts filed by Frazier (Doc. No. 845), Santiago (Doc. No. 874), Aldridge (Doc. No. 871), Hines (Doc. No. 858) and Boylston (Doc. No.

---

[3] If counsel deems it absolutely necessary to have an official transcript for a specific witness, a request in writing shall be made to the court reporter at least 24 hours in advance of the witness's testimony. Pursuant to the Guide to Judiciary Policy, Vol. 7, Ch. 3, § 320.30.20, if a Defendant and the Government request an official transcript for the same witness, the costs shall be born by the Government, with CJA counsel responsible for paying the copy rate and thereafter seeking reimbursement from CJA funds.

836) are **GRANTED** with the condition that official (as opposed to realtime) transcripts will not be necessary for the vast majority of witnesses (if any), and there may be times that realtime transcripts are not necessary either.[4]

### IV. <u>Motion to Sequester Witnesses</u>

Boylston has filed a Motion to Sequester Witnesses in which he requests that

> the Court order that each of the government's witnesses who are in the custody of the USM, the BOP, or on pre-trial release shall have no contact with each other before their respective testimony, during their respective testimony, or after their respective testimony, until the conclusion of trial and, if applicable, the conclusion of sentencing in this case. Defendant Boylston asks the Court to instruct all government agents involved in this matter to provide no information to any of the cooperating alleged co-conspirators that is based on the testimony of other witnesses so as to prevent collusion or the tailoring of testimony for the benefit of the only party in a position to aid the alleged co-conspirators, *i.e.*, the government.

(Doc. No. 839 at 3). He cites Rule 615 of the Federal Rules of Evidence, <u>Geders v. United States</u>, 425 U.S. 80 (1976), and <u>United States v. Jackson</u>, 60 F.3d 128 (2nd Cir. 1995) as authority, but none come close to supporting the breadth of the sequestration that he seeks.

In <u>Geders</u>, the Supreme Court stated that a trial judge has "broad power to sequester witnesses before, during, and after their testimony," 425 U.S. at 87, but it did so in the context of a case where the trial judge prohibited counsel from talking with defendant (his client) during an overnight recess. The Supreme Court's holding that the sequestration order was improper certainly does not aid Boylston, particularly because the Court also noted that there were other ways to deal with "coached" witnesses, including "skillful cross-examination" into whether the witness had

---

[4] Notably, no concerns were expressed in <u>Darden</u> about the accuracy of the realtime transcripts, nor was there any suggestion that the realtime (as opposed to official) transcripts were inadequate for use at trial.

spoken with anyone about his testimony.  Id. at 90.

Jackson dealt with the issue of whether more than one case agent can be in the courtroom during trial, an open question in the Second Circuit at the time. Noting it was likely "to be the rare case when a district judge exempts more than one witness under a particular subprovision of Rule 615," the court "h[e]ld that a district court judge has discretion to do so."  60 F.3d at 134.

Finally, Rule 615 simply states that "at a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony."  Fed. R. Evid. 615.  Thus, if Boylston, any of his co-defendants, or the Government invoke "the Rule," the Court will be obligated to exclude prospective witnesses from the courtroom at that time.  The Rule does not require the Court to do so now, and does not even hint that an order effectively precluding potential witnesses from talking to each other over the coming seven months would be proper.

Further, the Court has no idea who the witnesses might be, nor is it inclined to ask the Government to show its hand at this early date.  Presumably there are a large number of witnesses expected to be called at trial, many of whom are in federal custody.  Exactly how the Court would go about enforcing what would effectively be a gag order over who knows how many people in who knows how many places is unaddressed by Boylston.  Even if such an order were feasible and enforceable, the logistics would likely make it wholly impractical.  If past trials are any indication, non-feuding prisoner-witnesses will be transported together and held together if for no other reason than available manpower and accommodations do not allow otherwise.

Boylston's Motion to Sequester Witnesses (Doc. No. 839) is **DENIED**.

## V.  **Motion for Jury Questionnaire**

Frazier and Aldridge have filed Motions for Jury Questionnaires (Doc. No. 846, 873).  Those

Motions are **DENIED AS MOOT** because, by Order entered February 27, 2019, the Court already found "that utilizing a juror questionnaire will be of enormous benefit in selecting a jury in this case[.]" United States v. Darden, 3:17-cr-124."  (Doc. No. 714 at 1).

## VI.  <u>Motion to Pay Childcare Expenses</u>

Santiago has filed a "Motion for the Court to Pay For Care of Dependent Children and Family Members of Single Parents Who Are Selected as Jurors" (Doc. No. 876).  In it, he writes:

> 2. Santiago is entitled to a trial by a fair and impartial jury composed from a fair cross-section of the community pursuant to his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

> 3. In major cases generally, and particularly in cases which last as long as Aelix Santiago's trial is expected to last, a large percentage of single parents, especially single African-American parents and women, are struck for cause by the Court due to the fact that they have no money to pay for alternative child care arrangements during a trial the length of Mr. Santiago's, or no money to pay for alternative care of dependent (usually elderly) family members during such a lengthy trial.

> 4. The Government's interest in not causing undue juror hardship does not outweigh the Accused's constitutional rights to a fair jury trial.

> 5. As a result of a jury selection process in which jurors who cannot afford child care are excluded, Aelix Santiago may face a venire pool that is non-representative of a general cross-section of the community because certain poor and/or African-American individuals and/or women are removed due to hardships imposed by the length of the trial anticipated in Mr. Santiago's case.

(<u>Id.</u> at 2).  He then cites <u>Duren v. Missouri</u>, 439 U.S. 357 (1979) and <u>Taylor v. Louisiana</u>, 419 U.S. 522 (1975) (mis-cited as <u>Brown v. Louisiana</u>) for the proposition that, in the absence of payment of dependent care, the jury selection process will violate not only his "right to a fair and impartial jury composed from a fair cross-section of the community," but also his right to equal protection under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).  As for funding, Santiago claims the "Court can order that the costs of such care be taxed as costs in this case, just at it can order the costs of transportation,

9

room and board be taxed as cost for any sequestered jury" pursuant to 28 U.S.C. § 1871(e).[5]

Turning to the latter point first, the cited statute has nothing to do with paying for child or elder care in the routine case. Rather, it provides:

> (e) During any period in which a jury is ordered to be kept together and not to separate, the actual cost of subsistence shall be paid upon the order of the court in lieu of the subsistence allowances payable under subsection (d) of this section. Such allowance for the jurors ordered to be kept separate or sequestered shall include the cost of meals, lodging, and other expenditures ordered in the discretion of the court for their convenience and comfort.

28 U.S.C. § 1871(e). Even assuming that dependent care expenses comes within the ambit of "convenience and comfort," no sequestration order has been entered in this Court. The remainder of the statute deals with non-sequestered juries and permits fees for such things as meals, lodging, parking, travel, and tolls, but mentions nothing about child or elder care.

Funding aside, Santiago has not shown that the failure to provide funding will deny him equal protection or result in him being tried by a jury that is not a fair-cross section of the community. Batson, on which he relies, applies to peremptory strikes by the government against certain classes of persons. J.E.B. v. Alabama *ex rel.* T.B., 511 U.S. 127, 130–31(1994), on which Santiago also relies, "reaffirm[ed] what, by now, should be axiomatic: Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where . . . the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes about the relative abilities of men and women." The scenario presented by Santiago, however, does not arise from peremptory challenges or state action, but rather challenges for cause based on a potential juror's own request to be excused.

---

[5] The Court notes Santiago's arguments are identical to those raised by Maurice Burks in the Darden case, including the mis-citation to Taylor.

Duren and Taylor also do not aid Santiago. Taylor merely holds that a male defendant had standing to challenge the systematic exclusion of women from jury pools, and that "the fair-cross-section requirement is violated by the systematic exclusion of women." Taylor, 419 U.S. at 531. Duren, decided four years later, applied Taylor to state statutes that automatically exempted from jury service any women requesting not to serve, and held that "such systematic exclusion of women that results in jury venires averaging less than 15% female violates the Constitution's fair-cross-section requirement." 439 U.S. at 360. Duren went on to hold that "[i]n order to establish a *prima facie* violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Id. at 364.

In his Motion, Santiago does not discuss the Duren factors, let alone try to establish them. True, the systematic exclusions of African-Americans, Strauder v. State of W. Virginia, 100 U.S. 303, 311(1879), Hispanics, Castaneda v. Partida, 430 U.S. 482, 492 (1977), and women, Taylor, is unlawful, but it does not necessarily follow that "a mixed race-gender group – such as African–American [fe]males – can constitute a distinctive group under Duren." United States v. Barlow, 732 F. Supp. 2d 1, 27 (E.D.N.Y. 2010) (collecting cases); see also, United States v. Greer, 900 F. Supp. 952, 957–58 (N.D. Ill. 1995) ("The Court concludes that recognizing the subgroup of African–American males as a Duren distinctive group would amount to pursuing a level and type of representativeness that is simply not demanded by the Sixth Amendment, which requires only a cross-section that is fair, not one perfectly attuned to multiple variables."). And it certainly does not

follow that a mixed, race-gender-marital-parental-economic status group – such as an indigent African-American female single mother – to the exclusion of all others – should be deemed a distinctive group for purposes of <u>Duren</u>.

Regardless, Santiago' complaint is not about unlawful exclusion by the Court or the Government, but about the possibility that certain individuals will seek to be excused because of family care issues. The probability that some jurors will not be able to serve because of child or elder care responsibility does not mean that Santiago or the other Defendants will not be tried by a jury representing a fair cross-section of the community. To the contrary, even in the context of exclusion by statute, the Supreme Court in <u>Duren</u> "recognize[d] that a State may have an important interest in assuring that those members of the family responsible for the care of children are available to do so. An exemption appropriately tailored to this interest would, we think, survive a fair-cross-section challenge." 439 U.S. at 359. The same can be said about jurors who seek to be excused because of responsibilities relating to caring for their children or other relatives.

Accordingly, Santiago' Motion for the Court to Pay For Care of Dependent Children and Family Members of Single Parents Who Are Selected as Jurors (Doc. No. 876) is **DENIED**.

## VII. <u>Motion to Preclude Golden Rule Arguments</u>

Myers has filed a Motion in Limine to preclude "Golden Rule" arguments. Such a motion could be denied simply as being unnecessary because the Government's lawyers are experienced and well aware of the substantial body of case law holding that it is improper to appeal to jurors to stand in the shoes of the victim of a crime. <u>See</u> <u>e.g.</u>, <u>Bedford v. Collins</u>, 567 F.3d 225, 234 (6th Cir. 2009) ("The prosecution, to be sure, may not urge jurors to identify individually with the victims with comments like '[i]t could have been you' the defendant killed or '[i]t could have been your

children.'"); <u>Johnson v. Bell</u>, 525 F.3d 466, 484 (6th Cir. 2008) ("Closing arguments that encourage juror identification with crime victims are improper."); <u>Johnson v. Howard,</u> 24 F. App'x 480, 487 (6th Cir. 2001) ("'Golden Rule'" arguments" are "'universally condemned . . . because they invite decision based on bias and prejudice rather than consideration of facts"). Likewise the defense lawyers in this case are experienced, and what's good for the goose is good for the gander: Defendants, too, run afoul of the Golden Rule if they ask the jury to be placed in their shoes. <u>See e.g.</u>, <u>Gov't of the Virgin Islands v. Mills</u>, 821 F.3d 448, 458 (3d Cir. 2016) ("[T]he propriety of 'put yourself in the defendant's shoes' argument, as a tool of advocacy, is doubtful because it 'encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'"); <u>United States v. Roman</u>, 492 F.3d 803, 806 (7th Cir. 2007) ("Golden Rule" appeal in which the jury is asked to put itself in the defendant's position "is universally recognized as improper because it encourages the jury to depart from the neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence."); <u>United States v. Chapple</u>, No. 1:18-CR-326, 2018 WL 6498653, at *2 (N.D. Ohio Dec. 11, 2018) ("[Counsel] asked the jury to place themselves in the shoes of Defendant. Courts do not allow these so-called 'golden rule' arguments precisely because they ask the jury to decide the case based on self-interest rather than the facts."). Accordingly, Meyer's Motion (Doc. No. 881) is **GRANTED**, and neither the Government nor the Defendants shall make "Golden Rule" arguments to the jury.

### VIII. <u>Motion for Notice of Government's Intention to Use Residual Hearsay Exception</u>

Aldridge has filed a motion under Rule 807 of the Federal Rules of Evidence seeking notice of the Government's intention to utilize the residual hearsay exception, and requests that notice be provided at least 90 days before trial. In response, the Government acknowledges its responsibility,

but suggest 30 days advance notice is sufficient.

Rule 807 provides:

a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;

> (2) it is offered as evidence of a material fact;

> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

> (4) admitting it will best serve the purposes of these rules and the interests of justice.

> (b) Notice. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

Fed. R. Evid. 807.

Although what constitutes "reasonable notice" is not specified in Rule 807, the "requirement 'is intended to afford the party against whom the statement is offered sufficient opportunity to determine its trustworthiness in order to provide a fair opportunity to meet the statement.'" Cynergy, LLC v. First Am. Title Ins. Co., 706 F.3d 1321, 1330 (11th Cir. 2013) (quoting United States v. Evans, 572 F.2d 455, 489 (5th Cir.1978)). The 30 days requested by the Government is sufficient to fulfill that purpose. See, United States v. Hill, No. 3:17-CR-00276, 2019 WL 2110573, at *10 (M.D. Pa. May 14, 2019) (requiring the Government to provide Rule 807 notice at least ten days before trial); United States v. Kontz, No. 18-CR-125 (DSD/TNL), 2018 WL 4358194, at *7 (D.

Minn. Sept. 13, 2018) (requiring notice two weeks before trial); United States v. Cooper, 91 F. Supp. 2d 79, 81(D.D.C. 2000) (requiring government to provide 4 day notice).

Accordingly, Aldridge's Motion for Notice of Government's Intention to Use Residual Hearsay Exception (Doc No. 868) is **GRANTED** to the extent that the Government shall provide the notice required by Rule 807(b) at least thirty (30) days before trial. If statements are discovered after that deadline, the Government can seek leave to file a supplemental notice.

## IX. Motions for Notice and Disclosure of Other Act Evidence

Rule 404(b), too, has a disclosure requirement. When requested by a defendant, the Government must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial[.]" Fed. R. Evid. 404(b)(2)(a). Again, the rule does not specifically define "reasonable notice" although it does state that the notice should be before trial, unless "good cause[] excuses lack of pretrial notice." Id. (B)(2)(b).

The policy behind Rule 404(b)'s notice requirement is "'to reduce surprise and promote early resolution on the issue of admissibility.'" United States v. Barnes, 49 F.3d 1144, 1147 (6th Cir. 1995) (quoting, Advisory Committee notes); accord, United States v. Bradley, 644 F.3d 1213, 1273-74 (11th Cir. 2011). Although, the remedy for an unexcused violation of Rule 404(b)'s notice requirement is exclusion of the evidence, United States v. Gonzalez, 501 F.3d 630, 638 (6th Cir. 2007), notice given a week before trial, see, United States v. Paul, 57 F. App'x 597, 607 (6th Cir. 2003), or even during trial, see, United States v. Johnson, 2000 WL 712385 at *7 (6th Cir. May 23, 2000), can be sufficient, depending upon the circumstances. See also, United States v. Green, 215 Fed. App'x 189, 190 (4th Cir. 2007) (upholding as reasonable Rule 404(b) notice provided only four days before trial); United States v. Perez-Totsta, 36 F.3d 1152, 1162 (11th Cir. 1994) (district court

did not abuse its discretion in finding that notice of intent to use Rule 404(b) evidence was reasonable where it was provided to defendant immediately before *voir dire* and six days before evidence was presented).

Here, Santiago and Frazier request Rule 404(b) notice by January 6, 2020, while Aldridge request pretrial notice, but does not specify a deadline. The Government proposes that the deadline be February 24, 2020, which is forty-five days before the scheduled trial date of April 7, 2020.[6]

The Government is correct that in <u>Darden</u>, the Court set a notice deadline that was 45 days before trial (January 15). In doing so, however, the Court was also cognizant of the deadline for filing motions in limine (January 23), and therefore set the other act notice a week before it.

Motions in limine in this case are to be filed by February 10, 2020. In order that Defendants have notice of other act evidence before then, the Government shall provide Defendants with 404(b) notice by February 1, 2020. To that extent, the Motions for Notice of Other Act Evidence (Doc. Nos. 847, 855 & 877) are **GRANTED.**

### X. <u>Motion for Pretrial Notice of Impeachment Evidence</u>

Unlike Rules 807 and 404(b), Rules 608 and 609 of the Federal Rules of Evidence do not require notice, except in regard to convictions that are more than ten years old. Santiago acknowledges as much, but nevertheless asks "the Court to enter an order requiring the Government to provide written notice of impeachment evidence under Rules 608 and 609 intended to be used by the Government during trial by January 6, 2020." (Doc. No. 856 at 2).

---

[6] In their papers, both Aldridge and the Government go far beyond the notice issue, with Aldridge arguing that his prior convictions are not admissible, and the Government asserting that prior acts intrinsic to the RICO and drug conspiracy counts are not Rule 404(b) evidence. Perhaps, this was done in an effort to preview arguments to come, or to educate the Court. Either way, the arguments do not deal with the timing of the disclosures.

Santiago argues that pre-trial notice will (1) "avoid disruption of the trial"; (2) "provide defense counsel adequate time to investigate and properly challenge the proffered impeachment evidence before commence of the trial"; and (3) provide him "time to reflect on his decision of whether to exercise his right to testify or not, rather than a rushed decision during trial dependent on the Court's ruling." (Id.). The same thing could be said about most evidence – the longer a defendant has notice of the evidence, the more time he or she will have to consider it and its potential ramifications. However, "[ t]here is no general constitutional right to discovery in a criminal case," Weatherford v. Bursey, 429 U.S. 545, 559 (1977). "Although a trial court may have some inherent power to enter specific orders compelling the disclosure of specific evidence when justice requires it," United States v. Presser, 84 F.2d 1275, 1285 n.12 (6th Cir. 1988), the Court is not going to exercise that power simply because a defendant wants that evidence sooner rather than later. Santiago's Motion for Pre-Trial Notice of Government's Intent to Use Rule 608 or Rule 609 Impeachment Evidence (Doc. No. 856) is **DENIED.**

## XI. <u>Motions for Pretrial Disclosure</u>

Frazier and Santiago seek pretrial disclosure of presentence reports ("PSRs").[7] "PSRs are confidential reports created by an arm of the court and designed for use by a judge in reaching a fair sentence." United States v. Pendleton, 832 F.3d 934, 940 (8th Cir. 2016). They "occupy a unique position," In re Morning Song Bird Food Litig., 831 F.3d 765, 773 (6th Cir. 2016), and "ha[ve] always been jealously guarded by the drafters of the federal rules and by the federal courts," United States v. Trevino, 89 F.3d 187, 192 (4th Cir. 1996). "The commonly invoked reasons underlying

---

[7] In addition, Santiago seeks disclosure of any offers of immunity, leniency, or preferential treatment, as well as all <u>Brady</u> and <u>Giglio</u> material. That portion of his motion will be addressed in section XVI of this opinion.

PSRs' special status are threefold: (1) the defendant's interest in privacy and in preventing the dissemination of inaccurate information, (2) law enforcement's and cooperating informants' interest in confidentiality, and (3) the sentencing court's interest in encouraging the free flow of information during the presentencing process." In re Morning Song, 831 F.3d at 773.

"Neither Brady nor the Federal Rules of Criminal Procedure mandate that a trial court produce a copy of a presentence report concerning a government witness, prepared for the court, to the defense upon request." United States v. Sherlin, 67 F.3d 1208, 1218 (6th Cir. 1995). Additionally, "presentence reports are not statement of the defendant within the meaning of Jencks," but are "reports prepared by probation officers used primarily as an aid to district courts at sentencing" and contain "the government's version of the offense," to which defendants rarely object. United States v. McGee, 408 F.3d 966, 973 (7th Cir. 2005).

Nevertheless, the production of a PSR, being a discovery matter under Fed. R. Crim. P. 16(d), is a matter of discretion for the trial court. Sherlin, 67 F.3d at 1218. In exercising that discretion, a court should first conduct an in camera examination of the PSR to see if disclosure is warranted. Pendleton, 832 F.3d at 940.

"This in camera review is not mandatory, however." United States v. Allen, 716 F.3d 98, 104 (4th Cir. 2013). "The district court need only perform the in camera examination once the defendant has 'clearly specified the information contained in the report that he expects will reveal exculpatory or impeachment evidence.'" Id. (quoting Trevino, 89 F.3d at 192). "Thus, 'as a prerequisite for an in camera review, an accused must plainly articulate how the information contained in the PSR will be both material and favorable to his defense.'" Id. He must also make "a threshold showing of a good faith belief that a co-defendant's PSR contains exculpatory evidence

not available elsewhere." United States v. Molina, 356 F.3d 269, 275 (2d Cir. 2004); see United States v. Jewell, 614 F.3d 911, 921 (8th Cir. 2010) (citing Molina for the proposition that a defendant must "make a showing of a special need" for another's PSR); United States v. Happ, No. CR2-06-129(8), 2008 WL 5101214, at *9 (S.D. Ohio Nov. 25, 2008) ("If a defendant can describe what exculpatory or impeaching information he expects to find in the requested PSR, the district court is obligated to undertake an in camera review of the PSR to determine whether it does indeed contain any such information and whether the defendant's need for that information is 'compelling.'").

At this point of course, the witness lists have yet to be exchanged, and neither Frazier nor Santiago know who the Government will call at trial. As a consequence, neither is in a position to make a showing of the need for a cooperating witness's PSR, or to state that a given PSR is in the possession of the Government. That said, the Government has indicated that, "to the extent any cooperating witness's PSR is completed and disseminated to the government prior to the witness's testimony, the United States will seek permission from the Court to disclose the PSR in a redacted form and subject to a protective order." (Doc. 940 at 3). With this understanding, the Motions for Disclosure filed by Frazier (Doc. No. 849) and Santiago (Doc. No. 886) are **DENIED WITHOUT PREJUDICE.**

### XII.  Motion to Dismiss Counts Nine, Ten, Eleven and Twenty-Eight

Frazier seeks to dismiss Count Twenty-Eight of the Third Superseding Indictment. He also seeks to dismiss Counts Nine, Ten, and Eleven, or to have the Government elect one of the three counts to try.

**A. Count Twenty-Eight**

Count Twenty-Eight of the Third Superseding Indictment charge the following:

> Beginning on or about January 1, 2016, and continuing up through on or about January 16, 2016, in the Middle District of Tennessee, [1] JAMES WESLEY FRAZIER, a/k/a "SLO-MO," a/k/a "SPECIAL," [2] AELIX SANTIAGO, a/k/a "GOON," a/k/a "BIG O," a/k/a "BIG OFFIT," and [3] KYLE HEADE, did combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute a quantity of a mixture and substance containing a detectable amount of Oxymorphone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1). All in violation of Title 21, United States Code, Section 846.

(Doc. No. 485, Third Superseding Indictment at 39). Frazier contends this is part of the larger drug conspiracy alleged in Count Two that reads:

> Beginning on a date unknown to the Grand Jury, but since at least March 2015, and continuing up through and including the present, in the Middle District of Tennessee and elsewhere, [1] JAMES WESLEY FRAZIER, a/k/a "SLO-MO," a/k/a "SPECIAL," [2] AELIX SANTIAGO, a/k/a "GOON," a/k/a "BIG O," a/k/a "BIG OFFIT," [3] KYLE HEADE, [6] JOEL ALDRIDGE, a/k/a "SLEEZY," a/k/a "SPOON," [7] JAMES HINES, a/k/a "FESTER," [8] MICHAEL FORRESTER, JR., a/k/a "STIX," [10] JAMIE HERN, a/k/a "J-ROC," [12] MICHAEL MYERS, a/k/a "YEA YEA," [13] MICHAEL LEVI WEST, a/k/a "SMURF," a/k/a "BLUE," [14] ADRIANNA FRAZIER, a/k/a "ADRIANNA MILES," [15] DEREK LEIGHTON STANLEY, [16] WILLIAM NELPER, a/k/a "FLIP," and [21] JANIE LEE, and STEPHEN COLE, a/k/a "LURCH," now deceased, did combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to knowingly and intentionally distribute and possess with intent to distribute fifty (50) grams or more of Methamphetamine, a Schedule II controlled substance, in violation of Title 21, United State Code, Section 841(a)(1). All in violation of Title 21, United States Code, Section 846.

(Id. at 24). Because of the overlap between these two drug conspiracies, Frazier argues that trying him on Count Twenty-Eight in addition to Count Two would violate the double jeopardy clause of the Fifth Amendment.

The Fifth Amendment prevents persons "subject for the same offence to be twice put in

jeopardy of life or limb." U.S. CONST. amend. V. "That clause protects criminal defendants from prosecution following conviction or acquittal for the same offense, and also prohibits infliction of 'multiple punishments for the same offense imposed in a single proceeding.'" Jones v. Harry, 405 F. App'x 23, 28 (6th Cir. 2010) (quoting Jones v. Thomas, 491 U.S. 376, 381 (1989)).

Determining whether two drug conspiracies charged in an indictment violate the double jeopardy clause requires examining the "totality of the circumstances" by applying "Sinito's five-factor test." United States v. Wheeler, 535 F.3d 446, 456 (6th Cir. 2008). The Sinito factors consider "(1) time; (2) persons acting as co-conspirators; (3) the statutory offenses charged in the indictments; (4) the overt acts charged by the government or any other description of the offenses charged which indicates the nature and scope of the activity which the government sought to punish in each case; and (5) places where the events alleged as part of the conspiracy took place." United States v. Sinito, 723 F.2d 1250, 1256 (6th Cir. 1983); accord, United States v. Meda, 812 F.3d 502 (6th Cir. 2015). "These factors assist in answering the ultimate question: 'whether the evidence shows one agreement or more than one agreement.'" United States v. Kennedy, 743 F. App'x 649, 653 (6th Cir. 2018) (quoting, In re Grand Jury Proceedings, 797 F.2d 1377, 1380 (6th Cir. 1986)). "Where several of these factors differ between the conspiracies, the conclusion follows that the alleged illegal conspiracies are separate and distinct offenses." Sinito, 723 F.2d at 1256. Because all but one of the relevant factors are different between case Counts Two and Twenty-Eight, the Court finds no double jeopardy bar.

### 1. Time

The time frame is entirely different. Count Two alleges a three-year drug conspiracy lasting from March 2015 to the return of the Third Superseding Indictment on June 28, 2018. Count

Twenty-Eight alleges a 16-day conspiracy that began on January 1, 2016 and ended on January 16, 2018.

### 2. Co-conspirators

The conspirators are different. Leaving aside individuals "known and unknown" to the Grand Jury, Count Two involves 13 members and associates of the Mongols Motorcycle Club, whereas County Twenty-Eight involves only 3 member or associates of the Mongols. That the three Defendants alleged to be involved in the Count Twenty-Eight conspiracy are also alleged to be involved in the Count Two conspiracy does not require finding a double jeopardy violation because Sinito "hold[s] that two distinct conspiracies can be found 'even though they may involve some of the same participants.'" United States v. Goff, 400 F. App'x 1, 9 (6th Cir. 2010) (quoting Sinito, 723 F.2d at 1257).

### 3. Statutory Offenses

The statutory offense are the same, *i.e.* violations of 21 U.S.C. § 846. Hence, this factor favors Frazier.

### 4. Nature and Scope of Activity

The language of the Third Superseding Indictment itself suggest that the nature and the scope of activity as between the two counts is different. Count Two involves a wide-ranging conspiracy to distribute methamphetamine involving more than a dozen named individuals that lasted more than three years.[8] In contrast, Count Twenty-Eight was a small conspiracy to distribute oxymorphone by a trio of named individuals over a course of little more than two weeks. Furthermore, the

---

[8] Indeed, several of the substantive counts arise from one or more Defendant's involvement in that drug conspiracy, such as Counts Four and Five that allege Aldridge distributed five grams or more of methamphetamine on two occasions in March 2015, and Counts Twelve and Thirteen that allege Frazier, Aldridge, and Forrester carried a firearm in June 2015 during and in relation to trafficking methamphetamine.

Government represents that the evidence "adduced at trial will be materially different." (Doc. No. 946 at 3). Specifically,

> the government anticipates offering evidence to show that the sources of supply for the two conspiracies differed, as did the drug-seeking clientele between two conspiracies. Moreover, following a shooting at Bojangles restaurant that involved the conspirators attempting to purchase a large quantity of Oxymorphone from a new source of supply, Frazier and others were arrested. Afterwards, the Oxymorphone conspiracy ended. However, Frazier and the other co-conspirators referenced in Count Two continued trafficking in multi-kilogram quantities of methamphetamine, obtained from their California source of supply, in furtherance of the gang's enterprise, even holding gang meetings wherein the trafficking of methamphetamine was discussed.

(Id. at 4).

### 5. *Places Where Events Took Place*

Frazier argues that "both counts allege the location is in the Middle District of Tennessee" and therefore this factor favors his claim of double jeopardy. Frazier is correct, but only to a point. Both Counts Two and Twenty-Eight not only allege that the event occurred in this district, but also "elsewhere." According to the Government, the

> evidence will show the large-scale methamphetamine-trafficking conspiracy alleged in Count Two had far-reaching consequences outside the state of Tennessee, including in Kentucky and California, and it involved a single, continuous and reliable source of supply, located in California, for highly pure methamphetamine. However, the pill conspiracy alleged in Count Twenty-Eight was in its infancy stages, did not involve a single, continuous and reliable source of supply for pills, and was limited in scope to Tennessee.

((Doc. No. 846 at 9). If established at trial, this evidence indicates that the places where the events took place was different.

In summary, the record presently before the Court suggests that Counts Two and Twenty-Eight involved different agreements, different parties, different time periods, different conduct, and different controlled substances, with the only connection between the two being that three

individuals participated in both conspiracies, and both conspiracies violated the federal drug laws. This is not a "single agreement to commit several crimes," but rather "multiple agreements to commit separate crimes," United States v. Broce, 488 U.S. 563, 570–71 (1989). Prosecution of both Counts Two and Twenty-Eight does not violate the double jeopardy clause.

### B. Counts Nine Ten, and Eleven

Counts Nine, Ten, and Eleven, all involve the use of a firearm in relation to the kidnapping and murder of S.B. on May 22, 2015. Specifically, Count Nine charges that, in violation 18 U.S.C. § 924(c)(1)(A) and 2, Frazier, Aldridge, and Jacob Ort

> did knowingly use, carry, brandish, and discharge a firearm, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, Kidnapping of Victim S.B. and Victim B.C., as charged in Count Six of this Indictment, Kidnapping in Aid of Racketeering of Victim S.B. and Victim B.C., as charged in Count Seven of this Indictment, and the Murder in Aid of Racketeering of Victim S.B., as charged in Count Eight of this Indictment.

(Doc. No. 845, Third Superseding Indictment at 29-30).

Count Ten charges that those same individuals, in violation of 18 U.S.C §924(j)(1) and 2,

> did knowingly use, carry, brandish, and discharge a firearm, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, Kidnapping of Victim S.B., as charged in Count Six of this Indictment, Kidnapping in Aid of Racketeering of Victim S.B., as charged in Count Seven of this Indictment, and the Murder in Aid of Racketeering of Victim S.B., as charged in Count Eight of this indictment, and in the course of those crimes did cause the death of a person, Victim S.B., through the use of a firearm, the killing of whom was murder as defined in Title 18 United States Code, Section 1111.

(Id. at 30). Finally, Count Eleven charges that, in violation of 18 U.S.C. § 924(c)(1)(A), 924(j) and 2, the same Defendants

> did knowingly use, carry, brandish, and discharge a firearm, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, that is, Conspiracy to Distribute and Possess with Intent to Distribute Fifty (50) Grams or More of Methamphetamine, a Schedule II controlled substance, as

24

charged in Count Two of this Indictment, and in the course of such violations did cause the death of a person, Victim S.B. through the use of a firearm, the killing of whom was murder as defined in Title 18 United States Code, Section 1111.

(Id. at 30-31). Frazier argues that "violation of separate federal statues cannot support multiple § 924 charges on the sole basis of one simultaneous firearm use," and relies on United States v. Vichitvongsa, 819 F.3d 266 (6th 2016) for his position.

Though not characterized as such, Frazier present a multiplicity argument, *i.e.* the impropriety of "charging a single offense in more than one count in an indictment." United States v. Swafford, 512 F.3d 833, 844 (6th Cir. 2008). "Multiplicity may result in a defendant being punished twice for the same crime, United States v. Brandon, 17 F.3d 409 (1st Cir.1994), or may unfairly suggest that more than one crime has been committed. United States v. Dixon, 921 F.2d 194 (8th Cir.1990)." Id.

Vichitvongsa involved multiplicity and "the important issue regarding the application of 18 U.S.C. § 924(c)(1)'s criminalization of the use, carry, or possession of a firearm during the commission of two simultaneous conspiracies." 819 F.3d at 268. Recently, the Sixth Circuit summarized its decision in Vichitvongsa, writing:

> In Vichitvongsa, we considered "whether a defendant can be convicted of violating § 924(c) twice on the sole basis of using the same firearm one time to simultaneously further two different conspiracies." The convictions in Vichitvongsa stemmed from two separate armed robberies of drug dealers. For each robbery, the defendant was convicted of one count of conspiracy to commit Hobbs Act robbery, one count of conspiracy to traffic drugs, and two violations of § 924(c). The defendant was thus convicted of four § 924(c) convictions.
>
> *                    *                    *
>
> The Vichitvongsa court acknowledged . . . that "924(c)'s unit of prosecution is the underlying offense, not the number of firearms." The court explained, however, that . . . courts are required to "look not to the number of firearms, but rather to the facts and circumstances driving the underlying offense." The court therefore clarified that,

"courts must look both at the offense upon which a § 924(c) charge rests and § 924(c)'s express language linking a firearm to the predicate offense—the defendant's use, carry, or possession." So, in "order for the government to convict a defendant of more than one § 924(c) charge, the defendant must use, carry, or possess a firearm ... more than once."

The Vichitvongsa court "emphasize[d] the narrowness" of its decision, noting that it did "not hold that multiple crimes with one firearm occurring during 'the same criminal episode' may support only one § 924(c) charge." "Whether a criminal episode contains more than one unique and independent use, carry, or possession depends at least in part on whether the defendant made more than one choice to use, carry, or possess a firearm." Finding that Vichitvongsa only made one choice to use, carry, or possess a firearm for each robbery, the court vacated two of Vichitvongsa's § 924(c) convictions.

United States v. Jackson, 918 F.3d 467, 490 (6th Cir. 2019) (internal citations omitted).

The facts in this case are quite different. "Vichitvongsa took one affirmative firearm act (brandishing a handgun) while simultaneously committing two predicate offenses (conspiring to commit Hobbs Act robbery and to traffic drugs), and this does not support two § 924(c) convictions." Vichitvongsa, 819 F.3d at 267. Here, Frazier (along with others) is alleged to have (1) used a firearm during a crime of violence – the kidnapping of S.B. *and* B.C. (Count Nine); (2) used a firearm in relation to the kidnapping and murder of S.B. (Count Ten); and (3) used a firearm in relationship to a drug trafficking crime (Count Eleven). Furthermore, the Government asserts the evidence will show that "defendants used the firearms to kidnap Victim S.B. from her residence; to kidnap B.C. from a different location; and to murder Victim S.B. at a third location." (Doc. No. 946 at 13).

Vichitvongsa aside, whether an indictment is defective on the grounds of multiplicity is determined by whether each count requires proof of a fact that the other does not. Swofford, 812 F.3d at 844; see also, Blockburger v. United States, 284 U.S. 299, 304 (1932); United States v. Myers, 854 F.3d 341, 355 (6th Cir. 2017). That test is met here because Count Nine adds B.C. as

a victim; Count Ten requires that the firearm was used to cause death and only relates to the kidnapping and murder of S.B.; and Count Eleven requires use of a firearm in relation to a drug trafficking crime.

Regardless, even if Count Nine, Ten and Eleven are multiplicitous, pretrial dismissal of one or more of those counts is not required. This is because "[t]he Supreme Court has instructed that the proper remedy for multiplicitous counts may include allowing the jury to consider all counts that are reasonably supported by the evidence and addressing any multiple-punishment issues at sentencing by merging overlapping convictions." <u>United States v. McCafferty</u>, 482 F. App'x 117, 126 (6th Cir. 2012) (citing <u>Ball v. United States</u>, 470 U.S. 856, 864–65 (1985)). Frazier's Motion to Dismiss Counts Nine, Ten, Eleven, and Twenty-Eight (Doc. No. 888) is **DENIED WITHOUT PREJUDICE**.

## XIII.  <u>Motions to Sever and *Bruton*</u>

Frazier seeks a separate trial on Counts Six through Eleven. Meyerholz, Santiago, and Boylston each moves to sever the charges against them from that of their co-Defendants. Those Motions will be considered in turn after a discussion of the standards governing joinder and severance of charges and defendants.

### A.  Standards Governing Joinder and Severance

Rule 8(a) of the Federal Rules of Criminal Procedure governs whether multiple offenses may be joined:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 8(a). "[T]he spirit of Rule 8(a) ... is to 'promote the goals of trial convenience and

judicial efficiency,' " United States v. Tran, 433 F.3d 472, 478 (6th Cir.2006) (citation omitted), and the Sixth Circuit "construes Rule 8(a) in favor of joinder and evaluates whether joinder was appropriate based upon the four corners of the indictment." United States v. James, 496 F. App'x 541, 546 (6th Cir.2012).

> Rule 8(b) governs the joinder of multiple defendants in one indictment by providing: The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b). As with Rule 8(a), joinder under Rule 8(b) is "encouraged rather than discouraged" because it helps to "promot[e] efficiency and avoid[ ] the potential for inconsistent verdicts." United States v. Cope, 312 F.3d 757, 779 (6th Cir. 2002).

"If the requirements of Rule 8 are not met, 'the district court has no discretion on the question of severance.'" United States v. Cody, 498 F.3d 582, 586 (6th Cir. 2007). However, even if the joinder of offenses is proper, a severance may still be ordered under Rule 14 that provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). Whether to grant a severance lies in the sound discretion of the Court, and abuse occurs only where there is a "strong showing of prejudice," that is, "that joinder would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence." Than, 433 F.3d at 478.

## B. Motion To Sever Counts

The Third Superseding Indictment alleges crimes relating to the separate murders of S.B. (in

which Frazier is charged), and the murder of Stephen Cole (in which he is not). Counts Six through Eleven relate to the murder of S.B.; Counts Fifty-Six through Fifty-Nine allege crimes relating to Cole's murder.

The facts underlying the two murders are fleshed-out in the overt acts section of the RICO conspiracy charge. According to those allegations, the events surrounding the murder of S.B. primarily involved Frazier, Aldridge and Ort. More specifically, on May 21, 2015, those Defendants went to a residence in Clarksville, Tennessee where they held S.B. and J.E.C. hostage while they interrogated S.B. at gunpoint about stolen narcotics, firearms, and money.[9] They also extorted S.B. by taking her Dodge Durango through force and intimidation. The next day, Frazier, Aldridge and Ort kidnapped S.B. and B.C. at gunpoint, and took them to the Kingins-Brandon Cemetery in Bumpus Mills, Tennessee, where S.B was shot at least eight times and killed. (Doc. No.485, Third Superseding Indictment at 11-12).

The allegations surrounding the kidnapping and murder of Cole involve Boylston, Meyerholz, Nelper, and Christopher Wilson. Specifically, Boylston, Meyerholz and Wilson are alleged to have held R.J., C.J., and others hostage at gunpoint at a residence in Clarksville on November 19, 2017, while Cole was kidnapped and stripped of his personnel possessions. Cole was then taken across state lines to Nelper's residence in Trenton, Kentucky where he was killed. After the murder, Nelper, Boylston and Meyerholz disposed of the body, and destroyed evidence by burning it in a fire pit at Nelper's residence. (Id. at 21-22)

Frazier seeks to sever the counts relating to S.B.'s murder and have them tried separately. In other words, he is okay with a murder charge being tried in this case, so long as it is not the

---

[9] It is also alleged that S.B. was interrogated about the stolen items the day before by Frazier and Ort.

murder for which he is charged.

Frazier argues that the two murders "are not connected or related . . . by time, place, victims, allegations, motive, year, or any other fact or specific allegation." (Doc. No. 887 at 5). Indeed, the supposed unrelatedness of the killings is a theme that pervades both his motion and reply brief.

It is true that the alleged murders were separated by 2½ years, and involved different defendants, different victims and different locales. But Frazier ignores the unifying allegations underlying the RICO conspiracy charge.

Frazier is alleged to be a Mongol, as was Cole. That organization is alleged to be a criminal enterprise whose purposes include "[e]nriching the leaders, members, associates, and prospects of the Mongols Motorcycle Gang through, among other things, illegal trafficking of narcotics, including Methamphetamine and Oxymorphone, in territory controlled by the Mongols Motorcycle Gang"; "[m]aintaining the control and authority of the Mongols Motorcycle Gang over the territory claimed by the gang"; and "[p]reserving, protecting, and expanding the power of the Mongols Motorcycle Gang through the use of intimidation, violence, threats of violence, assault, kidnapping, and murder." (Doc. No. 485, Third Superseding Indictment at 6). The methods and means used to achieve those purposes allegedly included "commit[ting], attempt[ing] to commit, and threaten[ing] to commit acts of violence to protect and expand the enterprise's criminal operation, which includes murder, assaults, intimidation, robbery, extortion, witness tampering, money laundering, drug trafficking, and threats of violence directed against rival gang members, law enforcement, and potential witnesses to the crimes of the enterprise"; "promot[ing] a climate of fear through intimidation, violence, and threats of violence intended to promote the authority of the Clarksville Mongols Enterprise and insulate its members from liability for drug-trafficking and violent crimes

committed on behalf of the organization"; and "engag[ing] in the interstate and intrastate trafficking of controlled substances as a means to generate income for themselves and the organization." (Id. at p. 7). Cole was allegedly killed because of his drug use and his theft of motorcycles from a fellow gang member. S.B. was killed allegedly because she was suspected of stealing drugs from the gang. In this sense, the murders are related – both victims were allegedly killed to protect or promote the authority of the Mongols criminal enterprise.

Notwithstanding that he is charged in 29 of the 75 counts in the Third Superseding Indictment, Frazier claims that he would be unduly prejudiced if the murder charges against him were tried with the "overarching Mongol Conspiracy" and the other murder charges. (Doc. No. 887 at 7). After all, "[m]urder is different and prejudice must be presumed when the government proposes to try two unrelated murders simultaneously." (Id.).

For purposes of joinder and severance, "there is no test or exclusive list of putative prejudices[.]" United States v. Martinez, 432 F. App'x 526, 529 (6th Cir. 2011). The Supreme Court has explained:

> We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.
>
> When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. . . . Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. . . . Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. . . . The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations

not discussed here. When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.

Zafiro v. United States, 506 U.S. 534, 538-39 (1993).

Here, the Court is at a loss to understand why an individual charged with some of the most serious offenses in a conspiracy case is entitled to severance because the same type of serious crimes are charged against other defendants. Frazier submits that prejudicial spillover will occur "from proof of the unrelated non-murder crimes, result[ing] in a jury that is hearing an enormous amount of evidence that has nothing whatsoever to [do] with [S.B.'s] death. That enormous amount of irrelevant evidence is highly prejudicial to Frazier in his murder defense, and should be enough, but any question about prejudice disappears when a second unrelated murder is being tried simultaneously in the same courtroom." (Doc. No. 887 at 8).

Contrary to Frazier's suggestion, it is not uncommon for RICO conspiracy cases to involve more than one murder charge. See e.g., United States v. Alvarado-Linares, 698 F. App'x 969, 971-2 (11th Cir. 2017) (RICO case against members of MS-13 involving at least three murders); United States v. Granton, 704 F. App'x 1, 3 (2d Cir. 2017) (RICO case against member of the Cash Money Brothers gang involving "several murders"); United States v. Shryock, 342 F.3d 948, 962-69 (9th Cir. 2003) (RICO case against members of the Mexican Mafia involving five murders); United States v. Miller, 116 F.3d 641, 652 (2d Cir. 1997) (RICO conspiracy case against members of the "Supreme Team" gang and eight murders). Nor is it uncommon, given the nature of a RICO conspiracy, that a host of other serious and not so serious crimes will be charged in the same indictment because "Congress intended for RICO to apply to individuals who, through involvement in an enterprise, commit any combination of the many and diverse predicate acts, whether the usual

organized crime-type offenses (e.g., bribery, extortion, gambling), more violent crimes (e.g., murder, kidnapping), or more niche crimes (e.g., counterfeiting music or trafficking in illicit prescription drugs)." United States v. Bergrin, 650 F.3d 257, 270–71 (3d Cir. 2011). Indeed, "[a] criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities." United States v. Masters, 924 F.2d 1362, 1367 (7th Cir. 1991).

Frazier also argues that, had the Government continued to pursue the death penalty, "this Court would have automatically severed the murder counts" and "the same severance should be granted here where . . . life in prison is the penalty for the SB murder." (Doc. No. 887 at 8). No doubt there would have been a severance, but it is likely that all of the charges as to Frazier would have been severed, not just those relating to murder.[10] This would not have been because of prejudice, but because a death penalty case involves picking a death eligible jury.

Finally, in his reply brief, Frazier notes that this Court recently granted a new trial to Burks in the Darden case relating to Malcolm Wright's murder. Frazier claims that "Darden indicates the unreliability and inefficiency of trying multiple murders, even in a case, like Darden, where the glue that binds the murders is stronger." (Doc. No. 985 at 4). Darden indicates no such thing.

The vacation of Burks' convictions on the murder charges had absolutely nothing to do with a joint trial involving several murder counts. Rather it had to do with unreliable witnesses that presumably would be just as unreliable in a separate trial. Further, severing the S. B. counts here would hardly promote efficiency because Frazier himself claims that "[s]hould the Court grant the severance and excise [the S.B.] counts for a second trial, the second trial should take less than eight days," but "[b]y excising these counts . . . the Court will reduce the time of the first trial by at least

---

[10] This is what happened to Brandon Hardison, the sole defendant facing the death penalty in Darden.

four days." (Id. at 5).  This would net one additional trial week to an already taxed criminal trial docket.

Frazier's Motion to Sever Counts for Trial (Doc. No. 887) is **DENIED**.

**B. Motions to Sever Defendants**

Underlying the Motions to Sever filed by Meyerholz, Santiago, and Boylston is the argument that the Bruton rule and their Sixth Amendment confrontation rights may be violated should the Government introduce the confession of a non-testifying co-defendant at trial.  This can be a legitimate concern but it has practical implications as well.  As the Supreme Court has observed:

> Confessions by one or more of the defendants are commonplace – and indeed the probability of confession increases with the number of participants, since each has reduced assurance that he will be protected by his own silence.  It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand.  Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability – advantages which sometimes operate to the defendant's benefit.  Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.  The other way of assuring compliance with an expansive Bruton rule would be to forgo use of codefendant confessions.  That price also is too high, since confessions "are more than merely 'desirable'; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law."

Richardson v. Marsh, 481 U.S. 200, 209–10 (1987).

 Bruton v. United States, 391 U.S. 123, 136-37 (1968) holds that the Confrontation Clause of the Sixth Amendment is violated by the introduction of an incriminating out-of-court statement by a non-testifying co-defendant, even if the court gives a limiting instruction that the jury may consider the statement only against the co-defendant. While Bruton involved a joint trial, the rule

derived therefrom also applies where the declarant is unavailable at trial and has not previously been subjected to cross-examination about the statement. <u>Crawford v. Washington</u>, 541 U.S. 36, 54 (2004).

<u>Bruton</u>, however, does not preclude the admission of a co-defendant's statement at a joint trial. The statement can be "redacted to eliminate not only the defendant's name, but any reference to his or her existence." <u>Gray v. Maryland</u>, 523 U.S. 185, 181 (1987). This may be done "by replacing the co-defendant's name with a neutral pronoun or other generalized phrase." <u>United States v. Winston</u>, 55 F. App'x 289, 294 (6th Cir. 2003) (collecting cases). "Such redaction is particularly effective . . . where the government alleges 'a multifaceted conspiracy in which several individuals engaged in activities.'" <u>United States v. Al-Din</u>, 631 F. App'x 313, 321 (6th Cir. 2015) (quoting <u>United States v. Vasilakos</u>, 508 F.3d 401, 408 (2007). Properly redacted and accompanied by a limiting instruction, a confession does not violate <u>Bruton</u> "'even if the codefendant's confession becomes incriminating when linked with other evidence adduced at trial.'" <u>United States v. Ford</u>, 761 F.3d 641, 654 (6th Cir. 2014) (quoting <u>United States v. Cobleigh</u>, 75 F.3d 242, 248 (6th Cir. 1996)).

In response to Defendants' motions, the Government states that, to the extent it "intends to offer at trial (1) a testimonial statement (2) of a non-testifying co-defendant, (3) that facially incriminates a particular defendant (or particular defendants) the government will comply with <u>Bruton</u> by making redactions to these statements as appropriate." (Doc. No. 947 at 4). Whether this can be accomplished remains to be seen, and, by opposing severance, the Government runs the risk that the Court will find the redactions insufficient and not allow the statements into evidence. <u>See</u>, <u>Stanford v. Parker</u>, 266 F.3d 442, 456 (6th Cir. 2001) ("[W]here a <u>Bruton</u> situation exists, the court

may protect the non-confessing defendant's Sixth Amendment rights by 1) exclusion of the confession, 2) severance of the trial, or 3) redaction of the confession to avoid mention or obvious implication of the non-confessing defendant."); United States v. Logan, 187 F.3d 639 (6th Cir. 1999) (same). Accordingly, prior to *any* use of a statement at trial that implicates Bruton, the Government shall share its redactions with Defendants and present the redacted statement to the Court so that the Court can rule on the statement's admissibility. See United States v. RW Prof'l Leasing Servs. Corp., 317 F. Supp. 2d 167, 177 (E.D.N.Y. 2004) ("Given the absence of a proposed redacted statement, the Court is unable to determine whether, on its face, the redacted statement sufficiently complies with the standards set forth in Bruton [and thus] defendants' motion to suppress [a co-defendant's] statement on the ground that its admission would allegedly violate the Bruton rule is denied without prejudice and with leave to renew.").

Prior to leaving the arguments relating to Bruton, the Court notes that Santiago seeks to exclude jail telephone calls inculpating him, while Boylston seeks to strike Overt Act 12 from the Third Superseding Indictment, wherein Santiago allegedly identified himself as a Mongol and stated the Mongols are "a multi-million dollar corporation that owns Tennessee." Both take the position that the statements are barred by Bruton. They are not.

Bruton addressed testimonial evidence that, "[b]y definition," is made with an "awareness or expectation that [the] statements may later be used at a trial." United States v. Mooneyham, 473 F.3d 280, 286 (6th Cir. 2007); see also, Crawford, 541 U.S. 51 ( "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Statements made in furtherance of a conspiracy are not testimonial in nature, United States v. Sutton, 387 F. App'x 595, 602 (6th Cir. 2010), nor are casual

jail conversations between friends, families and associates, even when the participants know they are being recorded, United States v. LeBeau, 867 F.3d 960, 980 (8th Cir. 2017) (collecting cases). Santiago's alleged statement may have been testimonial, or he may simply have been a braggart. Either way, other evidence would be needed to link Boylston to the Mongols and the Mongols to the criminal organization it is alleged to be.

The general arguments relating to Bruton aside, Boylston, Santiago and Meyerholz assert that a joint trial would result in prejudicial spillover. After acknowledging that he is charged in the RICO conspiracy count and with the kidnapping and murder of Cole, Boylston asserts that the proof "as to each of the violent acts is tenuous at best," writing:

> The government lacks any physical evidence to corroborate the dubious criminals and drug addicts that it intends to parade before the jury. Neither Defendant Boylston's DNA nor fingerprints were recovered at the alleged crime scenes relating to the kidnapping or the murder or at the body disposal site. Moreover, cell cite location data for Defendant Boylston's phone does not place him at any crime scene during the relevant times. Finally, Defendant Boylston has made no admissions or statements regarding the kidnapping and murder of Cole. Therefore, the spill-over effect to Defendant Boylston could easily result in an emotionally based verdict - not one based upon the actual admissible evidence against him.

(Doc. No. 840 at 9) (footnote omitted).

Santiago, too, acknowledges that he is charged in the RICO conspiracy count but points out that "[e]xcept for the kidnapping charge, [he] is not charged in the violent acts alleged of murders, attempted murders, robberies, and assaults." (Doc. No. 878 at 7). Like Boylston, Santiago also submits that "the spillover-effect . . . could easily result in an emotionally based verdict – not one based upon the actual admissible evidence against him." (Id.).

Meyerholz argues that, with the exception of two unlawful firearm possession counts, "all of the allegations in the indictment . . . relate to the kidnapping and murder of Stephen Cole, and,

as to those:

> He is alleged to have committed these offenses with William Boylston, Christopher Wilson and William Nelper. However, based on the government's discovery, no independent, unbiased eyewitness has identified Mr. Meyerholz as participating in these offenses; in sharp contrast, independent, unbiased witnesses have identified Mr. Boylston and Mr. Wilson. Furthermore, the government's discovery contains a substantial amount of evidence of "Cole's association with Nelper and Boylston," but none of any association between Mr. Cole and Mr. Meyerholz. The discovery also contains evidence that Cole owed both Boylston and Wilson money, which the government will no doubt argue gave them a strong motive to participate in Cole's kidnapping and murder.

(Doc. No. 893 at 4).

The Court does not know the universe of evidence the Government intends to introduce at trial, but Defendants' own characterization of the evidence is contradictory. Boylston argues the evidence connecting him to the Cole murder and kidnapping is "tenuous," while Meyerholz claims that "independent, unbiased witnesses" can testify as to Boylston's involvement. Regardless, the "spillover of evidence between counts does not require severance unless there is 'substantial,' 'undue,' or 'compelling' prejudice." Thomas v. United States, 849 F.3d 669, 676 (6th Cir. 2017) (quoting United States v. Fields, 763 F.3d 443, 457 (6th Cir. 2014). Moreover, "[e]ven where the risk of prejudice is high, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" United States v. Driver, 535 F.3d 424, 427 (6th Cir. 2008) (citation omitted).

It may be that the evidence against Boylston is slim, but that is for the jury to weigh, and "a defendant is not entitled to severance because the proof is greater against a co-defendant." United States v. Gardiner, 463 F.3d 445, 473 (6th Cir. 2006). It may also be that Meyerholz's alleged involvement in the RICO conspiracy is less than others because he did not move to Tennessee until 2017, but "'[w]hether he was a big fish or a little fish is not of great consequence in a conspiracy

unless the person didn't fully participate.'" United States v. Caper, 571 F. App'x 456, 461 (6th Cir. 2014) (citation omitted). And, while Santiago is not charged with a murder in this case, the same is true of many of his co-Defendants. Severance is not mandated merely because a defendant is not charged in connection with a murder where the murder was an overt act done in order to support the overall conspiracy. United States v. Reyes, 51 F. App'x 488 (6th Cir. 2002).

Finally, Meyerholz argues "there is a strong possibility that [his] defense will be antagonistic to one or more of his co-defendants." (Doc. No. 893 at 5). However, "in order to prevail on a motion to sever, a defendant must show that the antagonism will mislead or confuse the jury. . . . The defendant carries the heavy burden of making a strong showing of prejudice." United States v. Weiner, 988 F.3d 629, 634 (6th Cir. 1993). In other words, "[t]he burden is on defendants to show that an antagonistic defense would present a conflict 'so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" United States v. Gardiner, 463 F.3d 445, 473 (6th Cir. 2006); (quoting United States v. Warner, 971 F.2d 1189, 1196 (6th Cir. 1992)). Meyerholz does not come close to carrying that burden given his as yet unexplained "antagonistic defense."

According, the Motions to Sever filed by Boylston (Doc. No. 840), Santiago (Doc. No. 867), and Meyerholz (Doc. No. 893) are **DENIED**.

## XV. <u>Motions to Disclose Co-Conspirator Statements</u>

On the issue of co-conspirator statements, Frazier request that the Government disclose the statements it intends to use at trial by January 6, 2020, so as to "level the playing field a bit" in this "complex case." (Doc. No. 848 at 1). Santiago request that such disclosures be made before September 9, 2019, because the Court has set aside that week "for hearings on the parties' pretrial

motions" and "[t]he Court (and Mr. Santiago) need production of co-conspirators' statements the Government intends to use at trial to analysis [sic] the legal arguments underpinning the motion to exclude or to sever."  (Doc. No. 866 at 1).

The Court set aside a week for hearings on motions that truly needed a hearing, not all motions that were filed.  To decide the motions to sever, it was unnecessary for the Court to have the exact language of the statements before it, or know the identity of the speakers.  Rather it was sufficient to know that statements had been made by co-conspirators, some of which inculpated others.

As for leveling the playing filed, the Government has already agreed to provide Jencks Act material and its witness list on March 10, 2020, almost a month before the trial begins.  It need not be required to do any more.  See, United States v. Presser, 844 F.2d 1275, 1285 (6th Cir. 1988) ("Rule 16 expressly exempts impeachment material subject to the Jencks Act from disclosure under its provisions" and "does not require discovery of a co-conspirator's statement.").  The Motions to Disclose Co-Conspirator Statements  (Doc. Nos. 866 & 890) filed by Frazier and Santiago are **DENIED.**

## XVI.  Other Discovery Motions

"[I]n most criminal prosecutions, the Brady rule, Rule 16 and the Jencks Act, exhaust the . . . discovery to which the defendant is entitled."  Presser, 844 F.2d at 1286 n. 12.  In this case, the Government is already obliged to provide its witness list and Jencks Act material by March 10.  The Government also recognizes its responsibilities under Brady and Giglio and the perils of failing to comply with those obligation.  Further, the Government acknowledges that, because it "has already agreed to provide Jencks materials on March 10, 2020, any materials subject to Brady/Giglio and

the Jencks Act would be subject to disclosure on that date." (Doc. No . 936 at 7); see, United States v. Bencs, 28 F.3d 555, 561 (6th Cir. 1994) ("When Brady material sought by a defendant is covered by the Jencks Act, 18 U.S.C. § 3500, the terms of that Act govern the timing of the government's disclosure."). In light of all of this, it appears that only one matter raised in the remaining discovery motions requires discussion.

Aldridge requests an order "requiring the Government to disclose to the defense ninety (90) days prior to trial all Grand Jury testimony in this case." (Doc. No. 869 at 1). In response, the Government states that it "will provide relevant grand jury material for any testifying witnesses when it discloses Jencks material on March 10, 2020." (Doc. No. 946 at 8).

"It has long been recognized that grand juries require a generous zone of secrecy in order to perform their investigative functions." United States v. Rutherford, 509 F.3d 791, 795 (6th Cir. 2007). Indeed, since 1946 the secrecy of grand jury proceedings has been governed by Rule 6(e) which provide that grand jury transcripts and subpoenaed documents shall remain secret unless the court authorizes disclosure. "The scope of that authority has been delineated in a series of cases setting forth the standard of 'particularized need.'" Illinois v. Abbott & Assocs., Inc., 460 U.S. 557, 567 (1983). Simply put, "[p]arties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 221 (1979).

Aldridge does not come close to shouldering the "heavy burden of showing particularized need." FDIC v. Ernst & Whinney, 921 F.2d 83, 87 (6th Cir. 1990). "For cause," he simply writes:

> [T]his case involves the charge of a RICO conspiracy involving approximately twenty (20) members of the Mogul Motorcycle Club. The conspiracy spans several years and an unknown number of critical witnesses, including unindicted co-conspirators and persons affiliated with the Mogul Motorcycle Club and knowledgeable as to its activities, testified before the Grand Jury. At least three (3), and perhaps more, individuals testified before the Grand Jury in a manner very incriminating as to the Defendant. The trial in this case will take several months. The amount of discovery is massive and the Defendant will be severely prejudiced without early disclosure of the Grand Jury testimony of witnesses (and it is assumed that the Government has disclosed any Brady information revealed in Grand Jury testimony).

(Doc. No. 869 at 1). Even though he recognizes that the "mere possibility" of finding impeachment evidence is not enough, Aldridge argues that he "faces the possibility of a life sentence or possibly a death sentence. Therefore, preparation for trial on the substantive issues of guilt or innocence, or for penalty phase mitigation purposes, and not merely preparation to impeach a witnesses, is of heightened importance." (Id. at 2). This argument might have more purchase were Aldridge still facing the death penalty. However, in a Status Report filed July 11, 2019 (Doc. No. 838), the Government stated it was not seeking the death penalty against any of the Defendants. Moreover, even if the death penalty were still on the table, "[t]he veil of secrecy [surrounding the grand jury] should not be destroyed merely to allow for rummaging through the entire grand jury proceedings in search of snippets of mitigating testimony." United States v. Diaz, No. CR 05 00167 WHA, 2006 WL 1806161, at *2 (N.D. Cal. June 29, 2006).

What Aldridge is really left with is the argument that because this is a "complex case," he is entitled to all grand jury testimony. The "several distinct interests served by safeguarding the confidentiality of grand jury proceedings," Douglas Oil, 441 U.S. at 219, however, are no less important in the big case than the small. They may be even more important because of "the possible effect upon the functioning of future grand juries." Id. At bottom, Aldridge has not shown that his

need for disclosure is greater than the need for secrecy, nor has he attempted to limit his request for disclosure to only that which is truly necessary.  See In re Antitrust Grand Jury, 805 F.2d 155, 160-161 (6th Cir. 1986) ("A party requesting grand jury information must show the need 'with particularity' so that 'the secrecy of the proceedings [may] be lifted discreetly and limitedly.'").

The motions seeking further discovery filed by Frazier (Doc. Nos. 844 & 850), Aldridge (Doc. No. 869) and Santiago (Doc. No. 886) are **DENIED.**

### XVII.  Motions to Suppress – (A) 333 Yorkshire Circle; (B) 2930 Charlie Sleigh Road; & (C) Photo Identifications

In response to Meyerholz's motion to suppress evidence seized from 333 Yorkshire Circle on February 16, 2018, the Government has represented that it does not intend to offer any evidence seized from that search during its case-in-chief.  It also states that it will file a motion to dismiss Count Sixty-Two of the Indictment that charges Meyerholz with being unlawfully in possession of the firearm and ammunition that was found during the search.

Similarly, in response to separate motions to suppress filed by Meyerholz and Boylston related to the search of 2930 Charlie Sleigh Road on January 18, 2018, the Government has represented that it does not intend to introduce any evidence seized from that search during its case-in-chief and will move to dismiss Count Sixty alleging Meyerholz was unlawfully in possession of a firearm and ammunition based on their discovery during the search.[11]

Finally, in response to Boylston's motion to suppress photo identifications, the Government has indicated that it does not intend to elicit an in-court idenficiation of Boylson from R.J., a witness who was allegedly present when Cole was kidnapped, nor does it intend to introduce evidence of

---

[11]  True to its word, the Government filed a Motion to Dismiss Counts Sixty and Sixty-Two on August 20, 2019 (Doc. No. 955).

R.J.'s pretrial identification of Boylston as one of the perpetrators allegedly involved in the kidnapping. As a consequence, the Government submits that all three of these motions to suppress should be denied as moot.

In reply, Meyerholz and Boylston argue that the Court should grant their motions to suppress rather than deem them moot. They do so so even though "the government has confirmed it will not use evidence gathered from the search of 333 Yorkshire Circle [or 2930 Charlie Sleigh Road] during any aspect of the trial of this case," and even though they "are satisfied with the government's stipulation that it will not use the evidence at trial[.]" (Doc. Nos. 974 at 2 & 977 at 2).

The Court will not decide issues unnecessarily, even motions to suppress that are self-proclaimed to be "exceptionally well-founded." (Doc. Nos. 973 at 1; 974 at 1 & 977 at 1). Given the representations by counsel that the Government does not intend to introduce at trial any of the evidence found during the searches of 333 Yorkshire and 2930 Charlie Sleigh Road, the Motions to Suppress relating to those searches (Doc. Nos. 852, 891 & 892) are **DEEMED MOOT**.

The Motion to Suppress Photo Identifications is different because there is no representation by counsel that the Government does not intend to use that evidence at trial, only that it will not use the evidence during its case-in-chief. Further, Boylston asserts:

> To be clear, the defense will likely cross-examine Ronnie Johnson regarding his failure to identify Defendant Boylston three days after the alleged kidnapping. The exclusion of evidence resulting from a violation of a defendant's constitutional right forbids use by the government, but not the defense. The defense's use of Johnson's failure to identify will not negate a suppression order or "open the door" for the use of suppressed evidence.

(Doc. No. 973 at 1). Because it is possible that the Government could seek to introduce the photo identification during redirect examination of R.J. (assuming he is called as a witness), the Court **DEFERS** ruling on Boylston's Motion to Suppress Photo Identification (Doc. 843). The Court will

hold an evidentiary hearing on that Motion unless the Government files a notice in advance of the

hearing that it does not intend to use the photo identifications for any purpose at trial.

## XVIII.  Remaining Motions

By Order entered August 26, 2019, the Court set the following hearing schedule:

1. Thursday, September 12, 2019, beginning at 9:00 a.m.  Oral argument on Michael Forrester, Jr's Motion to Suppress Evidence from 129 Westfield Court, Room 231, and from the 2002 Gold Chevrolet Cavalier (Doc. No. 884) and Motion to Suppress Evidence Obtained from the Red Mazda B3000 Truck (Doc. No. 885).

2. Wednesday, September 11, 2019, at 1:30 p.m.  Evidentiary hearing and oral argument on James Wesley Frazier's Motion to Suppress evidence obtained from the seizure of two cell phones (Doc. No. 882).

3. Wednesday, September 11, 2019, beginning at 9:00 a.m. to noon.  Evidentiary hearing and oral argument on Aelix Santiago's Motion to Suppress Evidence seized from 1331 Meredith Way and statements made by Santiago (Doc. No. 883), which James Wesley Frazier has moved to join (Doc. No. 890).

4. Friday, September 13, 2019, beginning at 9:00 a.m.  No hearings, unless additional time is needed to complete an earlier hearing or to set selected other motions for oral argument, if needed.

(Doc No. 978 at 1-2).  That schedule is hereby **CONFIRMED**.  In addition, the Court will hold an

evidentiary hearing on Boylston's Motion to Suppress Photo Identifications (Doc. No. 843) on

Thursday, September 12, 2019, beginning at 2:00 p.m. unless, before then, the Government files a

notice indicating that it does not intend to introduce that evidence for any purpose at trial.

The Court believes that this Memorandum Opinion and Omnibus Order either resolves all

pending substantive Motions filed in accordance with the Amended Scheduling Order (Doc. No.

585), or sets them for hearing.  To the extent that is not the case, it should be brought to the

Court's attention by 5:00 p.m., Monday, **September 9, 2019**, so that any outstanding motions can

be addressed, or set for a hearing.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE