**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **3:17-cr-00130** |
| | ) | |
| **[1] JAMES WESLEY FRAZIER** | ) | |
| **[2] AELIX SANTIAGO** | ) | |
| **[3] KYLE HEADE** | ) | |
| **[8] MICHAEL FORRESTER, JR.** | ) | |
| **[10] JAMIE HERN** | ) | |
| **[15] DEREK LEIGHTON STANLEY** | ) | |
| **[17] WILLIAM BOYLSTON** | ) | |
| **[18] JASON MEYERHOLZ** | ) | |

## MEMORANDUM OPINION AND OMNIBUS ORDER II

Pending before the Court in this case set for a three month trial beginning April 6, 2020 are five Motions in Limine regarding six witnesses the Government has indicated it may call in its case-in-chief. Those Motions are:

(1) Joint Motion in Limine No. 1 filed by James Wesley Frazier, William Boylston and Jason Meyerholz to Exclude the Testimony of Darrin Kozlowkski and John Carr (Doc. No. 1166);

(2) The Joint Motion to Exclude Testimony of the Government's Gang Experts Filed by Defendants Aelix Santiago, Kyle Heade and Jamie Hern (Doc. No. 1212)

(3) Boylston's and Meyerholz's Joint Motion in Limine No. 2 to Exclude the Testimony of James Berni and Trial Exhibit 1953 (Doc. No. 1207);

(4) Boylston's and Meyerholz's Joint Motion in Limine No. 3 to Exclude the Testimony of Phillipe Esperança (Doc. No. 1168); and

(5) Frazier's Motion in Limine No. 2 to Exclude the Testimony of Will Evans and Lon Chaney (Doc. No. 1172).

All of the Motions have been briefed by the parties. After reviewing the general standards governing the introduction of expert testimony at trial, the Court considers each motion in turn.

First, however, a caveat. By definition, a ruling in limine is preliminary, <u>United States v.</u>

Yannott, 42 F.3d 999, 1007 (6th Cir. 1994), based on the record that is then before the court. After all, "[a] motion in limine is a request for guidance by the court regarding an evidentiary question." United States v. Luce, 713 F.2d 1236, 1239 (6th Cir. 1983). Consequently, limine rulings are subject to being revisited should the circumstances at trial warrant.

## I. **Rule 702 and *Daubert***

Rule 702 of the Federal Rule of Evidence 702 governs the admissibility of an expert witness' testimony at trial. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule "gives district courts a 'gatekeeping role' in screening the reliability of expert testimony," Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 668 (6th Cir. 2010), with the task being to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue," Daubert and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993).

"Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 528–29 (6th Cir. 2008). Those requirements are:

First, the witness must be qualified by "knowledge, skill, experience, training, or education." Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Third, the testimony must be reliable.

Id. (citation omitted). A court must exercise its role as a "gatekeeper" with "heightened care" when evaluating the relevance and reliability of proposed expert testimony. United States v. Cunningham, 679 F.3d 355, 379 (6th Cir. 2012)

To assist trial courts in their gatekeeping role, the Supreme Court in Daubert provided a list of matters that can be considered, such as "testing, peer review, error rates, and 'acceptability' in the relevant scientific community, some or all of which might prove helpful in determining the reliability of a particular scientific 'theory or technique.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (citing Daubert, 509 U.S. at 597). Because the test for reliability is flexible, however, these factors are not definitive and may or may not fit a particular case. In Kumho, the Supreme Court explained that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." 526 U.S. 137, 141–42 (1999). When evaluating the reliability of non-scientific expert testimony, for example, the district court may forgo the Daubert factors and focus on the reliability of the expert's personal knowledge or experience. Thomas v. City of Chattanooga, 398 F.3d 426, 431-32 (6th Cir. 2005). But even in this situation, the expert cannot ask a court simply to take his or her "word for it"; rather, he or she "'must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts.'" Id. at 432 (quoting Fed. R. Evid. 702 adv. comm. note).

**I. Joint Motion in Limine No. 1 filed by James Wesley Frazier, William Boylston and Jason Meyerholz to Exclude the Testimony of Darrin Kozlowski and John Carr (Doc. No. 1166) and The Joint Motion to Exclude Testimony of the Government's Gang Experts Filed by Defendants Aelix Santiago, Kyle Heade and Jamie Hern (Doc. No. 1212)[1]**

A number of Defendants seek to exclude the testimony of Darrin Kozlowski and John Carr, insofar as the Government intends for them to testify as "gang experts." They argue that "the testimony of Kozlowski and Carr will be a toxic combination of factual assertions without personal knowledge and bald legal conclusions." (Doc. No. 1166 at 13).

Both proposed experts have substantially the same background, and part of Defendants' concern is that this background does not specifically relate to the Clarksville chapter of the Mongols Motorcycle Club. Kozlowski's experience centers around Mongols Motorcycle Clubs located in California, Ohio, Colorado, Nevada, Washington, and Oregon. Similarly, Carr's experience relates to Mongols Clubs in California, Arizona, Geogia, Oklahoma, Colorado, and Nevada. Both were involved in the "Black Rain Investigation," which involved the infiltration of one or more Mongols Motorcycle Clubs, albeit not in Tennessee. Both have testified as experts about Mongols Motorcycle Clubs, although not in Tennessee. And both also have extensive experience relating to Outlaw Motorcycle Gangs ("OMGs") generally, even apart from their knowledge about the Mongols.[2]

Defendants also raise concerns that utilizing a law enforcement officer such as Kozlowski

---

[1] In addition to arguing the merits, the Government asserts that the motion filed by Santiago, Heade, and Hern is untimely because it was filed after the deadline for Daubert motions. This is a non-issue because both motions in limine raise the same substantive issues, and the ruling on the motion filed by Frazier, Boylston, and Meyerholz will necessarily apply to all eight defendants that are proceeding to trial.

[2] Even though Kozlowski and Carr are noticed as potential experts, in its response brief the Government asserts that, at this point in time, it only intends to call Kozlowski. Accordingly, the Government's focus and this Court's focus is on the proposed testimony of Kozlowski.

to testify as an expert will result in a violation of the Confrontation Clause of the Sixth Amendment because of his need to rely on hearsay in formulating his opinions. Defendants also assert that the Government has not established that the proposed expert's methodology or experience is reliable as required by Daubert, nor has it shown what *opinions* (as opposed to factual testimony) he intends to provide. In Defendants' view, the testimony any gang expert would provide is not relevant, will not assist the trier of fact, is not reliable, and would be misleading.

The concerns raised by Defendants are not uncommon in cases where a gang expert is called and, to an extent, can sometimes be legitimate. It does not follow that Kozlowski's expert testimony must be excluded, however.

In United States v. Rios, 830 F.3d 403 (6th Cir. 2016), the Sixth Circuit wrote extensively on the use of "gang expert" testimony. After discussing Rule 702, and Daubert and its progeny, the court observed:

> In cases involving law-enforcement experts . . . a district court, in performing its gatekeeping role, must assess whether, "without expert testimony, the average juror is unlikely to understand" the material about which the expert proposes to testify. See United States v. Thomas, 74 F.3d 676, 682 (6th Cir. 1996) . . . . Law-enforcement expertise is therefore relevant when it imparts "evidence regarding the inner-workings of organized crime[, which] has been held to be a proper subject of expert opinion because such matters are 'generally beyond the understanding of the average layman.'" United States v. Tocco, 200 F.3d 401, 419 (6th Cir. 2000) (quoting Thomas, 74 F.3d at 682). For example, an FBI Agent in a case about organized crime may properly give expert testimony "on the structure, the organization, [and] the rules" of the organized-crime entity. Id. at 418 (internal quotation marks omitted). Nor are we alone in condoning the use of such experts in prosecutions involving criminal organizations. See, e.g., United States v. Kamahele, 748 F.3d 984, 998 (10th Cir. 2014) (gang-expert testimony was helpful to the jury where expert would provide "expertise about [the gang's] structure, insignia and history," "[a]nd the district court could have assumed that a typical juror would lack knowledge of the gang terminology and the significance of [the] insignia").
>
> Given the variation in practices among different gangs, a gang expert's testimony on these relevant subjects is reliable only insofar as it is based on significant experience

with the gang about which the expert is testifying. <u>See, e.g.</u>, <u>United States v. Norwood</u>, 16 F. Supp. 3d 848, 861–62 (E.D. Mich. 2014) (noting that gang expertise "usually arises from the officer's significant experience investigating a particular gang" and concluding that a proffered expert would be unreliable because the expert had not been involved with the specific gang at issue, or even the geographic region).

<u>Rios</u>, 830 F.3d at 413-14.

Based on the Government's representations, it appears that much of what Kozlowski intends to testify to is precisely the type of evidence that calls for expert testimony. Specifically, the Government notes:

> Kozlowski will provide testimony regarding the nature and structure of the Mongols Motorcycle Gang, their terminology, rules, and modus operandi. More specifically, he will explain the interplay between various OMGs in the United States, describe the territories occupied by each, and what steps such gangs undertake to exert and maintain control of those territories. He will describe the history of the Mongols Motorcycle Gang and the various identifiers of the Mongols Motorcycle Gang and its members. He will provide an overview of the Mongols Motorcycle Gang's national membership and leadership structure, including the hierarchy and different chapters within the organization and the geographic locations claimed by the Mongols Motorcycle Gang, and discuss how the gang operates financially. Kozlowski will explain the division of responsibility among members of the Mongols Motorcycle Gang, including the positions of authority held by members of the gang and the duties associated with each rank. He will describe how a new Mongols Motorcycle Chapter gets "stood up" and how a person becomes a member or associate of the Mongols Motorcycle Gang. He will describe the membership rules, regulations, and other guidance or governing laws for the Mongols Motorcycle Gang, including the gang constitution, by-laws, prospect rules and regulations, and other organizational creeds. He will describe how members and/or associates' respective enterprise affiliation is displayed to others in ways such as the color of clothing, tattoos, accessories, associations with certain people, symbols, monikers, and modes of communication by gang members, including spoken and/or written language, slang, jargon, and codes used by the gang. Finally, he will testify to measures taken by the Mongols Motorcycle Gang to protect against infiltration by individuals working for or cooperating with law enforcement.

(Doc. No. 1243 at 3-4).

Kozlowski's resume suggests that he is well-versed to talk about OMGs from a big picture perspective, and more specifically, the Mongols Motorcycle Club. In addition to the general

descriptors referenced previously, he was a Special Agent with the ATF for almost 30 years and retired in 2017. He received training relating to OMGs in 1994, 1998, 2001, 2004, 2005, 2010, and 2014, and has been an instructor regarding OMGs in various states around the country, as well as around the world. His background includes personal law enforcement experience with gangs, having authored more than 50 affidavits for search warrants and participated in the execution of 500 search warrants during his almost three decade long career. He also infiltrated OMGs, including the Vagos, the Warlocks, and, most pertinently here, the Mongols.

The Court recognizes Kozlowski's experience has been primarily in the western United States, and that the Sixth Circuit in Rios cited Norwood for the proposition that a proffered gang expert might be "unreliable because the expert had not been involved with the specific gang at issue, or even the geographic region." Rios, 830 F.3d at 414. But Norwood involved an FBI agent who was proffered to testify about "gangs" in the most generic of ways (*i.e.* that it is a group of three or more individuals that identify as a group and use fear and intimidation as a tactic) in a case where there was a specific gang on trial – the "Howard Boys" of Flint, Michigan. Here, of course, Kozlowski's qualifications suggest that he has a tremendous amount of experience with OMGs in general, and the Mongols Motorcycle Club in particular.

As for the geographical and temporal limitations on Kozlowski's expertise, three things are worthy of note. First, the Third Superseding Indictment indicates that, even though most of its chapters are in California, the Mongols Motorcycle Club is both a national and international organization, with a hierarchical structure that is headed by a "Mother Chapter." The Third Superseding Indictment also describes interactions and travel between California and Tennessee for Mongols' business, and how the Clarksville Chapter came into being after travels to and from the

Mongols' home state. In other words, the Clarksville Chapter of the Mongols Motorcycle Club was not an island to itself, and Kozlowski appears eminently qualified to provide the jury with some insight into such things as the origin and operations of the Mongols Motorcycle Club, its hierarchical structure, and the geographical territories it controls. These are the exact types of things that an average juror will be unfamiliar with.

Second, Kozlowski is not unqualified to offer his expert testimony simply because he has no experience with the Clarksville Chapter of the Mongols Motorcycle Club. "[E]liciting expert testimony on a national gang and separately drawing a link to the local set [] was approved of in Rios," and "[a]rguments that this link [is] too tenuous go to the weight of [the] testimony and not its admissibility." United States v. Ledbetter, 929 F.3d 338, 349-50 (6th Cir. 2019). Thus, in Ledbetter it was not improper for a detective to testify as a expert on the national Crips gang – even though the gang on trial was the Short North Posse – because the Government was otherwise able to draw a connection between the two. Nor was it error in Rios for the court to allow opinion testimony about the nationwide Latin Kings when members of the Holland Latin Kings were on trial. Rios, 830 F.3d at 414.

Third, based on the record presently before the Court, it does not appear Kozlowski's expertise is unduly dated. See United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000) (stating that "relevance and remoteness are left up to the commonsense of the trial judge," and finding that gang expert testimony was not too remote even though some of the information dated back 10 or 11 years). While Kozlowski's infiltration into the Mongols ended in 2008, he was a gang instructor until 2016, a member of the ATF's Enhanced Undercover Program until 2017, received the International Outlaw Motorcycle Gang Investigators Association Outstanding Investigation

Award in 2017, and (the Government claims) "continued to proactively investigate members and associates of the Mongols Motorcycle Gang up until his retirement in October 2017 – two years after defendants began establishing the Clarksville Mongols, and just months before the indictments in this case were returned." (Doc. No. 1243 at 15).[3]

Although the Court is making a preliminary determination that Kozlowski will be able to testify as a gang expert, the Government should not consider this to be *carte blanche* approval of his testimony. As the Sixth Circuit observed in <u>Rios</u>:

> "An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence." <u>Mejia</u>, 545 F.3d at 190. District courts must therefore remain vigilant to ensure that all of a law-enforcement expert's testimony relates to issues that are "beyond the ken of the average juror." <u>Amuso</u>, 21 F.3d at 1263. Otherwise,
>
> > [i]f the officer expert strays beyond the bounds of appropriately 'expert' matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from 'organized crime' to 'this particular gang,' from the meaning of 'capo' to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of

---

[3] In making these observations, the Court read with some interest the passage in <u>United States v. Cerna</u>, No. CR 08-0730 WHA, 2010 WL 2347406, at *7 (N.D. Cal. June 8, 2010) quoted in Defendants' reply brief. There, the district court disallowed "police opinion" evidence about the structure of the MS-13 gang and its organization. That case, however, was decided under Ninth Circuit, not Sixth Circuit, law. Even so, the Ninth Circuit previously found no abuse of discretion in <u>United States v. Zaragoza</u>, 212 F. App'x 658, 661 (9th Cir. 2006), when the trial court admitted expert testimony about the Mexican Mafia in a case involving members of the Columbia Lil' Cycos. Moreover, as the court in <u>Cerna</u> itself recognized, other trial judges within the Ninth Circuit have "allowed gang expert evidence in the case-in-chief in RICO/VICAR prosecution[s]," and still others have "allowed some and disallowed other aspects of proposed gang experts' testimony." <u>Cerna</u>, 2010 WL 2347406, at *7. At most, <u>Cerna</u> represents a discretionary and considered judgment by that trial judge.

the facts than an aide in understanding them. The officer expert transforms into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt.

Mejia, 545 F.3d at 190–91.

United States v. Rios, 830 F.3d 403, 413–14 (6th Cir. 2016). Thus, for example, in Rios it was "potentially problematic for an expert on the national Latin Kings to testify 'about specific criminal actions, including: (1) drug dealing by the Holland Latin Kings and, for example, his estimate that it was 'a common thing for members to do,' (2) how the Holland Latin Kings obtained and utilized 'nation guns,' (3) his 'experience' that the Holland Latin Kings commonly engage in violent disputes with other gangs, and (4) the use of violence against those who steal drugs from the Holland Latin Kings." Rios, 830 F.3d at 415-16. In other words, the Government must keep in mind that Kozlowski is being called to testify as an expert on OMGs and the Mongols Motorcycle Club, not as a fact witness about the Clarksville Chapter, or whether that entity, as alleged in the Third Superseding Indictment was a criminal organization for purposes of the RICO statute. Accordingly, the Government is instructed to exercise restraint, prudence and caution during the direct examination, the Defendants are reminded to raise timely objections and the Court will exercise the vigilance recommended in Amuso and approved of in Rios.

Based on the foregoing, the Joint Motion in Limine No. 1 filed by James Wesley Frazier, William Boylston and Jason Meyerholz to Exclude the Testimony of Darrin Kozlowski and John Carr (Doc. No. 1166); and the Joint Motion to Exclude Testimony of the Government's Gang Experts Filed by Defendants Aelix Santiago, Kyle Heade and Jamie Hern (Doc. No. 1212) is **DENIED** to the extent it is directed at the testimony of Kozlowski.

## II. Boylston's and Meyerholz's Joint Motion in Limine No. 2 to Exclude the Testimony of James Berni and Trial Exhibit 1953 (Doc. No. 1207)

In this Motion, Boylston and Meyerholz move to exclude the testimony of James Berni insofar as the Government intends for him to testify as a "cellphone location expert." They also seek to exclude Trial Exhibit 1953.

Berni has been an FBI Special Agent since 2007 and has been assigned to its Cellular Analysis Survey Team ("CAST") for the last four years. As it applies to this case, Agent Bernie reviewed cell phone data reports from Verizon, ATT&T, and T-Mobile related to phone numbers allegedly being utilized by Boylston, Meyerholz, C.W. and C.D. on November 19 and 20, 2017, which was allegedly the time-frame when Stephen Cole was kidnapped, murdered, and buried. Based upon the cellphone data and reports from law enforcement about the location of events surrounding the alleged kidnapping and murder, Agent Berni developed a slide show (Trial Exhibit 1953) that purports to show the approximate location of cellphones based upon their cellular communications with towers at or around the time in question.

The methodology generally utilized for an historical cell phone analysis has been described as follows:

> Historical cell-site analysis uses cell phone records and cell tower locations to determine, within some range of error, a cell phone's location at a particular time. A cell phone is essentially a two-way radio that uses a cellular network to communicate. Aaron Blank, THE LIMITATIONS AND ADMISSIBILITY OF USING HISTORICAL CELLULAR SITE DATA TO TRACK THE LOCATION OF A CELLULAR PHONE, 18 Rich. J.L. & Tech. 3, 5 (2011). Each cell tower covers a certain geographic area. That geographic area depends upon "the number of antennas operating on the cell site, the height of the antennas, topography of the surrounding land, and obstructions (both natural and manmade)." Id. In urban areas, cell towers may be located every one-half to one mile, while cell sites in rural areas may be three to five miles apart. Id. When a cell phone user makes a call, the phone generally "connect[s] to the cell site with the strongest signal," although "adjoining cell [towers] provide some overlap in coverage." Id. While the proximity of the user is a significant factor in determining

the cell tower with which the cell phone connects, it is not the only one. Id. Other factors include the towers' technical aspects, including geography and topography, the angle, number, and directions of the antennas on the sites, the technical characteristics of the relevant phone, and "environmental and geographical factors." Id. at 7.

United States v. Hill, 818 F.3d 289, 295–96 (7th Cir. 2016).

Notwithstanding that Agent Berni has testified as an expert in historical cell site analysis in both federal and state courts in Minnesota and Alabama, as well as in the Eastern District of Virginia, Defendants seek to preclude his testimony at trial and the introduction of his slide show. In doing so, they do not contest Agent Berni's qualifications, nor do they challenge the reliability of the data upon which he reached his conclusion. Rather, they challenge the introduction of such cellphone evidence as not meeting the reliability requirements of Daubert. They rely primarily upon two cases: United States v. Evans, 892 F. Supp.2d 949 (N.D. Ill. 2012), and United States v. Reynolds, 626 F. App'x 610 (6th Cir. 2015).

To an extent, the decision in Evans actually favors the Government's position. There, the Government proposed to call FBI Special Agent Raschke "to testify about the operation of cellular networks and how to use historical cell site data to determine the general location of a cell phone at the time of a particular call." 892 F. Supp. 2d at 950. The Evans court had no quarrel with that. What troubled the court was that the Government wanted to take it a step further by having Agent Raschke testify that calls were placed on defendant's phone from a particular building where the victim was held for ransom based upon a "granulization theory." Under this theory, Agent Raschke stated that he could "estimate the range of certain cell sites based on a tower's location to other towers," which "in turn allow[ed] him to predict the coverage overlap of two closely positioned towers." Id. at 956. In precluding this testimony, the court observed that "the granulization theory

remains wholly untested by the scientific community, while other methods of historical cell site analysis can be and have been tested by scientists." Id.

Key to the holding in Evans on which the present Defendants rely was the "granulation theory" and an attempt to pinpoint the precise location of a cellphone. The Government in this case, however, has represented that Agent Berni will not be testifying about exact locations of cell phones: "Agent Berni will be testifying about the *general location* of the relevant cell phones on November 19 and 20, 2017[.]" (Doc. No. 1246 at 9) (emphasis added). This representation makes Evans distinguishable. See, United States v. Pembrook, 119 F. Supp. 3d 577, 597 (E.D. Mich. 2015) (stating that exclusion based on Evans was not warranted where government explained that it did not intend to proffer testimony attempting to place cell phone in a specific location); United States v. Machado-Erazo, 950 F. Supp. 2d 49, 55 (D.D.C. 2013) (noting that, while defendant's argument based on Evans "appear[ed] forceful at first blush," it became "seriously flawed" after considering the government's representation that it intended to only offer testimony about location of certain cell towers used by defendant's phone during the relevant period).

Even though Evans dealt with the "granulization theory" and "has been cited by other federal courts with some skepticism," United States v. Elima, No. SACR 16-00037-CJC, 2016 WL 3546584, at *3 (C.D. Cal. June 22, 2016) (collecting cases), the Sixth Circuit in Reynolds discussed it in some detail, and listed it as representing one line of cases in the dispute over the reliability of using historical cell-site tracking analysis to determine a person's past location. The Sixth Circuit also noted United States v. Schaffer, 439 F. App'x 344 (5th Cir. 2011), as representing the opposite view. In so doing, the Sixth Circuit noted that, while the Fifth Circuit in Schaffer held that "using historical cell-site tracking analysis to determine a person's past whereabouts was reliable because the

technique was 'neither untested nor unestablished,'" this conclusion was based upon testing and acceptance by the law-enforcement community, not the scientific community. Reynolds, 626 F. App'x at 615; but see, United States v. McNeal, 763 F. App'x 307, 308 (4th Cir. 2019) (noting that "scientific acceptance is only one component of the Daubert analysis, and historical cell site analysis has been broadly tested and accepted by the scientific community and the federal courts alike").

The Sixth Circuit raised an interesting point in criticizing Schaffer, but its criticism is not particularly helpful to Defendants here because "Reynolds is unreported and, therefore, not controlling." United States v. Pembrook, 876 F.3d 812, 824 (6th Cir. 2017). More than that, the criticism about Schaffer and cases of similar ilk is *dicta* because the Sixth Circuit in Reynolds specifically chose "not [to] resolve in this case the split among federal courts as to the reliability of using historical cell-site analysis to determine a caller's location as being in a specific cell-sector." Id. at 617. In short there is no binding Sixth Circuit authority. The Court must look elsewhere.

"No federal court of appeals has yet said authoritatively that historical cell-site analysis is admissible to prove the location of a cell phone user," but "[d]istrict courts that have been called upon to decide whether to admit historical cell-site analysis have almost universally done so." Hill, 818 F.3d at 297 (7th Cir. 2016) (collecting case). This includes district courts within this circuit. See, e.g., United States v. Freeman, No. 06-20185, 2015 WL 2062754, at *4 (E.D. Mich. May 4, 2015). It also includes expert testimony by FBI CAST members who utilized a historical cell site analysis. See e.g., United States v. Jones, 918 F. Supp. 2d 1, 3 (D.D.C. 2013).

Given the weight of authority, the Court agrees with the Seventh Circuit in Hill that "historical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one. It shows the cell sites with which the person's cell phone

connected, and the science is well understood." Hill, 818 F.3d at 295. The Court also agrees, however,

> that the jury may overestimate the quality of the information provided by this analysis, [and] therefore cautions the government not to present historical cell-site evidence without clearly indicating the level of precision – or imprecision – with which that particular evidence pinpoints a person's location at a given time. The admission of historical cell-site evidence that overpromises on the technique's precision – or fails to account adequately for its potential flaws – may well be an abuse of discretion.

Id. at 299. Put somewhat differently, while "'[t]he science and methods upon which [historical cell-site analysis] is based are understood and well-documented,' they are only reliable to show that a cell phone was in a general area. . . . Thus, assuming that the Government lays a proper foundation and accurately represents historical cell-site analysis's limits at trial, its expert testimony is reliable [and] a Daubert hearing is unnecessary." United States v. Brown, No. 18-20075, 2019 WL 3543253, at *6 (E.D. Mich. Aug. 5, 2019) (quoting Hill, 818 F.3d at 299); see also, Machado-Erazo, 950 F. Supp. 2d at 55 (denying motion to exclude FBI agent's historical cell-site analysis without holding a Daubert hearing); United States v. Jones, 918 F. Supp.2d 1, 5 (D.D.C.2013) (same).

The need for a Daubert hearing is even less where, as here, Defendants raise no unique arguments to the methodology employed. See United States v. Porter, No. CR 13-66, 2016 WL 538456, at *3 (E.D. La. Feb. 10, 2016) (finding that Daubert hearing was unnecessary when defendant did not present a novel challenge to cell site analysis); United States v. Gatson, No. 2:13-CR-705 (WJM), 2015 WL 5920931, at *3 (D.N.J. Oct. 9, 2015) (same). For example, Defendants assert that Agent Berni's report places certain cell phones in proximity to a cell tower without providing information about the cell tower's range; fails to indicate the level of precision of location, and says nothing about the range of potential error. These sorts of cross-examination

points and arguments, however, go to the weight not the admissibility of the cell phone evidence, as even the Sixth Circuit in Reynolds recognized. Reynolds, 625 F. App'x at 617 ("While the assumption that a tower would not service a call made 10 or 20 miles away may be challenged – and indeed it was challenged at Reynolds's trial – such a challenge speaks to the weight of the evidence, and not to its inherent reliability, because there are identifiable, measurable, and scientifically accepted factors that determine a cell tower's maximum coverage."); see also, United States v. Hahn, No. CR 17-00582 JMS-RLP, 2019 WL 1246185, at *3 (D. Haw. Mar. 18, 2019) (stating that where witness could "not testify as to the specific range of any particular tower in relation to specific geographic locations . . . goes to the weight, not the admissibility, of the testimony"); Jones, 918 F. Supp 2d at 5 ( noting that "numerous other courts have concluded that the mere existence of factors affecting cell signal strength that the expert may not have taken into account goes to the weight of the expert's testimony and is properly the subject of cross-examination, but does not render the fundamental methodology of cell site analysis unreliable"). Indeed, it was the potential for overselling that led to the admonishment in Hill. See McNeal, 763 F. App'x at 308 (holding that district court "did not abuse its discretion in concluding that the cell site location evidence satisfied Daubert's touchstones of relevance and reliability" where "the Government carefully limited the weight and certainty of the evidence").

The concerns raised by Defendants do not preclude Agent Berni's testimony, but they do give the Court pause for thought as to the admissibility of Trial Exhibit 1953 as it presently exists. That slide show contains testimonial statements, inferences, and conclusions. For example, page three purports to identify the "techology" and purports to list several "facts." (Doc. No. 1201 at 3). Also presented as "facts" are specific location labels, such as "Abduction Point, "Nelper's Residence,"

"Body Found," Meyerholz residence, "Red Roof Inn," and "Humiston's Residence." The slide show also contains pictures of different cell phone towers and specific "cell sector examples," without any indication of whether those are representative of the ones the cellphones allegedly used in this case. Additionally, the slide show contains numerous graphs depicting the specific locations of cellphones in proximity to certain alleged specific places of interest, without any indication of the variables and limitations inherent in the historical cell phone analysis methodology. Just as the Government cannot oversell the methodology through testimony, it cannot oversell the methodology through the introduction of evidence.[4]

Accordingly, Boylston's and Meyerholz's Joint Motion in Limine No. 2 (Doc. No. 1207) is **DENIED** insofar as it seeks to exclude the testimony of James Berni, but the Court **DEFERS RULING** on the admissibility of Trial Exhibit 1953 until trial.

### III. Boylston's and Meyerholz's Joint Motion in Limine No. 3 to Exclude the Testimony of Phillipe Esperança (Doc. No. 1168)

Defendants Boylston and Meyerholz seek to preclude the Government from introducing a "Bluestar" expert at trial. This comes from the Government's notice that it intends to offer as a witness at trial Phillipe Esperança who

> is a Forensic Officer at the Forensic Analysis Laboratory in Marseille, France. Esperança is a specialist in the morpho-analysis of blood tracing and the use of Bluestar Forensic, a reagent that can be used to identify latent bloodstains. In connection with the government's presentation of evidence regarding the kidnapping and murder of Stephen Cole, the government anticipates calling Esperança to explain how Bluestar Forensic works and how it can be used to identify latent bloodstains,

---

[4] The Court flatly rejects the Government's assertion that "because federal courts have routinely admitted expert testimony and reports related to the mapping of cell site data, this Court need not address defendants' claim that Agent Berni's report is inadmissible as a summary report at trial." (Doc. No. 1246 at 14). Not only does the Court not have before it the reports used in other cases, it has an independent obligation to determine whether an exhibit is or is not admissible.

without altering the DNA, in order to allow subsequent DNA typing.

(Doc. No. 865 at 21-22). It also comes from proposed trial exhibits that contain photographs in which "Bluestar" indicated the possible presence of blood, even though (according to Defendants) subsequent testing failed to confirm the presence of blood.

In moving to preclude Esperança's testimony, Defendant submit that "the scientific community has not accepted either Bluestar or luminol presumptive blood testing, the theory or technique has not been adequately tested, nor has it been subjected to proper peer review." (Doc. No. 1168 at 3). Furthermore, according to Defendants,

> there is no known or potential rate of error and, to the extent there is, the error rate warrants exclusion. False positives can be produced by a plethora of other substances, including animal blood, "certain metals and vegetable matter," and "substances containing iron, such as dishwasher detergent, Comet cleanser, a penny and bleach." Bluestar's own literature concedes there are false positives with respect to various household, food and chemical products.

(Id.) (footnotes omitted). As a consequence Defendants claim, "[t]here is a paucity of federal and state caselaw on the admissibility of either Bluestar or luminol, including under the Daubert test." (Id. at 2-3).[5]

In response, the Government argues that "Defendants' motion should be denied because luminol products like Bluestar are universally accepted in the forensic community as a presumptive test to identify potential blood for further testing." (Doc. No. 1244 at 3). Bluestar itself was

---

[5] The Court notes that Defendants have also complained about the sufficiency of the Government's January 15, 2019 disclosure. However, the Government made a further disclosure on February 7, 2020, a week after counsel requested more detail. The Court further notes that the debate about the sufficiency of expert disclosures continues, as evidenced by the Defendants' Motion to Compel the Government to Provide Proper Rule 16 Notice for Kozlowski, Esperança, Berni (Doc. No. 1262). Because of the lateness of filing of the Motion to Compel (February 21, 2020), the Court will take this matter up at the pretrial conference, assuming it is not resolved by the parties before then, which the Court strongly urges counsel to do.

developed 20 years ago by Esperança and his colleagues and "is an improved luminescent (luminol) formula that (1) glows brighter than other products, and (2) is less toxic (it has a more neutral pH)."

(Id. at 3).  As for Esperança's qualifications, not only was he one of the inventors of Bluestar, he

> is a French forensic scientist and criminologist who has been qualified as an expert by the French Supreme Court and the International Criminal Court.  Esperança previously worked at the Institute of Criminology Research for the French National Police, where he was in charge of blood pattern analysis. Esperança is also a member of numerous scientific associations, and participated in the FBI's Scientific Working Group on Bloodstain Pattern Analysis for several years.  Against this background, Esperança's primary expertise is in blood detection and blood pattern analysis. Esperança has provided training in blood pattern analysis to police and forensic labs around the world.  He has participated in over 500 investigations and testified about Bluestar in approximately 100 cases. Esperança has assisted in war crimes investigations with the United Nations and consulted with courts in numerous other countries (including Switzerland, Portugal, and Belgium). Additionally, Esperança has testified as an expert regarding the use of Bluestar in at least two cases in the United States.

(Id. at 2-3).

Esperança's background is impressive.  However, the Court does not know what it takes to qualify as an expert in other countries, nor does it know whether Esperança's testimony was subjected to a Rule 702/Daubert analysis when he testified in this country.  On this score, the Court has found no federal cases where Bluestar was determined to be reliable under Rule 702.  At a minimum, this suggest the need for a hearing prior to allowing testimony from Esperança.

That said, in addition to requiring that evidence be reliable, Rule 702 requires that it be 'relevant to the task at hand,'" Daubert, 509 U.S. at 597, "meaning that 'it will assist the trier of fact to understand the evidence or to determine a fact in issue,'" Superior Prods. P'ship v. Gordon Auto Body Parts Co., 784 F.3d 311, 323 (6th Cir. 2015) (citation omitted).  Here, the need for Esperança's testimony is not self-evident because the Government concedes that luminol (and Bluestar for that matter) "do not conclusively identify blood, but they aid investigators by identifying areas to swab

or collect for further testing to determine if blood is present." (Doc. No. 144 at 3). The Government also admits that investigators collected, sampled, and performed blood and DNA tests that "confirm[ed] the presence of Stephen Cole's blood," but does not convincingly explain how or why "Esperança's testimony about Bluestar's formulation will also assist the jury in evaluating the reliability and accuracy of [those] subsequent tests." (Id. at 4).

Obviously, the need for Esperança's testimony may become clear if, for example, Defendants assert that the DNA or blood testing was somehow compromised by the use of Bluestar (assuming, of course, Esperança is deemed qualified to testify that Bluestar can be used to identify latent bloodstains without altering its DNA). Esperança's testimony may also become relevant for any of a number of other reasons as the case progresses. For now, however, the Court **DEFERS RULING** on Boylston's and Meyerholz's Joint Motion in Limine No. 3 to Exclude the Testimony of Phillipe Esperança (Doc. No. 1168) and will hold a <u>Daubert</u> hearing if, and when, the need for Esperança's testimony becomes relevant.

## IV. <u>Frazier's Motion in Limine No. 2 to Exclude the Testimony of Will Evans and Lon Chaney (Doc. No. 1172)</u>

The Government has indicated that it intends to call Lon Chaney and Will Evans as "drug experts" at trial. As with Kozlowski and Carr, the Government only intends to call one as an expert at trial, but it has yet to indicate whether it intends to call Chaney or Evans. Also as with Kozlowski and Carr, Chaney and Evans have substantially similar backgrounds. Both have been officers with the Clarksville Police Department for close to twenty years, and both have over fifteen years of service as drug agents with the Special Operations Unit.[6] Further, according to the Government,

---

[6] Evans still holds that position. Chaney was promoted to Patrol Sergeant in 2019.

both have "participated in hundreds of investigations involving drug organizations and drug-trafficking," and both have "attended numerous conferences and trainings related to investigating drug-trafficking offenses . . . throughout [their] career[s]." (Doc. No. 1245 at 2, 3). Regardless of who is called, the Government has provided the following notice in its reply brief:

> The Government's expert, either Evans or Chaney, may testify that through his training and experience, he is familiar with, among other things: the "street value" of many drugs, including methamphetamine; the amount of methamphetamine that known drug sellers typically possess; the amount of methamphetamine typically acquired for personal use; the types of drug paraphernalia and drug-related material, such as baggies, rubber bands, legers, and digital scales, that known drug sellers typically possess; the frequency with which individuals who deal drugs possess other drugs for the purposes of resale; and the role that firearms play in the drug trade. He may also testify that the presence of drug paraphernalia and/or large sums of cash in the same proximity as methamphetamine further indicates that an individual who possesses the methamphetamine has the intent to distribute it. He may also testify that the presence of a firearm in the same location as distributable quantities of methamphetamine is a further indication that an individual who possesses that methamphetamine has the intent to distribute it.

> It is anticipated that these opinions will be based on Evans or Chaney's substantial training and experience investigating drug crimes and drug trafficking organizations. Their experience has consisted of numerous drug investigations, involving a myriad of controlled substances, including methamphetamine, that have required the use of varying methods of investigation. Those methods have included, but are not limited to, the use of informants and cooperators; physical and electronic surveillance; the execution of search warrants; controlled purchases of controlled substances; subpoenas; and undercover operations.

(Doc. No. 1245 at 5).

Frazier raises both procedural and substantive objections to either Chaney or Evans being allowed to testify as a drug expert. Procedurally, he argues that the Government's December 5, 2019 Supplement Notice of Expert Testimony did not comply with the requirement of Rule 16 of the Federal Rules of Criminal Procedure. Substantively, he argues that the proposed testimony is not admissible under the Federal Rules of Evidence and further that its admission would violate his Sixth

Amendment right. The Court is unpersuaded.

Rule 16 provides, in relevant part, as follows:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim P. 16(a)(1)(G). The Advisory Committee Note goes on to provide that "to permit more complete pretrial preparation by the requesting party," that party "is entitled to a summary of the expected testimony." Fed R. Crim. P. Rule 16 Advisory Committee Notes. "For example, this should inform the requesting party whether the expert will be providing only background information on a particular issue or whether the witness will actually offer an opinion." <u>Id.</u>

Even considering, as the Government argues, that the purpose of the Rule 16(a)(1)(G) expert disclosure requirement is "to minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination," <u>United States v. White</u>, 492 F.3d 380, 406 (6th Cir. 2007), its December 5, 2019 Notice does not comply with the spirit of Rule 16. All it really said is that either Chaney or Evans (1) "may testify that the presence of items (such as plastic baggies, scales, ledgers, paraphernalia, or large quantities of cash) in close proximity to controlled substances are indicative of drug packaging and/or distribution," and (2) "may also testify about the practices of drug operations, including the 'fronting' of drugs to co-conspirators." (Doc. No. 1135 at 3). Since then, however, the Government has filed the more appropriate disclosure excerpted above.

The new disclosure aside, Frazier requests, "on the basis of Rule 16 alone," that "the Court . . . not allow the testimony of Evans and Chaney." (Doc. No. 1172 at 4). This is too draconian a

sanction for the Government's sparse initial disclosure.

Rule 16(d) provides a number of sanctions for a violation of Rule 16, the harshest of which is that the party be prohibited "from introducing the undisclosed evidence." Fed. R. Crim. P. 16(d)(2)(C). "Rule 16 does not *require* federal courts to exclude evidence not turned over to the discovering party in violation of a discovery order." United States v. Bartle, 835 F.2d 646, 649 (6th Cir.1987) (emphasis in original). To the contrary, "[d]istrict courts should embrace the 'least severe sanction necessary' doctrine, and hold that suppression of relevant evidence as a remedial device should be limited to circumstances in which it is necessary to serve remedial objectives," United States v. Maples, 60 F.3d 244, 247 (6th Cir. 1995), such as where the government has acted in bad faith, and the defendant has been subjected to a prejudice that cannot be cured by granting either a continuance or a recess, United States v. Ganier, 468 F.3d 920, 927 (6th Cir. 2006). That is simply not the case here, particularly given the Government's more detailed notice that should tend to eliminate any surprise. See United States v. Thornton, 642 F.3d 599, 606 (7th Cir. 2011) (stating that even if a disclosure is inadequate, defendant is required to establish that this "Rule 16 violation hampered his opportunity to prepare a defense").

Substantively, Frazier argues that allowing either Chaney or Evans to testify as drug experts could present "serious Crawford issues"[7] because they will be "used as a mere conduit for testimonial hearsay, rather than a true expert whose opinion elucidates a specialized factual situation." (Doc. No. 1172 at 10). He further argues that Chaney and Evans should be barred from

---

[7] In Crawford v. Washington, 541 U.S. 36, 40 (2004), the Supreme Court held that out-of-court statements by witnesses that are testimonial are barred by the Confrontation Clause of the Sixth Amendment, unless witnesses are unavailable and defendant had prior opportunity to cross-examine witnesses.

testifying as drug experts because (1) their testimony will mirror the testimony offered by fact witnesses; (2) they will not offer any testimony that an average juror cannot understand from a fact witness; and (3) their testimony will be redundant and will not be based upon a sound methodology.

Addressing the last argument first, there will be no redundancy or, as Frazier puts it, "double-team 'experts,'" (id.), because the Government will be allowed to call either Chaney or Evans as a drug expert, not both. As for methodology, when evaluating "technical or other specialized knowledge," the <u>Daubert</u> factors "cannot readily be applied to measure the reliability of such testimony." <u>Surles ex rel. Johnson v. Greyhound Lines, Inc.</u>, 474 F.3d 288, 295 (6th Cir. 2007). Thus, while the Supreme Court stated in <u>Daubert</u> that the gatekeeper function applies to all expert testimony (not just testimony based in science), it also explained in <u>Kuhmo Tire</u> that when testimony relates to non-scientific evidence, the "relevant reliability concerns may focus on relevant knowledge or experience." <u>Kuhmo Tire</u>, 526 U.S. at 150. The record presently before the Court, in addition to the testimony the Court has heard from Chaney and Evans in earlier cases, makes clear that both have substantial experience in, and knowledge about, the drug trade and drug trafficking. <u>See United States v. Lopez-Medina</u>, 461 F.3d 724, 743 (6th Cir. 2006) (noting it was not an abuse of discretion for the district not to formally qualify drug agents before allowing their expert testimony "[g]iven the agents' obvious qualifications").

Frazier's assertion that what Chaney or Evans have to offer is within the ken of an average juror's understanding assumes too much. It may be that "[w]hether it is a gun in my pocket or gum in my pocket, proximity is relevant to control," and it may be that "[f]ronting is common in many businesses, including Girl Scout cookies and door-to-door Bible sales." (Doc. No. 1172 at 8-9). But it does not follow, perforce, that lay jurors will necessarily connect what Frazier claims to be the

"logical dots" (id. at 9), to wit: drug traffickers often carry guns and are fronted with drugs by suppliers. Indeed, "[c]ourts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror," United States v. Thompson, 74 F.3d 676, 681 (6th Cir. 1996), and the Sixth Circuit "regularly allows qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given, since knowledge of such activity is generally beyond the average layman." United States v. Swafford, 385 F.3d 1026, 1030 (6th Cir.2004). This is in keeping with the notion that "[t]here are innumerable trades and practices that employ their unique devices, feints, and codes that may mean nothing to the untrained observer but may speak volumes to a maven qualified by experience or training. The illegal drug trade certainly fits into that category." United States v. Johnson, 488 F.3d 690, 698 (6th Cir. 2007).

More substantial are Frazier's concerns about potential Crawford implications and expert testimony masquerading as facts. This Court has already touched upon the potential problems that can arise when a law enforcement officer testifies as an expert witness. Those potential problems may be even more acute in relation to the proposed testimony of Chaney or Evans because both are members of the Clarksville Police Department, and Frazier and his co-defendants are alleged to have operated in and around Clarksville.

The Sixth Circuit observed in Rios:

A[n] issue arises when the law-enforcement expert is also a fact witness in the case. This creates a significant risk that the jury will be confused by the officer's dual role, although we have refused to adopt a per se prohibition of the practice. One concern is that a case agent who testifies as an expert receives "unmerited credibility" for lay testimony. Alternatively, the witness's dual role might confuse the jury, or the jury may unduly credit the opinion testimony of an investigating officer based on a perception that the expert was privy to facts about the defendant not presented at trial. To assuage these concerns, we have suggested that the district court and the

prosecutor take care to assure that the jury is informed of the dual roles of a law enforcement officer as a fact witness and an expert witness.

Rios, 830 F.3d at 416-17 (internal citations and quotation marks omitted).

At this point in time, the Court has no way of knowing whether Chaney and/or Evans are also fact witnesses. To the extent that they are, Rios instructs that the jury properly be informed of the two roles. The Court intends to do just that with a cautionary instruction before and after Chaney or Evans testimony. The parties shall file an agreed cautionary instruction. In either event, the Government must exercise extreme care in presenting either Chaney or Evans as an expert witness. The Court will strictly hold the Government to its promise that it "will scrupulously direct and limit the witness's testimony to avoid any area that might touch upon Confrontation Clause or inadmissible hearsay concerns." (Doc. No. 1234 at 13-14). With that understanding, Frazier's Motion in Limine No. 2 to Exclude the Testimony of Will Evans and Lon Chaney (Doc. No. 1172) is **DENIED**.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE