# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:17-cr-00130 |
| | ) | |
| [1] JAMES WESLEY FRAZIER | ) | |
| [2] AELIX SANTIAGO | ) | |
| [3] KYLE HEADE | ) | |
| [8] MICHAEL FORRESTER, JR. | ) | |
| [10] JAMIE HERN | ) | |
| [15] DEREK LEIGHTON STANLEY | ) | |
| [17] WILLIAM BOYLSTON | ) | |
| [18] JASON MEYERHOLZ | ) | |

## MEMORANDUM OPINION AND OMNIBUS ORDER III

In advance of the three month trial scheduled to begin on April 6, 2020 against the eight remaining Defendants, the parties have filed over forty motions in limine. Although a pretrial conference and hearing on pending motions is scheduled for March 9 and 10, 2020, the majority of the motions in limine can be resolved without a hearing or the presentation of evidence. By separate Memorandum Opinion and Omnibus Order III, the Court addressed those that relate to proposed expert testimony. The remaining motions in limine are addressed below, deferred for further argument, or will be considered at trial.[1]

## 1. Frazier's Motion in Limine No. 3 to Exclude Reference to Case as "United States v. Frazier" (Doc. No. 1183)

This Motion is **GRANTED**. The parties will be required to simply refer to this matter as "this case" or "this matter." Additionally, and to further insure that the jury will not attribute alleged culpability by the number designated for each Defendant in the Third Superseding Indictment, the

---

[1] As noted in the contemporaneously issued Memorandum Opinion and Omnibus Order on expert witnesses, these ruling are, by definition, preliminary and are subject to change as evidence is introduced and the trial progresses.

Court will randomly assign seats for each Defendant and his counsel. The designation of assigned seating will be made before the final pretrial counsel, and will remain the assigned seating throughout the course of the trial.

**2. Joint Motion in Limine filed by Frazier, Boylston, and Meyerholz to require Government to Refer to Mongol Motorcycle Club as a "Club" and Not a "Gang" (Doc. No. 1186)**

  In this motion, Defendants ask this Court to require the Government to refer to the Mongols as a motorcycle "club" because "of the lack of probative value and substantial risk of unfair prejudice attached to the term 'gang.'" (Doc. No. 1186 at 2). In support, they quote <u>United States v. Carr</u>, 2:13-cr-00250-JAD, 2016 U.S. Dist. LEXIS 64822 (D. Nev. May 16, 2016), in which the court prohibited the Government from "use [of] the word 'gang' at trial to describe the motorcycle organizations at issue in this prosecution," writing:

> I find that referring to the defendants as "gang" members is unfairly prejudicial and must be precluded under FRE 403. Referencing these motorcycle groups, organizations, or clubs as a "gang" is not probative of any of the elements of conspiracy to interfere with commerce by extortion. Although the defendants' shared affiliations and group memberships are relevant to proving that they conspired together, referring to those groups as "gangs" (as opposed to clubs, organizations, or groups) does not make any fact of consequence more or less likely, and the danger of unfair prejudice flowing from the term "gang" is great. I therefore grant Carr's motion. The government is precluded from using the word "gang" at trial to describe the motorcycle groups at issue in this case. The parties and witnesses should use the word "club," "organization," or "group" instead.

<u>Id.</u> at *2. They also cite the ruling in <u>United States v. O'Reilly</u>, No. 05-80025, 2009 WL 3837877, at *1 (E.D. Mich. Nov. 17, 2009), where the court ordered the Government at trial to use the word "club" instead of "gang" because the latter had a "negative connotation."

  At first blush, Defendants' argument has some superficial appeal because a jury might "associate gangs with 'criminal activity and deviant behavior,' such that the admission of gang

evidence raises the specter of guilt by association or a verdict influenced by emotion." <u>United States v. Santiago</u>, 643 F.3d 1007, 1011 (7th Cir. 2011). However, Defendants do not consider the context in which both <u>Carr</u> and <u>O'Reilly</u> were written and the differences in charges between those cases and this one.

<u>Carr</u> involved a conspiracy to interfere with commerce by extortion, and there was no opposition to defendant's motion from the Government. <u>O'Reilly</u> dealt with bank robberies. Here, in contrast, the charges are quite different because they include an over-arching RICO conspiracy.

More specifically, the Third Superseding Indictment alleges that all Defendants were prospective and/or founding members of the Clarksville Chapter of the "Mongols Motorcycle Gang," that the "Mongols Motorcycle Gang" was an enterprise within the meaning of RICO, and that Defendants were a part of that enterprise and committed predicate acts in furtherance of that enterprise. In fact, the "Mongols Motorcycle Gang" is mentioned thirty-two times in the Third Superseding Indictment. The "Mongols Motorcycle Club" is not mentioned, even once.

To be sure, the factual and legal contentions in the Third Superseding Indictment are at this point mere allegations, nothing more, and it will be for the Government to prove the existence of the "Mongols Motorcycle Gang" of which Defendants were alleged to be members. Given this burden, it would be strange indeed to require the Government to sanitize its allegations by requiring it to call the Mongols a club. It would be stranger still if the jury months from now questions why the Government kept referring to the enterprise as the "Mongols Motorcycle Club," when the charging document identifies the organization as the "Mongols Motorcycle Gang."

Accordingly, the Joint Motion in Limine to refer to the Mongols as a "club" and not a "gang" (Doc. No. 1186) is **DENIED**, and the Court will not bar the Government from using the word

"gang" in reference to the Mongols. Nevertheless, the Government should strive to strictly limit its use of the word "gang" in relation to the Mongols. That is, referring to the Mongols as a "gang" should be the exception, and an extremely limited one at that. Even if the Government does not want to go so far as to call it a club, it can simply refer to the "Mongols," the "Clarksville Chapter," the "Clarksville Mongols," *etc*. This ruling, of course, in no way precludes Defendants from calling the Mongols a "club," or from arguing that the Mongols are a motorcycle club and not a gang. Further, the Court will entertain giving the jury a cautionary instruction on this issue should one be tendered by Defendants.

**3. Government's Motion in Limine to Exclude Improper Character Evidence (Doc. No. 1178)**

The admission of character evidence is governed by Federal Rules of Evidence 404 and 405. So far as it pertains to this case, Rule 404(a) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. Rule Evid. 404(a)(1). This rule is subject to two exceptions: a defendant may offer evidence of his or her "pertinent trait," or "an alleged victim's pertinent trait," both of which may be rebutted by the prosecutor. Id. (a)(2)(A) & (B). This general rule and exception do not apply to evidence of a witness's character, which may be admitted under Rules 607, 608, and 609. Id. (a)(3). All of this, of course, is also subject to the probative value/prejudicial effect balancing test of Rule 403. See United States v. Franco, 484 F.3d 347, 352 (6th Cir. 2007) ("[A] district court is required to perform a Rule 403 weighing of evidence falling under Rule 404(a) just as it is required to do for evidence falling under Rule 404(b).").

Recognizing the applicable rules, the Government seeks to "to exclude at trial (1) improper character evidence regarding any victims of the alleged offenses, and (2) evidence of the defendants'

4

character, except for reputation or opinion evidence of a pertinent character trait that is offered by a character witness, in accordance with Federal Rule of Evidence 405(a)." (Doc. No. 1178 at 1). This is hardly earth-shattering: evidence that does not meet the admissibility requirements of the Federal Rules of Evidence is, naturally, inadmissible.

The Government, however, goes much further. It provides what is effectively a mini-survey on the law of character evidence, presumably to educate either the Court, counsel, or both. For example, it argues Defendants "should not be permitted to claim that a victim has a character for violence"; "should be precluded from attacking any non-testifying victim's character for truthfulness, for example with respect to any deceased victims"; and should not be allowed to "introduce evidence of a victim's specific, past bad acts or crimes to support an argument that the victim acted aggressively on a particular occasion." (Id. at 3-5). Among several other things, the Government also "moves to bar character evidence regarding any defendant's prior military service, including evidence of distinguished service, combat injuries, awards, commendations, or other service records," while at the same time acknowledging that military service may be relevant, such as helping to explain why Defendants lived in the Clarksville area, or to show that they violated military policy by associating with what the Government characterizes as an Outlaw Motorcycle Gang or OMG. (Id. at 8).

The Government's approach to these issues is interesting given its response to some of Defendants' motions in limine wherein the Government chastises them for "attempting to litigate, in advance of trial" admissibility issues by "seeking the whole scale exclusion of evidence," when, in fact, the exclusion of evidence through a motion is limine is proper only where "the evidence [is] inadmissible on all potential grounds." (Doc. No. 1724 at 1-2). Even more fundamentally, the

Government offers no specific concrete examples of any evidence it seeks to exclude. The Court will decline the Government's invitation to rule in a factual vacuum. The Government's Motion (Doc. No. 1178) is **DENIED AS PREMATURE** because, while *improper* character evidence is not admissible, the Government only "*anticipates* defendants cannot meet th[e] pertinence test" of Rule 404. (Id. at 3) (emphasis added). Furthermore, the Court is not going to issue a ruling on whether certain evidence is or is not proper character evidence or a pertinent trait unless, and until, the question has been placed squarely in issue at trial.

### 4. Government's Motion in Limine to Permit Introduction of Statements Potentially Implicating <u>Bruton</u> (Doc. No. 1179)

In the first Memorandum Opinion and Omnibus Order in this case (Doc. No. 998), the Court reviewed the law that has developed since <u>Bruton v. United States</u>, 391 U.S. 123, 136-37 (1968), held that the introduction of an incriminating out-of-court statement by a non-testifying co-defendant violates the Sixth Amendment. Accordingly, the Court ruled that "prior to any use of a statement at trial that implicates <u>Bruton</u>, the Government shall share its redactions with Defendants and present the redacted statement to the Court so that the Court can rule on the statement's admissibility." (Doc. No. 998 at 36). The Government has made that submission with regard to the alleged statements by Frazier, Santiago, Heade, Forrester, Meyerholz, and Boylston. In response, Boylston (Doc. No. 1264), Meyerholz (Doc. No. 1290), and Forrester (Doc. No. 1298) have indicated no objection to the proposed redactions, although they reserve the right to object to their admission on other grounds. As to those three Defendants the Government's Motion (Doc. No. 1179) is **GRANTED**.

The Government's Motion is **DENIED WITHOUT PREJUDICE** as to Defendants Frazier,

Stanley, Heade, Hearn, and Santiago as each has raised objections to the proposed redactions. Some are relatively minor and straight forward, such as Stanley's request that the Government be required to further redact co-defendant Kyle Heade's statement to delete references to not only Stanley's name, but also his hometown of Owensboro, Kentucky and "travel to California." (Doc. No. 1285). Some are significantly more substantial, such as Santiago's assertion that certain statements made by Heade and Frazier simply cannot be redacted appropriately so as to comply with <u>Bruton</u>. Regardless of the extent of the disagreement between counsel for the Government and Defendants, the Court will require that before April 1, 2020, they meet and confer in person in a good faith effort to resolve their differences and determine whether appropriate redactions can be made or whether the proposed statement of a co-defendant is even necessary at trial.[2] The parties shall file a status report prior to April 1, 2020 on their joint efforts and, the Court will hear argument on the <u>Bruton</u> question statements purporting to implicate Frazier, Stanley, Heade, Hearn, and Santiago at the status conference on April 1, 2020. The parties are reminded that a proposed cautionary jury instruction is needed.

**5. Government's Motion in Limine to Admit Self-Authenticating Business Records (Doc. No. 1180)**

By way of this Motion, the Government has identified some 60-plus documents that it wants to introduce at trial through executed certificates of authenticity pursuant to Rules 803(6) and 902(11) and the exception to the hearsay rule for domestic records of regularly conducted activity. Defendants Boylston (Doc. No. 1258), Santiago, Heade and Hearn (Doc. No. 1265) do not see the need for the Government to call 62 records custodians and, accordingly, do not object. (Doc. No.

---

[2] In light of this meet and confer requirement, the Court has not considered the Government's additional redactions proposed in its reply brief, which Defendants have not yet had the chance to consider.

1258 at 2).  Neither do Stanley (Doc. 1286), Meyerholz (Doc. No. 1291), or Forrester (Doc. No. 1299).

Frazier objects insofar as the motion identifies Facebook records involving him and Michael West.  This objection is supported by both United States v. Farrad, 895 F.3d 859, 879 (6th Cir. 2018) and United States v. Quintana, 763 F. App'x 422, 427 (6th Cir. 2019).

"Rule 803(6) is designed to capture records that are likely accurate and reliable in content, as demonstrated by the trustworthiness of the underlying sources of information and the process by which and purposes for which that information is recorded."  United States v. Browne, 834 F.3d 403, 410 (3rd Cir. 2018).  However,

> Facebook does not purport to verify or rely on the substantive contents of the communications in the course of its business.  At most, the records custodian employed by the social media platform can attest to the accuracy of only certain aspects of the communications exchanged over that platform, that is, confirmation that the depicted communications took place between certain Facebook accounts, on particular dates, or at particular times.  This is no more sufficient to confirm the accuracy or reliability of the contents of the Facebook chats than a postal receipt would be to attest to the accuracy or reliability of the contents of the enclosed mailed letter.

Id. at 410-11.  Consequently, Facebook records must be authenticated through the "traditional standard" of Rule 901.  Farrad, 895 F.3d at 877; Quintana, 763 F. App'x at 427.  Accordingly, the Government's Motion (Doc. No. 1180) is **GRANTED**, except with respect to items from Frazier's and West's Facebook accounts identified as Bates Numbers P005621-P006119 and P006122-P007339.  This ruling, of course, only pertains to authentication.  Admissibility and relevance are separate issues.

**6. Government's Motion in Limine to Preclude Defendants From Presenting Justification Defense to the § 924(c) Charge in Count Thirty-One (Doc. No. 1181)**

In Count Thirty-One, Heade is charged with knowingly using, carrying, brandishing, and discharging a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c), while Frazier and Santiago are charged with aiding and abetting Heade's possession and use of that firearm. According to the Government, it expects to show that Heade and "T.C." intended to purchase Opana[3] pills from Timothy Grant and Dustin McKracken at a Bojangles Restaurant in Clarksville, and that Heade carried a firearm to the transaction for protection. The deal went south when Grant and McCracken tried to rob T.C. and drive off with the purchase money. This prompted Heade to fire multiple shots, three of which struck Grant.

Section 924(c) prohibits using or carrying any firearm in relation to a drug trafficking crime, meaning that the firearm facilitated or had the potential of facilitating the crime. Smith v. United States, 508 U.S. 223, 235 (1993). "[S]elf-defense is irrelevant to a section 924(c) violation," United States v. Poindexter, 942 F.2d 354, 360 (6th Cir. 1991), and a defendant's "alleged reasons for being armed, such as for self-protection, do not constitute defenses under § 924(c), Morris v. United States, 14 F. App'x 345, 347 (6th Cir. 2001). Indeed, it is common knowledge that drug dealers sometimes carry firearms as protection or to intimidate others, and it would effectively gut the statute to allow a defendant to interpose a "self protection" defense to a charge that he or she carried a firearm in relation to a drug trafficking crime. See also United States v. Lucas, 462 F.App'x 48, 51 (2d Cir. 2012) (collecting cases for the proposition that self defense is not a defense to a section 924(c) charge); United States v. Sloley, 19 F.3d 149, 153 (4th Cir. 1994) (stating self defense is not a

---

[3] Opana® is a brand name for oxymorphone, an opioid pain medication.

defense to a section 924(c) charge); <u>Barnes v. United States</u>, No. CR 14-47-RGA, 2018 WL 1905642, at *3 (D. Del. Apr. 23, 2018) (observing that "Second, Fourth, Sixth, Ninth, and Tenth Circuits have held that self-defense is irrelevant to a § 924(c) charge if the required offense elements are met").

Accordingly, the Government's Motion in Limine (Doc. No. 1181) is **GRANTED**. This ruling, of course, does not prohibit Defendants from arguing that Heade did not use or carry the firearm during or in relation to a drug trafficking crime, or that the presence of the firearm at the Bojangles was coincidental and not connected to alleged drug trafficking. Nor does it preclude Defendants from seeking some sort of necessity/justification instruction should the evidence at trial so warrant, however unlikely granting of such a request might be. <u>See Currier v. United States</u>, 320 F.3d 52, 57 (1st Cir. 2003) (recognizing that "at least in theory" there may be circumstances where a "necessity" defense may be interposed in 924(c) prosecution); <u>United States v. Lyttle</u>, No. 9:15-CR-00121-DCN, 2017 WL 492201, at *4 (D.S.C. Feb. 7, 2017) (stating that "it is difficult to conceive of how one might be forced to use or possess a firearm in relation to or in furtherance of a drug trafficking crime," but noting "perhaps these conditions can be met under some circumstances").

## 7. Government's Motion in Limine to Permit the Introduction of Defendants' Prior Convictions, and to Preclude Jury Nullification Arguments at Trial (Doc. No. 1182)

The Government requests that it be permitted to introduce prior criminal convictions for Frazier and Stanley using certified copies of criminal judgments. That request is based upon Rules 803(22) and 902(1). In response, Stanley objects because he has filed his own motion in limine seeking to exclude evidence of his Colorado conviction. That motion is addressed and denied in

paragraph 26A. below and, accordingly this part of the Government's motion will be granted as to

Stanley. It will also be granted with respect to Forrester, who has indicated no objection (Doc. No.

1300) to the Government's motion.

As for Frazier, he pled guilty and was sentenced on June 5, 2017 in the Montgomery County

Circuit Court for three drug felonies: (1) possession of diazepam with intent to sell/deliver; (2)

possession of more than .5 ounces of marijuana, and (3) possession of methamphetamine. Frazier

concedes the authenticity of the underlying criminal judgment, and accepts that admissible

judgments are not hearsay. (Doc. No. 1301). He argues, however, that his convictions are not

admissible because no defendant is charged with possessing or selling Diazepam, he is not charged

with marijuana offenses (although others are for offenses that occurred after he went to jail); and the

methamphetamine possessed was minuscule and, therefore, not probative. As a consequence, Frazier

insists that his Montgomery County convictions do not make a fact in issue more or less likely. They

do.

In Count One, Defendants are charged with being part of a RICO conspiracy and part of a

criminal organization that, among other things, engaged in a "conspiracy to traffic in narcotics," and

that one of the purposes of the Clarksville Chapter was to "enrich[] the leaders, members" and others

through the "illegal trafficking of narcotics" (Doc. No. 485, Third Superseding Indictment ¶¶ 1 &

8a). These convictions could therefore be probative evidence of the RICO conspiracy.

Frazier also argues the convictions are inadmissible under Rule 609 because "[i]t is

fundamental that a prior conviction may not be used in a criminal trial unless the defendant testifies

or otherwise places his credibility in issue," and "[n]o other use of a prior conviction is allowed by

the Rules, until sentencing." (Doc. No. 1301 at 4). Not so. Rule 404(b) permits evidence of a

defendant's other crimes when that evidence is used to prove any of a number of things, including intent to commit the crime at issue, recognizing, of course, that "Rule 404(b) prohibits a court from employing reasoning that amounts to 'once a drug dealer, always a drug dealer [.]'" <u>United States v. Barnes</u>, 822 F.3d 914, 922 (6th Cir. 2016) (citation omitted) ; <u>see also</u>, <u>United States v. Love</u>, 254 F. App'x 511, 514 (6th Cir. 2007) (evidence that defendant had previously been convicted of selling cocaine was admissible in drug conspiracy case); <u>United States v. Wales</u>, 68 F. App'x 575, 581 (6th Cir. 2003) (finding that evidence of defendant's prior two felony drug convictions was admissible under other acts rule in trial for conspiracy to possess with intent to distribute cocaine). Moreover, a prior conviction may not even need to be considered as an "other crime" under Rule 404(b) when it is intrinsic evidence. <u>United States v. Donohue</u>, 726 F. App'x 333, 341 (6th Cir. 2018). That is, evidence intrinsic to a charged offense is "exempt . . . from application of Rule 404(b) on the theory that there is no 'other' wrongful conduct at issue; the evidence is admissible as part and parcel of the charged offense." <u>United States v. Daraio</u>, 445 F.3d 253, 264 (3d Cir.2006); <u>see also</u>, <u>United States v. Ruiz-Chavez</u>, 612 F.3d 983, 988 (6th Cir. 2010) (evidence of defendant's prior conviction for possessing stolen firearm was intrinsic to a charged drug conspiracy because it "provided context" and "completed the story"); <u>United States v. Royal</u>, 972 F.2d 643, 647–48 (5th Cir. 1992) (evidence of prior drug convictions was intrinsic in a drug conspiracy case because "it allowed the jury to understand the nature of the relationship between the [co-conspirators] and evaluate whether it was likely that the [d]efendant[s] would have conspired"). This portion of the Government's motion will be granted as to Frazier as well.[4]

---

[4] This ruling does not preclude Stanley, Forrester, or Frazier from arguing at trial that admission of their convictions would be more prejudicial than probative.

The Government also seeks to prohibit any arguments for jury nullification.  More specifically, the Government moves in limine to prevent Defendants "from arguing to the jury or encouraging an impermissible inference by the jury that, because they have been convicted and sentenced for similar conduct in another jurisdiction, they should not be held accountable in the instant case." (Id. at 7).  This part of the motion is also granted, although it could just as easily be denied as unnecessary because all counsel in this case are experienced professionals who know that jury nullification arguments are improper.  See United States v. Walsh, 654 F. App'x 689, 697 (6th Cir. 2016); United States v. Krzyske, 857 F.2d 1089, 1090 (6th Cir. 1988).  Obviously, there can be a fine line between zealous advocacy and improper arguments, but on which side of the line an argument falls can only be determined in context and at trial.

The Government's Motion in Limine to Permit the Introduction of Defendant's Prior Convictions and to Preclude Any Jury Nullifications Arguments at Trial (Doc. No. 1182) is **GRANTED**.

## 8. Government's Motion in Limine to Preclude Impeachment of Witnesses Based on Nature of Prior Convictions (Doc. No. 1208)

In this motion, the Government seeks to preclude impeachment of two witnesses – yet to be identified – as to certain prior convictions.  According to the Government, "Person 1" has multiple prior felony convictions, including convictions for burglary, aggravated assault, and rape.  "Person 2" has multiple felony offenses for "Possession of a Matter Portraying a Sexual Performance by a Minor."  The Government requests that the rape conviction for "Person 1," and the child sexual offense convictions for "Person 2" be referred to simply as "felony offenses."

Rule 609(a)(1) provides that, for purposes of "attacking a witness's character for truthfulness

by evidence of a criminal conviction," crimes "punishable by death or by imprisonment for more than one year . . . must be admitted, subject to Rule 403, . . . in a criminal case in which the witness is not a defendant." Fed. R. Evid. 609(a)(1). Acknowledging as much, the Government argues that, while the sexual convictions for both Person 1 and Person 2 are admissible, the Court should preclude the introduction of the specifics surrounding the felony under Rule 403 because the prejudicial impact of the convictions substantially outweighs their probative value.

Without even knowing the names of the witnesses, let alone the exact nature of the convictions, or the dates or the circumstances surrounding them, the Court is hardly in a position to "make an on the record finding based on the facts that the conviction's probative value substantially outweighs its prejudicial impact," United States v. Meyers, 952 F.2d 914, 916-7 (6th Cir. 1992), or vice versa.[5] This is particularly true because "[w]hen performing the Rule 403 analysis under Rule 609(a)(1), district courts are admonished to consider that Rule 609(a)(1) crimes, which do not bear directly on honesty such as to be automatically admissible under Rule 609(a)(2), may nonetheless be highly probative of credibility." United States v. Estrada, 430 F.3d 606, 617 (2d Cir. 2005). Included within this admonition are sexual offenses, as suggest by Defendants' citation to a number of cases where those types of offenses were admitted notwithstanding Rule 403. After all, "Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully." Id. Furthermore, the Government's position does not consider that a cautionary instruction to the jury can sometimes "provide an adequate safeguard against any potential prejudice

---

[5] In a footnote, the Government offers to provide, under seal, "additional details regarding these individuals[.]" (Doc. No. 1208 at 1 n.1). The Court declines that invitation because it would be better to hear argument from the parties at the time the Government seeks to keep the exact nature of the convictions from the jury.

possibly engendered by the admission of the prior conviction." United States v. Moore, 917 F.3d 215, 235 (6th Cir. 1990).

Based on the above, a ruling on the Government's Motion to Preclude Impeachment (Doc. No. 1208) is **DEFERRED** until trial. Prior to seeking to impeach either "Person 1" or "Person 2" based upon his or her felony convictions for a sexual offense, counsel shall bring the matter to the Court's attention so that a final ruling can be made.

**9. Joint Motion in Limine filed by Frazier, Boylston, and Meyerholz to Preclude Introduction of a Patch Chart (Govt. Ex. 2731) (Doc. No. 1187)**

The Government's proposed Trial Exhibit 2731 is captioned "Mongols Outlaw Motorcycle Gang Vest Insignia" and is a sketch of a vest with various patches, along with an indication of what those patches purport to mean or signify. Defendants seek to exclude the exhibit at trial for many reasons, not the least of which is that it is not evidence, but rather was apparently created by a law enforcement agency, as suggested by the seals of the ATF and various police departments at the top of the document. Defendants also object because the vest relates to the California Mongols, which is not on trial, and because it contains patches or descriptions that are not relevant here (such as a reference to a "2002 Laughlin Shooting" that necessarily occurred before the Clarksville Chapter even came into being). They also contend that the exhibit is inflammatory in several respects, including lurid descriptions (accurate or not) of sexual acts that the colored wings on the left side of the vest purport to represent. As a consequence, Defendants argue that "[b]ecause the California Mongols patch chart is not admissible under the Rule 1006 standard, the chart should be excluded from admission into evidence." (Doc. No. 1187 at 7).

The Government argues that its chart is not a summary within the meaning of Rule 1006, but

rather is properly a demonstrative aid, if not substantive evidence. However, and perhaps because Defendants raise a number of good points, the Government in its response has proposed a modified chart titled "Mongols Vest Insignia" (Doc. No. 1268-1) that pertains to the Clarksville Chapter of the Mongols, and changes the description of the colored wings to "colors represent different types of sexual acts."

Having considered the parties' arguments, the Court finds that the chart originally designated as Trial Exhibit 2731 is inadmissible for the reasons stated by Defendants. The Court also finds that the trial exhibit is not properly a summary chart because it is not based upon "voluminous writings, recordings, or photographs that cannot be conveniently examined in court," as required by Rule 1006. The Court further finds, however, that the Government's proposed revision, with some additional tweaking, may be a proper demonstrative aid at trial.

"[A]llowing the use of charts as 'pedagogical' devices intended to present the government's version of the case is within the bounds of the trial court's discretion to control the presentation of evidence under Rule 611(a)." United States v. Taylor, 210 F.3d 311, 315 (5th Cir. 2000). "Such demonstrative aids typically are permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that the charts are not independent evidence." Id.; see also United States v. Bray, 139 F.3d 1104, 1111 (6th Cir. 1998) (stating that "courts have discretionary authority to permit counsel to employ pedagogical devices . . . to assist counsel in the presentation of argument to the court or jury").

Here, in lieu of displaying the revised chart to the jury, the Government could be required to show the jury actual vests or picture of vests allegedly worn by Clarksville members and have a competent witness identify the patches. This seems entirely unnecessary when, so far as the Court

can now tell, there is really no dispute that certain patches exist on Mongols vests (or cuts as they are often called), except perhaps with respect to the "Tennessee" bottom rocker, and they mean or signify what the Government claims they do. That said, the Court sees no need for displaying a chart with a vest that contains the "sexual act wings," even if, as the Government claims, Santiago's vest contained one or more such wings. Defendants are not charged with "conspiring or combining" to commit sexual acts. The Court will also consider requiring the Government to remove certain patches from its revised depiction, such as the "Skull and Crossbones" patch if none of the Defendants earned and wore that patch for killing someone on behalf of the Mongols.

In sum, Defendants' Motion (Doc. No. 1187) is **GRANTED** and proposed Trial Exhibit 2731 will not be admitted into evidence in its present form. However, the Government may use a properly modified insignia chart as a demonstrative aid after review by the Court and comments from Defendants. This is a matter that can be taken up at the pretrial conference if the parties so desire.

**10. & 11.   Joint Motion in Limine filed by Boylston and Meyerholz to Preclude Introduction of Gruesome and Cumulative Photographs (Doc. No. 1188) & Frazier's Motion In Limine No. 6 relating to Photographs of S.B.  (Doc. No. 1209)**

Defendants Boylston and Meyerhoz seek "to preclude the government from advancing hundreds of especially gruesome, inflammatory, and cumulative photographs"  and then identifies them by number. Similarly Frazier objects to 208 photographs, identified by number. Both motions apparently relate to photographs pertaining to the alleged kidnappings and murders of Stephanie Bradley and Stephen Cole. Rulings on these Motions (Doc. Nos. 1188 and 1209) are **DEFERRED** until trial because all the Court has before it now are exhibit numbers, not the actual photographs. Nor have the photographs been placed in context so that the Court can determine whether they are unnecessarily cumulative, or whether (as Frazier argues) some have been altered or staged.

**12. Joint Motion in Limine filed by Frazier, Boylston, and Meyerholz Regarding Payment to Counsel (Doc. No. 1189)**

This Motion is **GRANTED.** The jury will be instructed at the appropriate time, and upon counsel's request, as follows: "You are instructed that none of the defense counsel appearing in this case were hired or paid for by the Mongols Motorcycle Club."

**13. & 14. Joint Motion in Limine filed by Frazier, Boylston, and Meyerholz to Prohibit the Publishing or Displaying of Evidence to the Jury in Opening Statements (Doc. No. 1191) and Stanley's Motion in Limine No. 3 to Adopt Motion (Doc. No. 1199)**

Defendants seek to preclude the Government from utilizing any evidence during opening statements. The Government objects, citing this Court's statement in United States v. Johnson, 299 F. Supp.3d 909,923 (M.D. Tenn. 2018) (citation omitted) that the purpose of an opening statement is "to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole." As this court also noted in Johnson, however, "[l]imitations on opening statements are a matter of discretion for the trial court, and a 'trial court has broad discretion in controlling the direction of opening statements.'" Id.

Generally, this Court does not allow the use of evidence during opening statements, unless the parties have agreed to its admissibility and authentication, or the parties have no objection to the use of the evidence at trial. This is because, up until the evidence is introduced, it is not evidence at all. Absent any agreement among the parties, the Motion to Prohibit Displaying or Publishing Evidence during opening statements is **GRANTED**. Also **GRANTED** is Stanley's Motion to Adopt. (Doc. No. 1199).

**15. Joint Motion in Limine filed by Frazier, Boylston, and Meyerholz to Preclude the Introduction of Cumulative and Redundant Photographs (Doc. No. 1192)**

This Motion is two-fold. First, Defendants seek to preclude the introduction of photographs

depicting alleged Mongol members and photographs depicting Mongol memorabilia because (1) they are irrelevant insofar as they do not depict anyone on trial, or who may be a potential witness or victim; and (2) they are cumulative. The question of cumulativeness cannot be taken up until trial. As for relevancy, the Government states that the photographs at issue (Trial Exhibits 2753-2827) were seized from one or more Google Gmail accounts associated with the Clarksville Chapter. Given the RICO charge alleged in Count One, these picture are potentially probative of the existence of the alleged enterprise, defendants' participation in the enterprise, and their relationships to other co-conspirators and co-defendants. They may also go towards alleged racketeering activity and the relationship with other, non-Clarksville based Mongols. This part of the Motion is **DENIED.**

Second, Defendants object to the Government introducing photographs of physical evidence that will be introduced at trial because there is no probative value in showing the jury the same evidence in different formats (*i.e.*, a picture of the object and the actual object itself). Insofar as Defendants are objecting to photographs of evidence taken by law enforcement officers during a seizure, the Court disagrees. Photographs of the location of seized evidence can be relevant to establishing ownership or control. It can assist the jury in understanding where certain evidence was located, aid in showing the chain of custody, and/or corroborate a witness's testimony that the object was found in the location that he or she said. To the extent this is what Defendants are complaining about, the Motion is also **DENIED.**

The Court notes that in their reply brief, Defendants indicate that there are a number of photographs that are not used to show location, but rather are just a pictures of items the Government intends to introduce at trial. If that is indeed the case, the Government can pick-and-choose between the two. There is no need to show both the item and a photograph of it, and to this extent

Defendants' Motion is **GRANTED.**

The Joint Motion in Limine to Preclude the Introduction of Cumulative and Redundant Photographs (Doc. No. 1192) is **GRANTED IN PART** and **DENIED IN PART** as set forth above.

**16. Frazier's Motion in Limine No. 7 to Prohibit the Government From Submitting Certain Photographs (Doc. No. 1210)**

Frazier moves to exclude Government Trial Exhibits 924, 925, and 927-944, which, according to the Government are photographs taken on January 16, 2016, at the time of a search at 1331 Meredith Way, Clarksville, Tennessee. Those photographs allegedly depict various evidence found in the residence. Although Frazier claims that "it appears not all of the photographs were taken at the scene, and there are no reports indicating where and when the photographs were taken," this goes toward the issue of authentication, meaning that, at trial, the Government must show that the exhibit is what it purports to be. Fed. R. Evid. 901.

Frazier additionally seeks to exclude Government's Trial Exhibit 944, which is a photograph taken of him while at the scene. He insists this is prejudicial because the Government already has a photo of him that they can publish to the jury. With his reply, Frazier attached what apparently is the photograph at issue. While Frazier certainly does not look happy in the photograph, it does not depict him in handcuffs, nor can the Court say, as Frazier insists, that his "custodial status is implied." (Doc. No. 1322 at 3). The photograph appears to be relevant insofar as it shows Frazier's connection to both the residence and items found therein. Accordingly, Frazier's Motion in Limine No. 7 (Doc. No. 1210) is **DENIED.**

**17. Frazier's Motion in Limine No. 10 to Preclude the Introduction of Trial Exhibits 1046-1060 (Doc. No. 1235)**

In this Motion, Frazier asks the Court to exclude certain photographs that were seized on

April 24, 2016, during a traffic stop in Boone County, Missouri, because the photographs "were not taken at the scene," but were taken by local AFT agents after they retrieved them from the sheriff's office. The Government has indicated that it has no intention to introduce these photographs and, accordingly, Frazier's Motion in Limine No. 10 (Doc. No. 1235) is **GRANTED.**

**18. – 20. Frazier's Motion in Limine No. 5 to Prohibit the Government From Using Any Excerpts of Statements or Recordings Prior to Review by Defendant (Doc. No. 1198)**; **Joint Motion in Limine by Santiago and Hern to Prohibit the Government From Using Any Excerpts of Statements or Recordings Prior to Review by Defendant (Doc. No. 1215) & Stanley's Motion in Limine to Adopt Frazier's Motion in Limine No. 5 (Doc. No. 1200)**

In these Motions, Defendants seek to preclude the Government from introducing any audio recordings at trial until counsel for each Defendant has had an opportunity to review and respond to any proposed excerpt the Government intends to use in its case-in-chief. The Government objects, noting that counsel and Defendants participated in an exhibit review on January 15-17 and 22, 2020, wherein the Government identified 31 potential recordings (all of which were in English), and all of those recordings were disclosed by November 21, 2019. The Government has also stated that transcripts will be made available as soon as they become available. The Court is inclined to agree with the Government based on the present record that Defendants have failed to identify a specific issue for pretrial resolution through a motion in limine. Moreover, they apparently have been in possession of the recording for months. Nevertheless, the Court **DEFERS RULING** on these motions (Doc. Nos. 1198. 1200 and 1215), and will hear further argument either at the final pretrial conference or at the April 1, 2020 status conference, after Defendants review the transcripts, and the parties meet and confer to resolve any concerns. This seems particularly appropriate given Frazier's reply in which he hones in on a handful of exhibits and request that the Government indicate which portions of those recordings it intends to introduce at trial.

**21. Santiago's Motion in Limine to Preclude the Introduction of Statement and Items Seized During His Detention and Interrogation at 1331 Meredith Way (Doc. No. 1204)**

This motion is covered by this Court's September 13, 2019 Order (Doc. No. 1013), granting in part and denying in part Santiago's Motion to Suppress Evidence (Doc. No. 833). Specifically, the Court ruled:

> The Motion is **GRANTED** solely with respect to any incriminating statements Santiago is alleged to have made at the residence up until the time that he was given his Miranda warnings in the Special Operations Unit interrogation room. Those statements may not be used for any purpose at trial. The Motion is **DENIED** with respect to the evidence that was seized from Defendant and the residence, and **DENIED** with respect to any statements that were made by Santiago after he was administered Miranda warnings.

(Doc. No. 1013 at 2). Santiago's Motion (Doc. No. 1204) is **DENIED AS MOOT.** This ruling, however, does not address Santiago's contention in his reply brief relating to an MDL PAPM85 pistol that police discovered in a duffle bag next to Santiago, which he claim was a legally purchased firearm and not relevant to this case.

**22. Boylston's Motion in Limine to Preclude the Introduction of a May 16, 2019 Phone Call (Doc. No. 1213)**

This motion relates to a recorded jail phone call between Boylston and Eddie Canas, who allegedly is a member of the Mongols Chapter in Arkansas. During the course of the 15-minute call, Boylston references the potential punishment he faces, and his attorney's travel to Washington D.C. to argue against the death penalty. Boylston's Motion is geared specifically towards those conversations, and the Government has indicated in response that it will redact the recording. This seemingly would resolve the issue except that, in his reply, Boylston has indicated there are additional, objectionable conversations, including further discussions about potential punishment, as well as discussions about plea negotiations, and his invocation of his Fifth Amendment right not

to testify. Accordingly, the Court hereby **DEFERS** ruling on Boylston's Motion (Doc. No. 1213).

Between now and the April 1, 2020 status conference, counsel shall meet in person in an effort to resolve this issues. If they cannot, they shall bring it to the Court's attention so that it can be discussed at the status conference.

**23. – 25. Joint Motion in Limine filed by Frazier, Boylston, and Meyerholz Regarding Tattoos, Clothing Containing Expletives, and Two Mongols Videos (Doc. No. 1190); Joint Motion in Limine by Santiago and Hern to Preclude the Introduction of Photographs of Gang Tattoos (Doc. No. 1214); & Joint Motion in Limine by Santiago and Hern to Prohibit the Government From Introducing Mongols Items and Photographs that Contain the "SS" Lightning Bolt (Doc. No. 1211)**

Collectively, these motions raise a number of different issues, which the Court considers in turn.

### A. Gang Tattoo Photographs

Defendants object to the introduction of pictures of gang tattoos. They claim that "[t]he only possible motivation for introducing these photographs would be to inflame the passions and prejudices of the jury" and would violate Defendants' Fifth and Sixth Amendment right to a fair trial. (Doc. No. 124 at 2). They also argue that introduction of the photographs would violate their First Amendment right to free association and expression.

Contrary to Defendants' contention that the sole purpose of utilizing this evidence is to prejudice them, the Sixth Circuit has made clear that "[g]ang-affiliation evidence may be highly probative of an individual's membership in a particular gang," and "gang-tattoo evidence helps to identify an individual as a member." United States v. Rios, 830 F.3d 403, 421 (6th Cir. 2016); see also, United States v. Suggs, 374 F.3d 508, 517 (7th Cir. 2004) (stating that "gang membership is relevant evidence in showing a drug distribution conspiracy" and that "[t]attoos that help to establish

gang membership are admissible to support a showing of a joint venture or conspiracy"); United States v. Brown, 288 F. App'x 518, 523 (10th Cir. 2008) (noting that the government is permitted "to introduce evidence of gang activity," including tattoos).

Furthermore, "[i]t is beyond dispute that the Constitution does not protect Defendant from giving non-testimonial evidence," and "[t]hus, the Fifth Amendment's protection against self-incrimination does not extend to physical characteristics such as giving a blood sample or handwriting exemplar." United States v. Nixon, No. 15-CR-20020, 2015 WL 4430176, at *2 (E.D. Mich. July 20, 2015) (citing Pennsylvania v. Muniz, 496 U.S. 582, 595–98 (1990); United States v. Dionisio, 410 U.S. 1, 5-6, (1973)). "Federal courts have therefore held that photographing a defendant's tattoos for display to the jury or requiring a defendant to reveal his tattoos to a jury does not run afoul of the Fifth Amendment." Nixon, 2015 WL 4430176, at *6 (collecting cases);see also United States v. Velasquez, 881 F.3d 314, 337-38 (5th Cir. 2018) ("If a tattoo is simply relied upon to identify a defendant, then the Fifth Amendment privilege against self-incrimination is not offended.").

Finally, while having a tattoo may be a form of expression or be used to show association with others, admission of them in a criminal case charging a RICO conspiracy is not improper. "The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993). Here, the Government is not attempting to proscribe or punish free speech. "[S]peech [i]s not the basis for the prosecution, but instead it [i]s used to establish the existence of, and [defendant's] participation in, the alleged RICO enterprise." United States v. Pierce, 785 F.3d 832, 841 (2d Cir. 2015); accord, United States v. Garnes, No. 14-20119, 2015 WL 3574845, at *3 (E.D. Mich. June 5, 2015).

Defendants' argument are not saved by either United States v. Ledbetter, 188 F. Supp.3d 674 (S.D. Ohio 2016) or United States v. Mongol Nation, 370 F. Supp.3d 1090, 1102 (C.D. Cal. 2019). Ledbetter indicated that permitting the Marshals to force a Defendant to display tattoos so that the tattoos could be photographed could implicate the Fifth Amendment. It also held that defendants could not be forced to display their tattoos to the jury. Neither scenario is at issue here. Instead, the Government intends to introduce photographs it already has in its possession.[6]

Mongols Nation had nothing to do with displaying photographs of tattoos at trial. Instead, it had to do with a forfeiture request from the Government relating to tangible personal property, including vests, patches, clothing, belts, belt buckles, jewelry, lighters, bandanas, stickers, flags or pennants, hats, helmets, documents, accessories, and motorcycle parts.

Accordingly, these Motions are **DENIED**. Included within this ruling are tattoos of "gang" nicknames to the extent that a nickname can be established for a particular Defendant. Also included for now, is Frazier's "Offit" tattoo because the Government asserts this is in reference to Jacob Ort, a Mongols prospect who died following the home invasion robbery and kidnapping alleged in Count Nineteen and Twenty and who is named in numerous overt acts alleged in Count One, as well as in numerous substantive counts. See United States v. Ford, 761 F.3d 641, 649 (6th Cir. 2014) ("Evidence of gang affiliation is relevant where it demonstrates the relationship between people and that relationship is an issue in the case, such as in a conspiracy case."); United States v. Miller, 48 F. App'x 933, 948 (6th Cir. 2002) (stating in drug conspiracy case that it was not error to admit defendant's tattoo which bore a gang name even though defendant was not a member of that gang

---

[6] Beyond that, the Ledbetter court stated the Government could "introduce evidence of the defendants' incriminating, communicative tattoos *if* those are plainly visible on the defendants' bodies[.]" Id. at 15 (italics in original).

because defendant wanted to curry favor with that gang, which supplied him drugs).

### B. Non-Gang Tattoos, Photographs & Items

Hern and Santiago seek to preclude the introduction of items that contain "SS" lightning bolts because those are readily identifiable as Nazi symbols. In response, the Government argues that this is direct evidence that Mongols used intimidation tactics to achieve the purposes of the enterprise. The Government also argues that this symbol, as well as Meyerholz's Iron Cross tattoo, are "probative because the symbols are associated with white supremacy," and "[t]he Mongols do not permit African Americans to become members." (Doc. No. 1272 at 13). Maybe so, but the Defendants are not charged with being part of a neo-Nazi or white supremacist organization, nor does the Third Superseding Indictment allege any hate crimes. The Court finds that the extraneous use of such symbolism is highly prejudicial and would have the potential to inflame the passions or prejudice of the jury for no apparent reason.

The same can be said about the gratuitous use of expletives. For example, Meyerholz apparently had a hat with the phrase "Fuck off" written on the side. So far as the Court can tell, this is not probative of anything at issue in this case.

That said, context matters. If, for example, the Government can establish that one or more of the Mongols' patches has SS lighting bolts as part of the design, this might be relevant and admissible. Likewise, Meyerholz's button with the phrase "Fuck the Police" could perhaps become relevant and admissible, if it is shown that one of the central tenets of the Mongols was to show disdain for law enforcement. Symbols and phrases might also be admissible if, for example, there is a group photograph of Mongols members wearing a t-shirt with a derogatory phrase because this might be relevant to show association. The point is, the Court will not allow the gratuitous

introduction of non-pertinent yet potentially inflammatory evidence into the case.

Frazier, Boylston, and Meyerholz also seek to preclude the introduction of two videos purportedly depicting Mongols-related events. The first captures the Mongols' 2017 "National Run" in Palm Springs, California, which the Government has agreed not to offer into evidence. (Doc. No. 1272 at 2 n.1). The second is a video taken at a funeral of Thomas Chavez, a member of the Mongols Harbor Chapter in California. The Government argues this is "directly probative of the RICO conspiracy and other criminal charges in this case," pointing out that Chavez was (1) the "patch daddy" who sponsored the Defendants' efforts to establish a Clarksville Chapter; (2) closely associated with the Chapter because of his sponsorship; and (3) intimately involved in Defendants' criminal activities, including the drug trafficking conspiracy. (Id. at 16). Additionally, the Government claims that it was Chavez's death in Clarksville, which precipitated the kidnapping and interrogation of S.P., as charged in Count Fifty-Two, and that, but for his death Chavez would have been indicted in this case. Even accepting this as true, the Court is not in a position to rule that the video is admissible at trial given the balancing required by Rule 403. On the one hand, it may be, as the Government claims, that the video is "probative of Defendants' motive, as it sheds light on Chavez's respected status within the national Mongols gang, the significance of his death to the gang, and provides context for why defendants were concerned about ramifications from his death (including the possibility they would be blamed for it)." (Id. at 16-17). On the other hand, and assuming none of the Defendants attended the funeral, showing the jury a video of a bunch of bikers attending a funeral may not be relevant within the meaning of Rule 401, or may be "unfair[ly] prejudicial," or result in "wasting time" under Rule 403.

Finally, Frazier, Boylston, and Meyerholz seek to prevent the Government from introducing

photographs of "evidence markers" because such markers might "mislead the jury into believing that the government has far more 'evidence' than it does." (Doc. No. 1190 at 7). There may come a point in time when the sheer number of photographs depicting evidence markers become too many and result in "wasting time, or needlessly presenting cumulative evidence." Fed. R. 403. Until then, however, photographs of evidence markers are admissible because they will help the witness explain where and under what circumstances particular items of evidence were recovered.

Accordingly, the (1) Joint Motion in Limine filed by Frazier, Boylston, and Meyerholz Regarding Tattoos, Clothing Containing Expletives, and Two Mongols Videos (Doc. No. 1190); (2) Joint Motion in Limine by Santiago and Hern to Preclude the Introduction of Photographs of Gang Tattoos (Doc. No. 1214); and (3) Joint Motion in Limine by Santiago and Hern to Prohibit the Government From Introducing Mongols Items and Photographs that Contain the "SS" Lightning Bolt (Doc. No. 1211) are **DENIED** insofar as they relate to photographs of gang tattoos, but are **GRANTED IN PART** and **DENIED IN PART** insofar as they relate to the other materials covered by the motions.

**26 - 29. Rule 404(b) Notice Motions – Stanley's Motions in Limine Nos. 1 and 2 (Doc. Nos. 1195 & 1196); Frazier's Motion in Limine No. 4 (Doc. No. 1197) & Santiago's and Heade's Joint Motion to Preclude Introduction of Rule 404(b) Evidence (Doc. No. 1202)**

Each of these motions, to some degree, relate to the Government's Rule 404(b) Notice (Doc. No. 1165) that was filed on January 31, 2020, in accordance with this Court's Scheduling Order. In it, the Government identified three categories of potential "other act" evidence: "(1) evidence related to opioids other than Oxymorphone"; (2) "evidence related to Frazier's distribution of opioids during the spring and summer of 2015, and the summer of 2016"; and (3) "evidence regarding marijuana seized during the search of 1331 Meredith Way and the search of the Chevrolet Cruze in

Aurora, Colorado." (Id. at 2-4). The notice also provides a short summary of the reasons why the Government believes the evidence is admissible. Importantly, however, before listing the categories, the Government stated its contention "that the evidence set forth below does not qualify as Rule 404(b) evidence, but rather is admissible because it is inextricably intertwined with the charges in the case," and stated that Rule 404(b) notice was being provided "alternatively . . . out of an abundance of caution[.]" (Id. at 2).

Rule 404(b) of the Federal Rules of Evidence provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." Fed. R. Evid. 404(b). "Before the court may admit 404(b) evidence, it must: (1) determine whether there is sufficient evidence that the prior acts occurred; (2) determine whether the other act is admissible for one of the proper purposes outlined in the rule; and (3) apply Rule 403 balancing to determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." United States v. Hardy, 643 F.3d 143, 150 (6th Cir. 2011).

The Sixth Circuit has held, however, "that Rule 404(b) is not applicable where the challenged evidence is 'inextricably intertwined' with evidence of the crime charged," United States v. Everett, 270 F.3d 986, 992 (6th Cir. 2001), "or when the acts are 'intrinsic,' or 'part of a continuing pattern of illegal activity.'" United States v. Rosin, 664 F.3d 1042, 1063 (6th Cir. 2012) (quoting United States v. Barnes, 49 F.3d 1144, 1149 (6th Cir. 1995)). Of course, "intrinsic evidence, like all evidence, must satisfy the balancing requirement of Rule 403: its probative value must not be

substantially outweighed by a risk of unfair prejudice to the defendant." Id.

With this backdrop, the Court turns to the Rule 404(b) motions in limine.

**A. Stanley's Motion (Doc. Nos. 1195, 1196)**

In the Third Superseding Indictment, Stanley is charged in Count One with participating in a RICO conspiracy; in Count Two with conspiracy to possess with intent to distribute fifty (50) grams or more of methamphetamine; and Counts Twenty-Three (23) and Twenty-Seven (27) with possession with intent to distribute fifty (50) grams or more of methamphetamine in December 2015 and January 2016, respectively.

At trial, the Government intends to introduce evidence that Stanley admitted to, and was convicted of, felony possession of drugs in February 2016. This occurred after Stanley and another individual were stopped on January 26, 2016, in Aurora, Colorado while traveling from California to Kentucky. During a search of the car, approximately 486 grams of methamphetamine, a quantity of marijuana and drug paraphernalia was discovered. Stanley seeks to exclude this evidence and his Colorado convictions because, not only is all of this irrelevant its probative value is substantially outweighed by its prejudicial effect under Rule 403. Additionally, he argues that admission of this conviction would be improper prior bad act evidence under Rule 404(b).

Neither of Stanley's motions address the admissibility of intrinsic evidence, yet that is central to the Government's position. He is charged with being a part of a methamphetamine drug conspiracy from March 2015 until the return of the Third Superseding Indictment, and his Colorado conduct and conviction for "controlled sub-poss M/H" falls squarely within the time frame of that conspiracy. In short, it has "a causal, temporal or spatial connection," United States v. Fortune, 759 F. App'x 417, 423 (6th Cir. 2018), to the charged drug conspiracy and is therefore admissible as

30

intrinsic evidence. Evidence that Stanley was arrested with methamphetamine during the period of the conspiracy can be highly probative and would not lead a jury to convict on an improper basis.

Nor would the jury to be called to convict on an improper basis regarding the marijuana evidence that was found. As noted previously, Defendants are charged with being part of a RICO conspiracy that engaged in drug trafficking, along with other illegal conduct. Moreover, the Government indicates that the smell of marijuana is what served as a basis for the search of the Chevrolet Cruze and, in this regard, this evidence would tend to complete the story of how officers ended up discovering the methamphetamine in the first place. See United States v. Marrero, 651 F.3d 453, 471 (6th Cir. 2011) (noting that "[t]he circumstances under which police officers apprehended [the defendant] are inextricably intertwined with evidence of the possession crimes with which he was later charged"); United States v. Fortune, 759 F. App'x 417, 423 (6th Cir. 2018) (admission of evidence from a traffic stop was not improper other act evidence; it was intrinsic evidence "because testimony from multiple witnesses established the stop was temporally, spatially, and causally connected to the charged conspiracy").

Accordingly, Stanley's Motions in Limine (Doc. No. 1195 & 1196) are **DENIED**.

**B. Frazier's Motion (Doc. No. 1197)**

Frazier objects to the introduction of any evidence relating to opioids other than Oxymorphone, to the vagueness of the Notice as to dates, and to the introduction of evidence relating to the Colorado stop. The last argument fails for the reasons just expressed.

His other two arguments fail because Rule 404(b) Notice is not required when the evidence at issue is intrinsic to the underlying charge. A "RICO conspiracy charge 'merely requires proof that the defendant intended to further an endeavor which, if completed, would satisfy all of the elements

of a substantive [RICO] criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'" United States v. Rios, 830 F.3d 403, 424 (6th Cir. 2016) (quoting United States v. Fowler, 535 F.3d 408, 420–21 (6th Cir. 2008)). As a consequence, "'[t]here is no requirement that a RICO conspiracy indictment allege any overt act.'" Id. (citing Salinas v. United States, 522 U.S. 52, 65 (1997)). Likewise, "the United States Supreme Court has made clear that '21 U.S.C. § 846, the drug conspiracy statute, [does not] require[ ] the Government to prove that a conspirator committed an overt act in furtherance of the conspiracy.'" United States v. Cureton, 661 F. App'x 369, 377 (6th Cir. 2016) (citing United States v. Shabani, 513 U.S. 10, 11, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) ). This is "[b]ecause the essence of the crime of conspiracy is agreement," and "the government must prove that each member of a conspiracy agreed to participate in what he knew to be a collective venture directed toward a common goal." United States v. Patel, 579 F. App'x 449, 461 (6th Cir. 2014).

Further, it must not be overlooked that, as a part of the RICO conspiracy, Defendants are alleged to have participated in drug trafficking. Evidence that one or more Defendant dealt in Oxycodone instead of Oxymorphone, or "pans" instead of "roxys" during the relevant time frame would not change that both helped facilitate the alleged enterprise. United States v. Stokes, 64 F. App'x 352, 356 (4th Cir. 2003) (evidence that defendants were engaged in drug distribution, carried firearms, and committed other crimes was intrinsic to both the drug conspiracy and racketeering count); United States v. Lerma-Plata, 919 F. Supp. 2d 152, 158 (D.D.C. 2013) (stating that court could "easily conclude, based on the present record, that the Government's proposed evidence of Defendant's alleged conspiracy to launder money and traffic firearms is properly considered intrinsic to the charged drug conspiracy as contemporaneous acts that facilitated the commission of the

charged offense"). Accordingly, Frazier's Motion (Doc. No. 1197) is **DENIED**.

### C. Santiago's and Heade's Motion (Doc. No. 1202)

Santiago and Heade argue the Government's notice is deficient because it does not provide the Court will enough information to perform the admissibility analysis required by Rule 404(b). In addition they argue that the third category (the Colorado traffic stop) is not intrinsic to the charged crimes. Those arguments are rejected for the reason stated in regard to the motions filed by Stanley.

The Court's denial of the foregoing motions should not be read too broadly. All the Court is ruling right now is that this evidence *appears* to be intrinsic to at least the RICO conspiracy charge. It will be for the Government to sufficiently establish before the introduction of this evidence that it is truly or actually intrinsic to that charge or another count. Furthermore, the Court has yet to determine whether the probative value of any of this evidence "is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." United States v. Mack, 258 F.3d 548, 553 (6th Cir. 2001). The Court has made preliminary rulings, none of which substitute for the rigor of trial. Santiago's and Heade's motion (Doc. No. 1202) is **DENIED.**

**30. – 32. Joint Motion in Limine filed by Frazier, Boylston, and Meyerholz to Preclude the Introduction of Other Crimes, Wrongs, or Acts (Doc. No. 1193); Joint Motion in Limine by Santiago and Heade to Prohibit the Government From Introducing "Additional Count One Overt Acts" (Doc. No. 1205)**; & **Hern's Motion in Limine to Exclude Additional Count One Overt Acts (Doc. No. 1218)**

Each of these motions deals with "Additional Count One Overt Acts" that were identified in a February 4, 2020 Discovery Letter to Defendants from the Government. Sixteen additional overt acts are identified in the letter.

Boylston, Meyerholz and Frazier object to acts 1, 2, 12, and 14-16. Santiago and Heade

argue that all of them are inadmissible. Hern adopts the arguments raised by the other Defendants and apparently seeks to exclude all of the additional overt acts as well. The essence of Defendants' arguments is that if these acts are intrinsic to the RICO conspiracy, they are nevertheless inadmissible because the are unfairly prejudicial, confusing, and cumulative under Rule 403. Alternatively, if the acts are extrinsic, they are improper character and propensity evidence, and therefore should be prohibited under Rule 404(b).

In the absence of any specific challenge to an overt act, it is not incumbent upon this Court to review the propriety of each of the overt acts listed by the Government. And, given the ground the Court has already covered regarding intrinsic evidence and Rule 404(b) evidence, the discussion regarding those that are properly challenged can be brief.

According to the Government, all of the challenged acts are intrinsic to crimes charged in the Third Superseding Indictment, and all of the events occurred during the time period described in Count One regarding the RICO conspiracy. As to acts that are specifically challenged by Defendants, the Government states:

> Additional overt act (1) – a drive-by shooting of R.W.'s house on May 13, 2015, which involves Frazier and Santiago – is intrinsic to the RICO conspiracy because it occurs during the alleged RICO conspiracy and involves two defendants acting on behalf of the enterprise, by assaulting a rival motorcycle gang member, in an effort to help the Mongols gain territory in Tennessee and intimidate/threaten a rival outlaw motorcycle gang. Indeed, this incident is one of the earliest events evidencing the existence of the racketeering enterprise charged in Count One. Additional overt act (2) – the transmission of personal identifying information to California for background checks in May 2015, involves multiple defendants sending their information to Mongols members in California – which was a step towards becoming a prospective Mongols chapter and members (and is actually discussed in the Third Superseding Indictment). Additional overt act (12) – a fight in Nashville on June 30, 2017, which involves Meyerholz – is intrinsic to the RICO conspiracy because it occurs during the time period of the conspiracy, places Meyerholz in Tennessee (he was formerly a member of a Colorado chapter), and helps establish his relationship

to and affiliation with other members of the Clarksville Mongols. Additional overt acts (14) and (15) – the assault at Rookie's Bar & Grill on September 22, 2017, involving Meyerholz and Boylston, and the assault at Night Deposit in the fall of 2017 – are intrinsic to the RICO conspiracy because they are acts of violence and intimidation, during the charged RICO conspiracy, involving multiple Clarksville Mongols, and thus are direct evidence of the purposes and means of the racketeering enterprise. And additional overt act (16) – the transmission of ATF Exhibit 653 in the mail in the spring or summer of 2018 (a letter to a potential witness regarding Stephen Cole's murder stating "SNITCHES ARE A DYING BREED, MOTHERFUCKER!") – is intrinsic to the RICO conspiracy because it shows continued efforts to silence potential witnesses against the racketeering enterprise and defendants (who, by this time, had all been arrested).

(Doc. No. 1275 at 8-9).

Based upon these representations of what the Government expects the proof to show and what this Court knows thus far about the allegations underlying this case, it appears that all of the specifically challenged overt acts are intrinsic to the RICO conspiracy charge alleged in Count One. Accordingly the Motions challenging the Government's notice regarding additional Count One overt acts (Doc. Nos. 1193, 1205 & 1218) are **DENIED**.  This denial is without prejudice to Defendants' argument at trial that the probative value of these acts is substantially outweighed by their prejudicial effect under Rule 403.

### 33. Hern's Motion in Limine to Exclude Overt Acts In Paragraphs 12gg of the Third Superseding Indictment (Doc. No. 1216)

For much the same reason, Hern's request to exclude evidence of overt act 12gg of the Third Superseding Indictment must be denied.  That paragraph alleges:

On or about January 27, 2016, T.C., a male coconspirator member of the Mongols Harbor Chapter in California, now deceased, [10] JAMIE HERN, a/k/a "J-ROC," and STEPHEN COLE, a/k/a "LURCH," now deceased, attended a court hearing for [1] JAMES WESLEY FRAZIER, a/k/a "SLO-MO," a/k/a "SPECIAL," and [2] AELIX SANTIAGO, a/k/a "GOON," a/k/a "BIG O," a/k/a "BIG OFFIT," at the Montgomery County Courthouse in Clarksville, Tennessee.

(Doc. No. 485, Third Superseding Indictment ¶¶ 12gg).  By its very terms, this paragraph seems to be probative of a connection between Hern, Frazier, Cole, Santiago, and Offit.  It may also, as the Government represents, be "evidence of the Mongols enterprise's means and methods of maintaining control, ensuring that members do not "snitch," and otherwise protecting the enterprise."  (Doc. No. 1275 at 18).

Accordingly, Hern's Motion to Exclude Additional Act 12gg (Doc. No. 1216) is **DENIED.** Again, the Court makes no final ruling as to whether this is evidence is excludable under Rule 403.

**34. – 37. Santiago's Motion in Limine to Exclude or Limit Photographs From His iPhone Depicted in Exhibit Numbers 1311-1315 (Doc. No. 1232); Hearn's Motion in Limine to Exclude Evidence Seized From Cellular Telephones (Doc. No. 1236); Frazier's Motion in Limine No. 8 to Preclude the Introduction of Social Media Evidence (Doc. No. 1233) & Frazier's Motion in Limine No. 9 to Preclude the Introduction of Phone Download/Text Messages (Doc. No. 1234)**

The Motions are a whole-scale attempt to preclude the Government from introducing evidence that was retrieved from cell phones, and in Frazier's case, his Facebook account as well. These Motions (Doc. No. 1232 – 1234 & 1236) are **DENIED** for two reasons.

First, the Motions are over-broad, and provide little meaningful analysis or the evidence's probative value/prejudicial effect.  The Court does not blame Defendants for this because the motions were apparently based on "phone dumps" from the Government that included hundreds, if not thousands of pages.  (Santiago claims his phone produced 2,414 pages of photographs and text messages: Frazier claims that the download of his Facebook account was 3,919 pages.)  Second, the Court is not privy to the documents, texts, photographs etc., nor does it want or need to be at this point given the sheer volume of pages.[7]

---

[7] In his reply, Hern cites as an example "Exhibit 2276 (text 96), where the messenger multiplies some numbers, subtracting what was purportedly given to him, and concluding with a balance of 17,000."

In its response to some of the motions, the Government has indicated that, in preparation for trial, it is endeavoring to identify the evidence that is relevant to the charged crimes and membership in the Mongols, and it either has or will prepare a partial extraction that only contains relevant evidence. Whether the partial extractions have been finalized for all Defendants is unclear. Regardless, and as soon as practicable, the Government shall provide Defendants with partial extractions that contain the evidence the Government in good faith believes is relevant and admissible. Additionally, prior April 1, 2020, counsel for the Government and Defendants' counsel shall meet and confer in person in an effort to pare down the number of exhibits extracted from electronic devices and/or pare down their disagreements. In so doing, counsel should keep in mind the guideposts the Court has previously mentioned in regard to non-Mongol related evidence. To the extent there remain issues, the parties will provide a written status report prior to April 1, 2020.

## 38. Hern's Motion in Limine to Exclude Prejudicial and Cumulative Evidence From Search of 902 Cimmaron Court (Doc. No. 1217)

During a search of Hern's residence, officers seized a gun, ammunition, body armor, and assorted Mongols paraphernalia. He seeks to exclude the firearm and ammunition because it is overly prejudicial and could cause confusion. This is because the search occurred on January 18, 2018, but he was not charged with unlawfully possessing a firearm on that date. He was, however, charged in Count Forty-Nine with being a felon in possession of a firearm on July 14, 2016.

Contrary to Hern's suggestion, the seized items are relevant. In addition to being charged with being a felon in possession, he is charged with being a part of RICO, drug, and money-

___

According to Hern, the Government claims that "this message, among others, is evidence of drug trafficking." (Doc. No. 1328 at 1-2). Obviously, this goes to the issue of relevance and admissibility, something the Court is not in a position to address in a vacuum. The Court is sure there are many more of similar ilk, which the parties should strive to resolve pre-trial to the extent possible.

laundering conspiracies (Counts One through Three), as well as possessing with intent to distribute 5 grams or more of methamphetamine (Count Twenty-Six). Possession of Mongols paraphernalia items suggests his affiliation with the RICO enterprise alleged in Count One.[8] Possession of a gun, ammunition, and body armor is relevant to both the RICO and the drug counts.

"[T]he accepted view [is] that guns (and naturally, ammunition) are "tools of the trade" used to protect drugs and drug money." United States v. Rhodes, 314 F. App'x 790, 793 (6th Cir. 2008); see also United States v. Hardin, 248 F.3d 489, 499 (6th Cir.2001) ("This Court has held many times that guns are 'tools of the trade' in drug transactions."). Furthermore, in addition to alleging narcotics trafficking, the RICO count alleges that Mongols members are engaged in assorted acts of violence involving firearms.

Whether the gun and ammunition may be uncharged crimes does not change the analysis. Although Rule 404(b) "prohibits the Government from using evidence of uncharged crimes 'to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character,'" the Government "can use uncharged crimes 'for any other proper purpose,'" including "when they are directly probative of 'an essential element of the crime.'" United States v. Johnson, 803 F.3d 279, 283 (6th Cir. 2015) (citations omitted). This includes utilizing uncharged crimes or acts to establish the enterprise element of a RICO conspiracy. See United States v. Cruz-Ramirez, 782 F. App'x 531, 542 (9th Cir. 2019) (stating that uncharged act can be "admissible as proof of the full scope of the [RICO] conspiracy); United States v. Henley, 766 F.3d 893, 914–15 (8th Cir. 2014) ("[E]vidence of uncharged crimes was admissible in a RICO prosecution as proof

---

[8] Insofar as Hern seeks to "limit the voluminous evidence of motorcycle gear" (Doc. No. 1217 at 1) that is a question of degree and something that can only be taken up at trial.

of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy.")

Finally, Hern's concern about confusion and prejudice arising because he is charged in a separate count with possessing a firearm on a different date can be addressed in an appropriate cautionary instruction. Indeed, the Government concedes "it would be impermissible for the Government to argue that Hern should be convicted of Count 49 because of his possession of a firearm and ammunition almost a year and a half after the charged conduct[.]" (Doc. No. 1274 at 10).[9]

Accordingly, Hern's Motion to Exclude Evidence from Cimarron Court Search (Doc. No. 1217) is **DENIED.**

## 39. Government's Motion to Allow Two Case Agents (Doc. No. 1169)

Even though this Motion is unopposed, it is **DENIED** as requested. The logistics of the courtroom and the sheer number of participants makes it impossible to seat two agents at counsel table. The Government can either alternate having one agent in the courtroom at a time, or can have both in the courtroom at the same time, with one sitting in the first row of pews.

## 40. Remaining Motions

The Court believes that this Memorandum Opinion and Omnibus Order either resolves all pending Motions in Limine, or reserves them for consideration at the final pretrial conference, the April 1, 2020 status conference, or trial. To the extent that is not the case, the parties shall bring that to the Court's attention immediately by filing a notice before noon on March 6, 2020.

---

[9] Of course, all of this presumes that Hern possessed the items either actually, or constructively. The Court makes no ruling on Hern's contention in his reply brief that the firearm was actually found in his wife's purse.

Apart from Motions in Limine, the Court recognizes that there remain outstanding a Joint Motion to Amend or Correct the Protective Order (Doc. No. 1248) and a Joint Motion under Brady (Doc. No. 1250), both of which will be taken up at the final pretrial conference.  Also to be taken up at the pretrial conference is Defendants' Motion to Compel the Government to Provide Proper Rule 16 Notice for Kozlowski, Esperança, Berni (Doc. No. 1262).

IT IS SO ORDERED.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE