UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 3:17-cr-00130 |
| ) | |
| [1] JAMES WESLEY FRAZIER ) | |
| [2] AELIX SANTIAGO ) | |
| [3] KYLE HEADE ) | |
| [8] MICHAEL FORRESTER, JR. ) | |
| [10] JAMIE HERN ) | |
| [15] DEREK LEIGHTON STANLEY ) | |
| [17] WILLIAM BOYLSTON ) | |
| [18] JASON MEYERHOLZ ) | |

## MEMORANDUM OPINION AND ORDER

At the pretrial conference on March 9, 2020, the Court informed the parties that, having considered United States v. Lawson, 5535 F.3d 434 (6th Cir. 2008) and United States v. Talley, 164 F.3d 989 (6th Cir. 1999), it intended to empanel an anonymous jury in this case. The Court, having studied the Third Superseding Indictment and considered all of record recreated through pretrial motions, identified a number of measures that would be taken to address potential security concerns, while at the same time preserving each Defendant's right to a fair trial.

Now before the Court is Defendant's Joint Objection to an Anonymous Jury and Motion to Reconsider Order (Doc. No. 1420), to which the Government has responded in opposition (Doc. No. 1454), and Defendants have replied (Doc No. 1480). Defendants' Motion will be denied.

**I.**

"The Sixth Amendment provides defendants with a right to a public trial by an impartial jury, but it does not guarantee a right to a public jury." Lawson, 535 F.3d at 440–41 (citing U.S. Const. amend). In fact, "[f]ounding-era evidence indicat[es] that such a right was not intended to be part

of the Constitution," id., and the empanelment of an anonymous jury is specifically allowed by statute, 28 U.S.C. 1 1863(b)(7). Nevertheless, anonymous juries are the exception, not the rule.

Relying on Talley, the Sixth Circuit in Lawson observed:

> We have referred in the past to the Second Circuit's preference that "a district court should not order the empaneling of an anonymous jury without '(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'" [Talley, 164 F.3d at 1001] (quoting United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991)). The anonymity of a jury should be preserved in situations including, but not necessarily limited to, the following: (1) when the case involves very dangerous defendants who were participants in large-scale organized crime, and who participated in mob-style killings and had previously attempted to interfere with the judicial process; (2) when the defendants had a history of attempted jury tampering and serious criminal records; or (3) when there have been allegations of dangerous and unscrupulous conduct by the defendant, coupled with extensive pretrial publicity. See id. (citing Paccione, 949 F.2d at 1192). (emphasis added).

535 F.3d at 439. Defendants insist that "[b]ecause the[se] factors are not present in this case, and because there is no evidence whatsoever suggesting that the jurors are in any danger," this Court's reliance on Talley and Lawson for its decision was misplaced, and "empaneling an anonymous jury in this case is unnecessary, inappropriate, and unconstitutional." (Doc. No. 1420 at 4). The Court disagrees.

### A.

As a preliminary matter, the Court notes that the jury selected in this case will hardly be anonymous. Rather, the jury will be "partially innominate" or "semi-anonymous" because, while the names of the jurors will be known to the Court and all counsel of record, Defendants will not know the actual identities of the jurors. See, United States v. Carpa, 271 F.3d 962, 964 n. 1 (11th Cir.2001) (describing a jury as "innominate" rather than "anonymous," where "[t]he only facts not

2

known to the parties were names, addresses, and exact places of work"); United States v. Nicholson, No. 13-20764, 2014 WL 5312276, at *1 (E.D. Mich. Oct. 17, 2014) (empaneling a "semi-anonymous jury, where only counsel know the names of the jurors, and counsel are required to maintain the use of those names for 'their eyes only'"); United States v. Johnson, 354 F. Supp. 2d 939, 956 (N.D. Iowa 2005) (stating that jury was not truly anonymous where "the prospective jurors and the jurors ultimately selected to serve [were] identified in court only by numbers").

Furthermore, unlike the typical case where little is known about a prospective juror prior to the start of voir dire, the prospective jurors in this case were each required to complete an extensive questionnaire that was the result of a joint effort between the Court and the parties. See United States v. Edwards, 119 F. Supp. 2d 589, 592 (M.D. La. 2000) (noting that "the use of the term 'anonymous' w[a]s very misleading" because, even though "the Court did not give the parties, the media or the public the names, addresses or places of employment of the jurors," it "did provide all concerned with a voluminous amount of information about each juror," including a 28-page questionnaire that "was answered by each potential juror and consisted of 116 questions, some with numerous sub-parts"). Nevertheless, for continuity's sake only, the Court will continue to identify the jury to be selected as anonymous.

## B.

Nomenclature aside, this Court's decision is supported by Talley and Lawson. Quoting Lawson, Defendants argue that (1) "it cannot be tenably suggested that the Defendants 'ha[ve] a history of attempted jury tampering,' have 'serious criminal records,' have 'participated in mob-style killings,' 'previously attempted to interfere with the judicial process,' or are 'very dangerous defendants'"; (2) "[n]one of the defendants in this case have been accused of intending to intimidate,

3

threaten, injure or tamper with the jury in any way, nor have they been accused of doing so in the past" and (3) "while there are unproven 'allegations of dangerous and unscrupulous conduct' in this case, the allegations have not been 'coupled with extensive pretrial publicity.'" (Doc. No. 1420 at 4-6).

Defendants fundamentally misread Lawson when they suggest that at least one of the three factors listed in Lawson and in Talley must be met in order for an anonymous jury to be appropriate. Quite the contrary, what the Sixth Circuit said was that the "anonymity of a jury should be preserved" when any of the three factors are met, while at the same time noting that empanelment of an anonymous jury is "not necessarily limited to" those factors. Lawson, 535 F.3d at 439. This proposition is clear from Talley itself.

In Talley, the trial judge empaneled an anonymous jury because defendant "had allegedly tried to interfere with the judicial process by attempting to have a witness in his criminal case killed, it was not unreasonable to assume that he may try to further interfere with the judicial process, [and] the case was of some 'modicum of interest' to the press." 164 F.3d at 1001. In affirming that decision, the Sixth Circuit acknowledged "there was no evidence that [defendant] was involved in a criminal organization that included a pattern of violence, that he had ever attempted to tamper with any previous juries (such as the grand jury in his case), or that there was any evidence of extensive pretrial publicity." Id. Nevertheless, an anonymous jury was appropriate because the record illustrated defendant's "dangerousness in this case and on other occasions, and showed that his many years of law enforcement experience provided him with the types of contacts that would enable him to tamper with the jury." Id. at 1002.

As in Talley, there are more than enough allegations before to the Court to warrant an

4

anonymous jury. Defendants (with the exception of Derek Stanley) are all alleged to be members of the Mongols, an outlaw motorcycle club that proclaims itself to be part of the "1%" of motorcycle clubs that are not law-abiding. While Defendants assert that "[a] Westlaw search unconvered no use of an anonymous jury in a prosection of alleged Mongols' members," (Doc. No. 1420 at 5), "the Mongols Nation is a convicted criminal entity" whose "members have pleaded guilty to heinous acts of murder, attempted murder, drug trafficking, and other crimes," United States v. Mongol Nation, 370 F Supp. 3d 1090, 1095 (C.D. Cal. 2019). In this regard, the Mongols are not dissimilar from the Outlaw Motorcycle Club, the Bandidos, or the Hell's Angels for whom trials before anonymous juries have been approved. See, United States v. Deitz, 577 F.3d 672, 685 (6th Cir. 2009) (affirming use of anonymous jury where, among other things, "the record provide[d] extensive evidence that [defendants] were members of, or closely associated with, the OMC [Outlaw Motorcycle Club], an organization with a long history of crime and violence"); United States v. Portillo, No. 5:15-CR-820-DAE (1), 2018 WL 9786081, at *6 (W.D. Tex. July 23, 2018) (empaneling an anonymous jury in RICO and drug conspiracy case involving member of the Bandidos motorcycle club); United States v. Fabel, No. CR06-041RSL, 2007 WL 9728659, at *1 (W.D. Wash. Oct. 30, 2007) (finding anonymous jury appropriate where defendants were "all either present or former members of the Washington Nomads Chapter of the Hells Angels Motorcycle Club," which is "recognized nationwide as an organization with a long history of alleged violent conduct and involvement in drug trafficking and other illegal activity").

Nor can it be seriously argued, as Defendants assert, that the Government supports the empanelment of an anonymous jury simply because "other members of the Mongols Motorcycle Club in other states in other regions of the country have intimidated witnesses before," or that

5

"because the national Mongols organization has been labeled as organized crime, an anonymous jury is justified" here. (Doc. No. 1480 at 2). To the contrary, the Third Superseding Indictment in this case alleges a wide-ranging RICO conspiracy involving two murders, four kidnappings, a shooting, four assaults in aid of racketeering, assorted physical violence, and the threat of physical violence. Some of those acts, according to the Indictment, were intended to obstruct and interfere with the administration of justice and/or to intimidate and tamper with witnesses and informants.

From a big picture perspective, the grand jury found probable cause to believe that "Members of the Clarksville Mongols and their associates promote a climate of fear through intimidation, violence, and threats of violence intended to promote the authority of the Clarksville Mongols Enterprise and insulate its members from liability for drug-trafficking and violent crimes committed on behalf of the organization." (Third Superseding Indictment, Doc. No. 485, ¶ 9(b)). More specifically, the grand jury concluded that several Defendants kidnapped S.B. and B.C. for the purpose of witness intimidation and murder (Count Six); conspired to use physical force, threatened to use physical force, and did in fact use physical force against V.P. in an effort to thwart him or her from communicating information to law enforcement about certain federal crimes, including attempted murder (Counts 50-51); and Mongols members attempted to thwart the judicial process by concealing evidence from the grand jury (Count 65). In short, and contrary to Defendants assertions, the decision to empanel an anonymous jury in this case is based upon "'something more' than [an] organized-crime label" disapproved of in cases such as <u>United States v. Mansoori</u>, 304 F.3D 635, 651 (7th Cir 2002).

Even though there are no specific allegations in the Third Superseding Indictment that any of the Defendants attempted to tamper with the grand jury in this case or with a trial jury in the past,

"to support a finding that an anonymous jury is warranted, obstruction of justice charges need not relate to prior jury tampering efforts, but instead may relate solely to efforts to tamper with witnesses or otherwise obstruct the judicial process." United States v. Prado, No. 10-CR-74 JFB, 2011 WL 3472509, at *3 (E.D.N.Y. Aug. 5, 2011); see also, United States v. Edmond, 52 F.3d 1080, 1091 (D.C. Cir. 1995) (internal citation omitted) United States v. Crockett, 979 F.3d 1204, 1214 (7th Cir. 1992) (affirming use of anonymous jury even though "there was no evidence before the court that [defendant] had attempted to tamper with a jury"). Again, this is clear from Talley where an anonymous jury was approved even in the absence of any evidence of prior jury tampering. 164 F.3d at 1002; see also, Lawson, 535 F.3d at 440 (stating that "[a]t least the first and third of the three situations described in Talley are present in this case," and discussing no allegations of jury tampering for purposes the second Talley factor).

Furthermore, Defendants "face[] lengthy sentences upon conviction, increasing the likelihood that they would resort to extreme measures to influence the outcome of their trial[.]" Dietz. 577 F.3d at 685. All Defendants, save Stanley, face a potential life sentence if convicted of the RICO conspiracy alleged in Count One; all Defendants, except William Boylston and Jason Meyerholz, face a mandatory minimum ten year sentence if convicted of the drug conspiracy alleged in Count Two; James Frazier, Boylston, and Meyerholz each face a mandatory life sentence if convicted on the kidnapping resulting in death or the murder in aid of racketeering as alleged in Counts Six, Eight, Fifty-Six and Fifty-Nine; and several Defendants faced multiple consecutive sentences if convicted on the assorted firearm counts contained in the Third Superseding Indictment.

To be clear, the Third Superseding Indictment contains nothing more than mere "allegations of dangerous and unscrupulous conduct by the defendant[s]," Talley, 164 F.3d at 1001, 989, and the

7

Court is in no way prejudging this case based upon that document. It will be for the Government to prove those allegations at trial beyond a reasonable doubt. If it fails to do so, that may be reason to question the empanelment of anonymous jury. See United States v. Dinkins, 691 F.3d 358, 374 (4th Cir. 2012) (collecting cases indicating that, in non-capital case, evidence introduced at trial can be used in determining whether it was proper to utilize an anonymous jury). This Court, of course, does not have the luxury of waiting to see how the proof actually develops in deciding whether to empanel an anonymous jury.

"The decision to empanel an anonymous jury is 'within the sound discretion of the trial court,'" Lawson, 535 F.3d at 439 (quoting Talley, 164 F.3d at 1001), and this remains so despite Defendants' suggestion in both their initial filing and response brief that the Court somehow overstepped its bounds by deciding to empanel an anonymous jury in the absence of a motion from the Government. "The fact that the district court *sua sponte* empanel[s] an anonymous jury does not change the analysis." United States v. Shryock, 342 F.3d 948, 971 (9th Cir. 2003) (citing United States v. Bowman, 302 F.3d 1228, 1236 (11th Cir.2002) United States v. Branch, 91 F.3d 699, 723–25 (5th Cir.1996); United States v. Edmond, 52 F.3d 1080, 1089–94 (D.C. Cir. 1995)). "Because the purpose of an anonymous jury is to protect that jury and the integrity of the justice system, and is permissible so long as the district court takes reasonable precautions to safeguard the defendant's rights, no principle would distinguish an order to empanel an anonymous jury made *sua sponte* from one based on a party's motion." Id.

## II.

In addition to challenging the decision to empanel an anonymous jury, Defendants voice objections to a couple of the security measures that the Court has indicated it will employ at trial.

Those measures – set forth in this Court's Order following the pretrial conference – can be summarized as follows:

> (1) Jurors will be identified in court by number and their questionnaires will be redacted to exclude their names, addresses, and employment.
>
> (2) Jurors will remain together as a group throughout the trial day.
>
> (3) Jurors will enter and exit the building through separate entrance from that used by the general public.
>
> (4) Jurors will be provided with off-site parking.
>
> (5) There will be secondary screening for those desiring to enter the courtroom.
>
> (6) Cellphones and other electronic devices will not be permitted in the visitor's gallery.

(Doc. No. 1367 at 2-3).

Defendants first argue that the "the Court's order directing counsel to keep the names of the jurors from the Defendants will seriously impede" the Sixth Amendment right to the effective assistance of counsel. (Doc. 1420 at 9). Other than quoting United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994) for the proposition that "[e]mpanelling an anonymous jury undoubtedly has serious implications for a defendant's interest in effectively conducting voir dire and in maintaining the presumption of innocence," Defendants do not explain how that is possibly so.

In Wong, the Second Circuit upheld use of an anonymous jury even though "the district court precluded disclosure of the jurors' names, addresses, and employer" because "the court questioned prospective jurors about their familiarity with the case, the defendants and the crime scenes, and inquired about their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service, and other matters." Id. Here, counsel and Defendants themselves will learn plenty about the prospective jurors, not only

9

from the detailed questionnaires the jurors have completed, but from the in-court questioning as well.

Moreover, and unlike in <u>Wong,</u> counsel will know the actual names, addresses, and place of employment of each prospective juror. They simply cannot share that limited universe of information with Defendants. As a consequence, counsel may know a prospective juror as "Jane Doe" a/k/a "Juror 77," while Defendant will only know her as "Juror 77." Either way, they both will be referencing the same individual, and they both will have more than sufficient information with which to (1) "explore . . . 'bias as to issues in the case[ ] and as to the defendant[s]'"; (2) "exercise their challenges meaningfully"; and (3) obtain a fair an impartial jury." <u>Id.</u> at 1377.

More generally, Defendants contend that the measures the Court intends to employ, such as providing the juror with a neutral explanation for anonymity, "create an unacceptable risk that Defendants' rights to an impartial and biased jury and presumption of innocence will be violated." (Doc. No. 1420 at 10). For the most part, these arguments are best directed to the appellate court.

As Defendants themselves concede, "[t]he Sixth Circuit has directed, that when a Court orders juror anonymity, special measures must be taken in order to ensure that the defendant retains his or her right to an unbiased jury,' . . . includ[ing] 'conducting a voir dire designed to uncover bias as to issues in the case[] and as to the defendant himself, and [] providing the jury a neutral and non-prejudicial reason for requiring that [the jury] be anonymous, so that jurors will refrain from inferring that anonymity.'" (<u>Id.</u> quoting <u>Talley</u> 168 F.3d at 1001). In fact, "[b]oth th[e Sixth Circuit] and several other circuits have held that the need to protect the jury from unwanted publicity is an appropriate explanation." <u>United States v. Deitz</u>, 577 F.3d 672, 685 (6th Cir. 2009) Thus,

Defendants' claim that there has been a "paucity" of press coverage[1] and their reference to a state trial judge's opinion that "[j]urors would not be so naive as to believe that news media coverage would be the reason for their anonymity," State v. Accetturo, 619 A.2d 272 (Law Div. 1992), are really of no moment.

Finally, Defendants argue that "[t]he deduction [defendants are "dangerous or trustworthy"] will be exacerbated by the jury's personal observations – the enhanced security outside of the courtroom, the large number of U.S. Marshals present inside the courtroom (even in plain clothes their firearms and roles are obvious) and given the black curtain separating the defense from the rest of the courtroom." (Doc. No. 1420 at 11).

The "enhanced security outside the courtroom" will consist of nothing more than a manned magnetometer to allow for secondary screening of spectators (not jurors). The Court has already informed the parties that, "to lessen any potential concern that this case is somehow 'special,' a magnetometer will [also] be set up outside Judge Campbell's courtroom so that the appearance of both courtrooms on the annex side of the building is identical." (Doc. No. 1367 at 2).

As for a large number of Marshals in the courtroom this is to be expected given that eight Defendants are slated for trial. Furthermore, the same number of Marshals would be present regardless of whether the case was before an anonymous jury or not.

The "black curtain" Defendants reference is nothing more than a table-high skirt that runs

---

[1] Defendants' characterization of the press coverage is an understatement. By this Court's count, more than 25 article/reports have been published about the Clarksville chapter of the Mongols Motorcycle Club since the return of the first Indictment in this case. This includes reporting by CNN and local television stations (*e.g.* News Channel 5, Fox News 17 and WKRN), as well as reporting in local newspapers, including the TENNESSEAN (Nashville) and the LEAF CHRONICLE (Clarksville). While most of the coverage has followed the returns of the various iterations of the Indictment in this case, there is nothing to suggest that interest will not be reignited once this case gets underway.

parallel to the Defendants' tables in the courtroom. It is no different than the skirt that surrounds the Government's table, and actually balances the skirt that will run the length of the jury box for those jurors sitting in front of it. The skirts also serve a salutary purpose: should Defendants misbehave to the extent that shacking becomes necessary (even though the Court has no reason to believe at this point that they will), the skirts will hide the shackles from the jury's view, and the jurors will not be left to wonder why a skirt has suddenly appeared.

## III.

On the basis of the foregoing, Defendant's Joint Objection to an Anonymous Jury and Motion to Reconsider Order (Doc. No. 1420) is **DENIED.**

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE