## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:17-cr-00130** |
| | ) | |
| **JAMES WESLEY FRAZIER,** | ) | |
| **AELIX SANTIAGO,** | ) | |
| **MICHAEL FORRESTER, JR.,** | ) | |
| **JAMIE HERN,** | ) | |
| **DEREK LEIGHTON STANLEY,** | ) | |
| **JASON MEYERHOLZ,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

After a 35-day trial held over the course of three and one-half months during which close to 100 witnesses testified and more than 1,200 documents were introduced, the jury returned guilty verdicts on the majority of counts against each of the above-named Defendants. Chief among those was a Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961 *et. seq.*, charge brought against James Frazier, Aelix Santiago, Michael Forrester, Jr., Jamie Hern, William Boylston and Jason Meyerholz for their role in the Clarksville, Tennessee chapter of the Mongols Motor Club ("Mongols" or "Mongols Nation"). In addition to the RICO conspiracy alleged in Count One, several of the trial Defendants were convicted of the drug conspiracy alleged in Count Two and the money laundering conspiracy alleged in Count Three, including Derek Stanley who was not a Mongols member. Apart from the conspiracy counts, each Defendant was convicted of certain substantive crimes, including murder, attempted murder, assault, kidnapping, robbery, extortion, witness tampering, money laundering, interstate travel in aid of racketeering, and distribution of

methamphetamine.

Now before the Court are Motions for a New Trial and/or Motions for Judgment of Acquittal filed by all trial Defendants except William Boylston.[1]  (Doc. Nos. 2250, 2457, 2463, 2464, 2465, 2466, 2467, 24682472, 2473, 2476, 2477, 2478).  To address the motions,[2] the Court begins by setting forth the appropriate standard of review, followed by a somewhat detailed overview of the facts presented at trial.  Next, the Court will discuss arguments raised in relation to how the trial was conducted and situations that occurred during trial.  Thereafter, and because there is significant overlap, the Court discusses the RICO count as to Frazier, Santiago, Forrester, Hern, Stanley and Meyerholz followed by a discussion of the arguments raised by Stanley and Frazier in relation to the drug conspiracy alleged in Count Two.  Finally, the Court discusses the arguments raised by Defendants in relation to specific counts.

## I.  Standards of Review

### A.  Motions for Judgment of Acquittal – Rule 29

Motions for judgment of acquittal after the close of the government's case-in-chief, after the close of all of the evidence, and after the return of a verdict are all governed by Rule 29 of the

---

[1]  After trial, new counsel was appointed for Boylston and his post-trial motions deadline has been extended.

[2]  At least two of the Defendants – Hern and Santiago – attempt to incorporate arguments made at the close of the Government's case-in-chief and before the case was submitted to the jury.  The Court will not scour the record in an effort to resurrect those arguments.  It is settled law in this circuit that "'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'"  United States v. Milliron, 984 F.3d 1188, 1197 (6th Cir. 2021) (citing United States v. Johnson, 440 F.3d 832, 846 (6th Cir. 2006)).  Accordingly, the Court will only discuss and resolve the arguments raised and briefed in the post-trial motions.

Federal Rules of Criminal Procedure. In determining whether such a motion should be granted, "[t]he relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Fisher, 648 F.3d 442, 450 (6th Cir. 2011) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

"Under the Jackson v. Virginia standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'" Id. (citation omitted). "'Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.'" Id. (quoting United States v. Lee, 359 F.3d 412, 418 (6th Cir. 2004)). Given this, a defendant moving for a judgment of acquittal under Rule 29 bears a "very heavy burden." United States v. Ostrander, 411 F.3d 684, 691 (6th Cir. 2005) (citing United States v. Walls, 293 F.3d 959, 967 (6th Cir. 2002); United States v. Tocco, 200 F.3d 401, 424 (6th Cir. 2000)).

**B. Motions for New Trial – Rule 33**

"A motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure may be premised upon the argument that the jury's verdict was against the manifest weight of the evidence." United States v. Hughes, 505 F.3d 578, 592 (6th Cir. 2007). "Generally, such motions are granted only . . . 'where the evidence preponderates heavily against the verdict.'" Id. at 592-93.

"In deciding Rule 33 motions based on the manifest weight of the evidence, ... a district judge 'may sit as a thirteenth juror' and consider the evidence to ensure that there is no miscarriage of justice.'" United States v. Monoz, 605 F.3d 359, 373 n.9 (6th Cir. 2010) (citation omitted). In this regard, the trial judge may assess the credibility of witnesses and the weight of the evidence. United

3

States v. Reeves, 636 F. App'x 350, 353 (6th Cir. 2016); United States v. Lutz, 154 F.3d 581, 589 (6th Cir. 1998). Still, and while "[t]he decision of whether to grant a new trial is committed to the 'sound discretion of the trial judge, ... this discretion should be exercised 'only in extraordinary circumstance[s].'" United States v. Canal Barge Co., 631 F.3d 347, 357 (6th Cir. 2011) (citation omitted).

Even though trial judges are to use their "sound discretion" when acting in the role of a thirteenth juror, the Sixth Circuit has recently stated that, in exercising that discretion, "the court must consider competing principles":

> On the one hand, it must scrutinize the record and ensure that a "miscarriage of justice" did not occur. On the other hand, the court must respect the role of the jury and ensure that evidence-supported convictions are upheld.

United States v. Burks, 974 F.3d 622, 625 (6th Cir. 2020).

With the foregoing standards in mind, the Court sets forth in narrative fashion the facts a reasonable jury could find based upon the evidence presented at trial.

## II. Summary of Facts[3]

The Mongols is an all male, all white and Hispanic 1% motorcycle club, making it among the small minority of motorcycle clubs that openly flout the law by engaging in criminal acts as a part of its business. Members see the club as a lifetime brotherhood and commonly use slogans and mottos such as "Mongols Forever, Forever Mongols," "Respect Few, Fear None," and "Mongols Until Death or Prison." The club even has its own set of "commandments" and a fight song.

When participating in club activities, Mongols members are easily identified by the black

---

[3] Because the Court is writing primarily for the trial participants and the Court of Appeals is obliged to review motions for judgment of acquittals *de novo*, the Court has chosen not to lard-up what will otherwise be a very lengthy opinion with unnecessary citations to the trial record.

leather vests (or "cuts") they wear. The back of the vest of a "full-patch" member contains an embroidered top "rocker" that says "Mongols" in black lettering over a white background, a bottom "rocker" that identifies the chapter he belongs to with the same contrasting colors, and a center patch consisting of a caricature of a Genghis Khan-type figure wearing sunglasses and riding a chopper motorcycle.[4] The front of the vest is also adorned with additional patches. Among others, these patches indicate the office (if any) the member holds; whether he is a founding member; "in memory of" patches for fallen brothers; notable club runs; "P" patches worn by prospects; and, ubiquitously, 1%'er diamond patches and initialisms, such as "MFFM."

Started in the Los Angeles, California area in 1969, the Mongols has chapters across the country and internationally. Hierarchically, the organization is led by the "Mother Chapter" in Southern California whose members include national officers. The Mother Chapter has authority over all chapters and members, including resolving disputes. Indeed, individuals who want to join the Mongols submit an application to the Mother Chapter. Upon joining, members are then responsible for paying dues and fees to the Mother Chapter.

Below the Mother Chapter are regional officers who are also members of individual chapters. Each chapter, in turn, has officers that generally include a President, Vice President, Secretary Treasurer, and Sergeant-at-Arms. Those officers oversee the local club members. Usually, one cannot become a full-fledged member of the Mongols until he has been a prospect for at least a year, during which time he wears a vest with a "P" on it. Underneath prospects are "hang-arounds," meaning individuals who are getting a feel for what the organization is about and whether they want

---

[4] As punishment, members can be "center punched." In other words, the center patch is removed from the back of the vest and only the top and bottom rockers remain.

5

to be a part of it. The chapter members, too, get to size-up the prospects and hang-arounds. Prospects and hang-arounds are pretty much at the beck-and-call of fully patched members during this period.

In early 2015, there were no Mongols chapters in Tennessee. This started to change that spring when several members and prospects of the Sin City Desciples [sic] ("Sin City") began discussing joining the Mongols and forming a chapter in Clarksville with Santiago as the lead proponent.[5] Extracts from his phone at the time showed that he had downloaded the Mongols commandments by the end of April 2015 and that at least he, Frazier and Hern had been prospecting for the Mongols by that time. (Ex. No. 982 at 20, 36-37).

At a graduation barbecue for JoJo Lauati's son held around the 2015 Memorial Day attended by Frazier, Hern, the Daye brothers (Justin and James), Santiago, Alexsandro Nieves, and others discussed breaking away from their former clubs and making a wholesale move to the Mongols. This was in no small part due to the presence of JoJo's husband Tipela Lauati, who lived in California the majority of the year because he was a full-patched member of the Harbor Chapter of the Mongols but agreed to serve as a sponsor or "patch daddy" for the Clarksville Chapter. At the party, photographs were taken and social security numbers were recorded so that they could be later sent to California as a part of the membership process. Nieves was so psyched by the discussions that, the following morning, he went to Appleton Harley-Davidson to trade in his sports bike because Mongols can only ride American-made motorcycles.

The idea to form a Mongols chapter in Clarksville continued to blossom as spring turned to

---

[5] Like the Mongols, Sin City is a 1% motorcycle club. Unlike the Mongols, Sin City accepts members of all races, although most of its members are African American.

summer. By May, Frazier, Santiago, Hern, Forrester, and Jacob Ort began to identify themselves as Mongols and started to hold meetings.[6] Though not yet officially recognized as such by the Mongols Nation, they took to wearing "soft colors," *i.e.* black and white items, which also happens to be the Mongols' colors.

Still neophytes in the world of the Mongols at this time, the group took it upon themselves to make their presence known and a force to be reckoned with. On May 13, 2015, Frazier, Santiago and Ort shot up the home of Ryan Waters, a member of the rival Outcast Motorcycle Club. Two days later, Santiago burned down the Sin City Clubhouse in Nashville, and, two days after that, Frazier and Ort burned down its clubhouse in Clarksville. As if a drive-by shooting and arson were not enough of a kick-off, things really began to heat up a week or so later with the kidnapping of Brandi Cooper and the kidnapping and murder of Stephanie Bradley.

Frazier and Ort suspected that Bradley had stolen drugs, money, or guns, or that she at least had some knowledge about the theft(s). As a consequence, Bradley was interrogated by them, as was Misty Wallace. The questioning occurred while the two were sitting on a bed in Ort's bedroom at 706 Green Valley Court in a house rented by Forrester where Frazier also lived. At some point, Joel Aldridge was called up from the basement where he was living to add his particular ferocious style of questioning. He did not disappoint. Both women were scared and began crying. Eventually, both were allowed to leave.

Bradley then made the mistake of posting derogatory comments about the Mongols on Facebook. This led to another round of questioning at the Green Valley Court residence when she returned looking for drugs. Aldridge questioned her in the presence of Frazier, Ort and, for a time,

---

[6] The meetings were also called "misas" or "church."

Santiago. The questioning was even more intense than the last time, but Bradley was again allowed to leave with a stern warning not to speak badly about the Mongols again. Although Bradley had arrived in a black Dodge Durango, she left on foot because Aldridge learned that she had gotten the vehicle from Jimmy Thorson who owed him drug money.

The interrogations at Green Valley apparently was not enough because on May 22, 2015, Frazier, Ort, and Aldridge went looking for Bradley in the Dodge Durango. They found her in a trailer on Lot 29, 428 Lafayette Road in Clarksville. Without knocking, Aldridge burst inside and brought Bradley out, at which point she was crying and wet herself. This prompted Aldridge to laugh. Once in the Durango, Aldridge called Cooper to meet him outside her house.

At first, Cooper thought that Aldrige was bringing her drugs, but that was not the case. Instead, Frazier was driving the Durango, Ort was in the passenger seat, and Bradley and Aldridge were in the back seat. All except Bradley had a gun. Once Cooper was in the vehicle, Frazier drove around the countryside for a while. During the ride, Ort wiped the fingerprints off his bullets and placed them back into his gun. Aldridge put his gun in Bradley's mouth. Bradley was so scared during the ordeal that at one point she begged not to be killed and told her captors she could be raped instead.

Eventually, the Durango was driven down TN-79 and ended up at the Kingins-Brandon Cemetery in Stewart County, Tennessee. Once there, Cooper remained in the car while Frazier stood between the car and a treeline, so that he could keep an eye on Cooper and observe what was happening with Bradley. Bradley was led down a path beyond the tree line where she was shot approximately 8 times by Ort. Aldridge then shot Bradley once in the head after Frazier instructed them to make sure she was dead, she was. The survivors then returned to Clarksville.

8

A few days after Bradley's murder, Frazier, Santiago, Ort, and Forrester sent their personal information to Mongols' headquarters for background checks. Thereafter, the group began holding meetings to discuss the governing rules and expectations of the club, and who should be its leaders. Because they were not yet officially a chapter, the Clarksville crew could only wear soft colors or Mongols support gear. Indeed, on June 3, 2015, while wearing Mongols support gear, Forrester, Ort and Frazier were interviewed outside a Hooters' restaurant by Clarksville police officers during which Santiago boasted that the Mongols were a $1 million corporation that "owned" the state.

The wearing of "soft colors" is an important indicia of club membership or affiliation as evidenced by an incident that occurred just twenty days later. This incident also exemplified how perceived petty slights were met with serious overreactions and to send a message from the Clarksville Mongols even when the club was in its formative stages.

On June 23, 2015, Timmy Smith, a member of the Iron Order Motorcycle Club (a 99%'er club), met Darren Michalski, another Iron Order member, at the Papa Rock gas station on Highway 79. Smith was wearing Iron Order "soft colors" while Michalski was wearing an Iron Order vest. The two met at the station so that Smith could use the ATM machine to withdraw cash in order for Michalski to pay his water bill. While there, Forrester drove by, gave them the finger, and revved up his engine. Smith and Michalski laughed the matter off, but waited a few minutes before heading to the Woodlawn Utility District to pay Michalski's bill.

As Smith got onto Woodlawn Road, he ended up behind Forrester who would speed up and then slow down. Forrester pulled out a pistol and pointed it at Smith who was driving a truck with his two children in the back seat. After pointing the weapon at Smith for 30 to 40 seconds, Forrester took-off down Woodlawn Road. Smith then pulled into the parking lot of the utility building

followed by Michalski. Meanwhile, Forrester U-turned and came into the same parking lot. Smith told Forrester not to do anything "stupid" because his kids were in the truck. The situation only diffused after Smith recognized Forrester (a fellow student at Miller Motte Technical College) and told him he could call one of their professors "and have him come out." (Doc. No. 2417 at 245).

Two weeks later, and just a month after the encounter with law enforcement at Hooters, Forrester and Ort orchestrated the Stateline Road and Travis Orten home invasion robberies. Both were committed to securing funds to travel to California for a Mongols national convention.

Late in the evening on July 3, 2015, Frazier, Ort, Cooper, Kendra Lee, and William Miles were riding around town looking for motorcycles to steal. They pulled into the Stateline Road apartments. There, Forrester and Miles exited the truck with their faces covered with bandanas. Forrester was carrying a handgun and Miles was carrying a knife. The two approached a vehicle and robbed two women who were sitting in the backseat. For their efforts, they made off with a clutch wallet containing credit cards. A short while later, they unsuccessfully tried to use the credit cards to purchase gas at a Mapco station.

After leaving the gas station, Cooper received a call from Travis Orten, one of her sexual "tricks." He called to ask if she knew any women who could come over for $100-$200 an hour. Cooper initially demurred, but eventually agreed to go to Orten's residence. This upset Ort until Cooper explained that Orten had a lot of money and drugs. Scenarios were then discussed about how best to rob Orten, including Cooper going into the house and leaving the door unlocked for her cohorts. As an added twist, once the robbery was completed, Cooper would be "kidnapped" because Orten was a good source (or "plug") of money and drugs and she did not want to lose the connection by robbing him.

10

Orten sent his friend, Curtis Killibrew, to pick Cooper up at a designated gas station. Unbeknownst to Orten or Killebrew, however, Forrester, Ort, Miles and Lee were also at the gas station sitting in Forrester's truck. Killebrew drove Cooper to Orten's residence on Huffman Mille Road in Hopkinsville, Kentucky. En route, Cooper texted Forrester and Ort the direction of travel. Upon arrival, she texted them the address and went inside with Killebrew.

Shortly thereafter, Orten's doorbell rang and Ort, Forrester and Miles entered the house. In the ensuing melee, Killebrew ran out of the garage, Forrester held a knife to Orten's neck and Orten was struck in the head. Somehow, Orten managed to escape prompting Forrester, Ort and Miles to flee, leaving Cooper behind. Orten jumped in his SUV and gave chase. The chase ended in a horrific accident in which Ort and Lee were killed. Orten ended up in the hospital and Forrester found himself in hot water with the authorities.

Forrester's legal troubles dashed his hopes of traveling to California in July to meet Harbor Chapter Mongols, but that did not deter others from going. This included Nieves, the Daye brothers (and one brother's girlfriend), Frazier, Santiago, Hern, and JoJo Lauati, several of whom had new tattoos in honor of Ort. Ironically enough, though the men were hoping to become patched motorcycle outlaws, they traveled to California in a Ford Expedition. They first stopped in Los Angeles and were told to wear either support gear or black t-shirts with jeans. Properly attired, they then traveled with hundreds of Mongols to Palm Springs for the National Run where the Mongols essentially took over a hotel.

Although the July 2015 California visit gave the Mongols an opportunity to size-up the

Tennesseans, the Clarksville crew was not awarded patches at the time.[7] The trip did, however, cement relationships that would provide the Clarksville group with pound quantities of methamphetamine for distribution. Indeed, Thomas Chavez and his Harbor Chapter would end up supplying the Clarksville Mongols with large scale quantities of methamphetamine for distribution in Tennessee and Kentucky over the next 18 months or so.

Seizing the opportunity to supply an essentially untapped methamphetamine market, Chavez essentially took over the "patch daddy" responsibilities of Lauati in September 2015 and became, not only the sponsor of the Clarksville Mongols, but also its chief methamphetamine supplier. The primary recipients of the methamphetamine were Frazier and Santiago. To that end, Frazier and Santiago oversaw the sale of dozens of pounds of methamphetamine between September 2015 and Chavez's death a little over a year later.

Frazier saw the sale of methamphetamine as a way to get in favor with the Harbor Chapter, even if he was paying a premium price for it. Santiago and Frazier were not the only ones involved in the meth trade. Among other Clarksville Mongols, Hern, Cole, Levi West, and William Nelper distributed methamphetamine.

Evidence of the group's drug trafficking came in the form of texts and the testimony of several confederates. It also included encounters with law enforcement. Several examples will suffice to provide context for the arguments raised in the pending motions:

> In November of 2015, West and Mark Wilkins were looking for a source of methamphetamine and were directed by Jennifer Wells to Frazier. Upon first meeting Frazier, they purchased an ounce of meth and later that same day purchased

---

[7] Shortly after the California trip, the Dayes left the group because of a falling-out with Santiago. They were replaced by Stephen Cole and James Hines who were then members of the Infidels Motorcycle Club. Later, Adam Wojciechowski, another Infidels, joined the group.

two more ounces each. Later than month, Wells was eliminated as the middleman and West began to contact Frazier directly, including by text. Those text messages show that, from Thanksgiving 2015 until December 29, 2015, Wells repeatedly texted Frazier to "re-up" his supply, usually an ounce or two of methamphetamine.[8] Those text exchanges also showed that Santiago "handled transactions," meaning that he was the money man and that hundred dollar bills were preferred over the five and ten dollar bills West had been giving them. Eventually, West's purchases increased over time to a quarter to a half pound, and on one day, West brought in $10,000 from selling methamphetamine purchased from Frazier. West's methamphetamine dealings with Frazier ended in March 2016 when West went to jail.[9] By then, he had become a Clarksville Mongols prospect and would later become fully-patched. (Doc. No. 2433 at 27-40, 94).

Sometime around Christmas 2015, Frazier, Callie (Teitler) DeCarlo and Lurch drove Decarlo's Chevy Cruze to Southern California where they met Chavez. They stayed one day and returned the next with three gallon bags of methamphetamine that were half-full. Those bags were stored at DeCarlo's apartment in a Tuff box. DeCarlo, who for a time was dating Frazier, also stored guns and money received from drug sales in her apartment. (Doc. No. 2432 at 182-85, 189-92).

In late 2015, Janie Lee (who was Adriana (Miles) Frazier's best friend) began selling methamphetamine for Stanley who Lee considered to be her brother-in-law and called him "Unk." She started out small, selling quarter-ounce quantities of methamphetamine that Stanley got from Frazier. The amount increased significantly and she, along with Adrianna, began to sell half-pound to pound quantities of methamphetamine, the latter of which they would sell for over $20,000. (Doc. No. 2240 at 66-68, 88-89).

On December 14, 2015, Chavez was stopped by an officer from the Dickson, Tennessee police department for tailgating a tractor trailer. A search of the vehicle resulted in the discovery of $44,000 in cash that corresponded with payments that Frazier and Santiago recently made to Chavez for methamphetamine that had been fronted. Also inside the rental vehicle, officers discovered assorted Mongols gear, including t-shirts. (Doc. No. 2433 at 10-13; Tr. Ex. 795).

Early in the morning on January 16, 2016, police executed a search warrant at 1331 Meredith Way in Clarksville. Present at the residence were Frazier and Santiago. A search of the house and their persons revealed: 36 grams methamphetamine in a

---

[8] West also dabbled in selling "Opanas" (oxymorphone) and "Roxies" from or to Frazier but their core business was dealing in methamphetamine.

[9] Upon release from jail in March 2016, West turned to Hines as a source for methamphetamine.

plastic container; 99 ½ Xanax pill; 30 blue pills; a handful of green and orange pills; two digital scales; a money counter; a Smith and Wesson 9mm pistol with 10 rounds of ammunition; a Springfield .45 caliber pistol and magazine; a Zastava firearm with two magazines; and $49,520.00 in cash. (Tr. Ex. 956, 957, 958, 960, 961, 962, 967, 969, 970, 975, 976, 977). The seizure of those items led to the arrest of both Frazier and Santiago. Upon hearing of Frazier's arrest, Stanley met with some other Mongols to see about repaying the $10,500 he owed to Frazier for methamphetamine that had been fronted to him by Frazier. (Tr. Ex. 799 at 24, 31-37).

In the last week of January 2016, when Frazier was released from jail (with the help of some bail money from Chavez) after the Bojangles shooting discussed below, he, West, DeCarlo, Hern, Nelper, Wojciechowski and Hines went to California for a National Run. Again they went in DeCarlo's car rather than by motorcycle. Upon arriving at the Harbor Chapter clubhouse, they received a call that Cole had been in a motorcycle accident in New Mexico and might die from his injuries. Several members of the group drove to New Mexico to check on Cole but returned to California a few days later where Frazier was fronted five pounds of meth from Chavez before traveling back to Tennessee. (Doc. No. 2432 at 225-26). Two weeks later, the methamphetamine had been sold so Frazier, his then-girlfriend Adrianna, Janie Lee (who would later become Santiago's girlfriend and who, along with Adrianna, sold methamphetamine to Stanley in Owensboro, Kentucky), and West returned to California. This time, Frazier was fronted ten pounds of meth from Chavez at $13,000 a pound. (Doc. No. 2420 at 218-19; 2433 at 79-81).

On January 26, 2016, an officer with the Aurora Colorado Police Department conducted a traffic stop of a vehicle driven by Stanley. Inside, the officer found a hollowed-out book containing syringes, another fake book, two digital scales and some drug paraphernalia. They also discovered a baggie containing methamphetamine and a container with two bags of methamphetamine. Combined, the methamphetamine weighed almost 500 grams. (Doc. No. 2435 at 32-39; Tr. Ex. 736-745).

In mid-February 2016, Frazier, Adrianna, West and Lee traveled to Downey, California in Frazier's black Charger. There, Frazier and West met up with Chavez and exchanged a duffle bag of money for what Lee estimated to be 15 pounds of methamphetamine. On a subsequent trip, Lee witnessed Frazier with what she calculated to be 20 to 25 pounds of methamphetamine. She also recalled an event where she, Adrianna, Frazier and Santiago traveled from Oak Grove, Kentucky to Nashville so that Frazier could give Chavez two backpacks, each containing $50,000 in cash. (Doc. No. 2420 at 104-109).

On April 24, 2016, a rental Dodge Journey was stopped by officers on I-70 in Boone County, Missouri. On board were Adrianna, Lee, Santiago and Frazier. Upon

14

approaching the car, officers smelled marijuana and the vehicle was subsequently impounded. A search of the vehicle revealed: (1) a Rock Island .40 caliber pistol and ammunition; (2) a Glock 9mm pistol and ammunition; (3) two magazines, one capable of holding 30 bullets; and (4) over 100 grams of methamphetamine. (Doc. No. 2420 at 109-110; Tr. Ex. 1062-1071).

Although Frazier was front and center in the drug trade with Santiago by his side during this period, when they became incapacitated either because they went to jail or were accused of using drugs, the void was immediately filled. This included Hern, Hines, Cole, Nelper, and West who all helped keep the drug conspiracy going, with West himself receiving 6 pounds of methamphetamine from Chavez in the summer of 2016. And, when Chavez overdosed and died in October 2016, his role as supplier was quickly filled by Richard Ramirez and "Lito." (Doc. No. 2433 at 116, 130-31, 147).

The above are but a few indicia of large-scale drug dealing by the Clarksville Mongols and Stanley's participation in the same. The jury also heard from scores of witnesses about the day-in and day-out sale of small amounts of drugs. That many members were involved in penny-ante drug sales is hardly surprising because the large amount of drugs acquired from the California Mongols had to be broken down and resold. It is also unsurprising because this was a major source of income for many of the Mongols. Some (such as Frazier who was unemployed) had no other income and others (such as Santiago) were living off of medical disability checks provided by the military. A notable exception was Meyerholz who was (or is) a master plumber.

Drug trafficking did not quench the Clarksville Mongols thirst for violence, although it sometimes promoted that trade. For example, on January 5, 2016, Clarksville police were dispatched to a hit-and-run call at the Bojangles on Tiny Town road. Upon arrival, they discovered 9 millimeter casings in the parking lot. Earlier that day, Timothy Grant received a phone call from Theresa Cobb who regularly purchased prescription pills from him, including Oxycodone, Opanas and Roxies. Her purchases were usually small – one or two tablets – but that day she wanted to purchase $5,000

worth of Opana-40's. This led to Grant (who was not a Mongols) and Dustin McKracken (who was) coming up with the idea of robbing Cobb of the money, instead of selling her drugs. So, they set up a meeting place at the Bojangles that evening.

Grant and McCracken drove to the meeting in a red Volkswagen Jetta. Shortly thereafter, Cobb arrived in a black Charger driven by Kyle Heade. Cobb exited the Charger and got into the backseat of the Jetta. After some of the bills were checked with a marker to ensure they were real, McCracken reached over the seat and tried to grab the money, prompting Cobb to scream hysterically. Hearing the screams, Heade jumped out of his car and fired into the Jetta four of five times. The Jetta then fled the scene, after first hitting a parked car. Critically wounded, Grant went to a local hospital and was eventually airlifted to the Vanderbilt University Trauma Center. At some point, Grant told law enforcement that Cobb lived at 1331 Meredith Way in Clarksville and the address was broadcast to responding units.

While police were searching for the Jetta, they stumbled upon another red car near Cobb's residence. An officer saw someone peaking from the blinds of the house, prompting the officer to approach for a knock and talk. Once the door was opened, he smelled a strong odor of marijuana in the house. This ultimately led to search of the home and arrest of Santiago and Frazier referenced previously, as well as the discovery of a black Charger in the garage.

Either the night of, or the day after Santiago and Frazier were arrested as a result of the Meredith Way search, Hern, Cole and Hines showed up at Callie DeCarlo's apartment where West was then living and Sharon Priess was visiting. After some small talk, Hines said he was tired of "BS'ing" whereupon Hern and Cole pulled out guns. West was searched and told to sit on the couch with DeCarlo and Priess. The visit was the result of a call from Santiago who thought that West had

stolen $41,000 from the Meredith Way after the search by law enforcement. Two days later, West was summoned to Hines' apartment and questioned about the money at gunpoint. In actuality, the money had been confiscated by the police at the time of the arrests of Frazier and Santiago.

The Clarksville group's ability to move large amounts of methamphetamine no doubt helped pave their way to being recognized by the National Chapter. Indeed, during the 2016 National Run in Palm Springs, the Clarksville chapter was officially recognized as a probationary chapter and on July 10, 2016, Frazier, Santiago, Hern, Boylston, Hines, Cole, Nelper, Wojciechowski, and Humiston became fully-patched members of the Mongols. Hines was President; Cole was Vice President; Humiston was Secretary; and Wojciechowski was the Sergeant-at-Arms.[10]

Now officially allowed to wear Mongols cuts, it did not take long for the group to try to make clear to other clubs that they were the premiere outlaw club in the area. Days after returning from Palm Springs, the Mongols got into a fight at Wize Guys bar on July 13, 2016, after Santiago told a Diablos member to take off his 1%'er diamond patch that indicated the Diablos were an outlaw motorcycle club. Participating in the fight were Humiston, Santiago, Hines, Cole, Wojciechowski, and Boylston. At one point the group managed to pull off the Diablos President's vest, an incredible sign of disrespect. The fight only stopped when a Diablo, who was sitting in a wheelchair, pulled out a gun, fired it, and the cops were called. Those who participated in the fight were later awarded the "Respect Few, Fear None" patch.

---

[10] The club's officers regularly changed. Frazier, Santiago, Meyerholz, and Hines all served as President at one time or another. The membership was also fluid and had internal conflicts. Boylston and Humiston joined the Clarksville Mongols in the early summer of 2016, while Meyerholz, a member of the Smoky Hills Chapter of the Mongols in Colorado moved to Clarksville in June 2017 to straighten out some problems the Clarksville Mongols were having. In April 2017, Santiago and Hern transferred to an Arkansas Chapter of the Mongols. At some point, Wojciechowski left to join a Mongols chapter in Indiana.

The intimidation and lack of respect for other motorcycle clubs extended even to those clubs that are considered law abiding. Just a day after the Diablos fight, on July 14, 2016, Michael Finley, the Treasurer of the Iron Order Motorcycle Club who had been "center punched" for speaking bad about its President, left the clubhouse around 9:30 p.m. As he neared his house, Finley pulled over to let a red Mercedes that had been following him pass by, but the Mercedes pulled in behind him. Robert Humiston, a Mongols member, got out of the Mercedes that was being driven by Vlad Pytyak, a hang-around. Humiston approached Finley and started patting him on the back. This was a major show of disrespect because one does not touch another's vest. Humiston also chided Finley for being a "prospect," which he was not. As Humiston was getting back in the car, Finley warned Humiston not to follow him again or there would be trouble. Once in the car, Humiston pulled out a revolver and shot at Finley six times. Finley, who had a concealed carry permit, was hit three times and returned fire. Humiston was also shot in the exchange and went to Jamie Hearn's house for assistance. He and other Mongols then lied to the police about the incident and repeatedly questioned Pytyak about whether he had spoken to the police.

Even perceived slights by everyday citizens could lead to retribution. For example pausing the chronological narrative (and fast forwarding a year in the time line), on September 17, 2017, Boylston and Meyerholtz (both wearing Mongols gear) went to the Rookies bar in Clarksville where Boylston sang karaoke. Both stayed until closing time. As they were leaving the premises around 3:00 a.m. that morning, they happened upon David Denman who was crossing the parking lot after drinking at another bar. Either Boylston or Meyerholz accused Denham of speaking bad about the Mongols and giving them a dirty look, leading Denman to tell them he did not care about the Mongols one way or the other. This prompted Boylston to punch Denman in the face, after which

18

Meyerholz joined. As things began to become more heated, Denman tried to enter Rookies, but the door was locked. Denman ended up on the ground where both Boylston and Meyerholz punched and stomped on him, including his face. Denman's nose was broken, he received large lacerations across the face, and passed out.

Returning to the roughly chronological narrative, on October 23, 2016, Chavez and John Alvarez (another Harbor Chapter Mongols) came to Tennessee. After a night of bar hopping, Chavez went with Priess to a room at the Riverview Inn in Clarksville where Chavez later overdosed on drugs. Chavez's death in Clarksville was monumental. He was a lifetime member of the Mongols and the "patch daddy" of the Clarksville chapter, which was still on probationary status. His death in Clarksville reflected poorly on the Clarksville Chapter and raised the scorn of the Mother Chapter.

Because she was the last one seen with Chavez, attention immediately focused on Priess, with one thought being that she may have robbed and drugged him. After Priess did not respond to several calls and texts, she fled to Nashville where she was eventually located. Priess was coaxed into a Dodge Magnum station wagon driven by Hern. Unbeknownst to her, Santiago was lying in wait under a blanket in the back seat. Once Priess was comfortable, Santiago leapt from under the blanket, put a belt around Priess's neck and held it tight for the duration of the trip from Nashville to West's home in Oak Grove, Kentucky.

Upon arriving at Oak Grove, Santiago led Priess into West's kitchen. In his hand, Santiago had a belt and hit Priess several times across the legs. He then placed the belt around her neck and made her crawl into the bathroom with him. Not only was Priess being accused of killing Chavez, so was West.

19

Eventually, Boylston, Humiston, Hines, and Wojciechowski showed up at the house and, as a group, badgered Priess while she sat helplessly on the floor. That night Priess was taken to Wojciechowski's house and two days later returned to West's residence where she stayed for the next two to three weeks while the California Mongols investigated Chavez's death and decided what they wanted to do with her. Ultimately, the Mongols Nation decided to free Priess.

Ironically, the Clarksville Mongols' homicidal violence that began with a murder at the Kingins-Brandon Cemetery in Stewart County, Tennessee over a supposed theft, ended with a murder on Cemetery Street in Trenton, Kentucky, again over an alleged theft. This time the victim was Cole who had purportedly stolen two motorcycles.

The belief that Cole had stolen motorcycles dated back to March 2017 when Cole was evicted from a house where he stored Boylston's motorcycles and those motorcycles somehow disappeared during the eviction process. Boylston accused Cole of selling the motorcycles for drugs and made that accusation to several other Mongols, including Meyerholz. Because Boylston believed that Cole had disposed of his motorcycles, he repeatedly demanded payment but Cole refused to pay. Boylston could not leave the matter unaddressed for at least three reasons: (1) he risked being viewed as weak by other members of the club were he not to retaliate; (2) one of the motorcycles had been his father's (or had at least been in his possession for a while before he died); and (3) Boylston needed a running motorcycle to remain in good standing in the club, otherwise he would lose his top rocker and go back to probationary status.

At some point, Cole (who was in the throes of drug addiction) agreed to pay Boylston for the lost motorcycles but then became scarce, prompting repeated efforts by Boylston to get in touch with him. Later, in the fall of 2017, Cole informed members that he was not going to pay the debt after

20

all. This led to his being ousted from the club in November 2017. That removal from the club, in turn, made it easier to justify retaliation because Cole no longer had the protection of being a brother Mongols.

Boylston was not the only one incensed with Cole's lack of respect and his reneging on a plan for repayment brokered by the Mongols. Both Nelper and Meyerholz shared that view. Accordingly, early in the morning on November 19, 2017, Boylston followed by Meyerholz (with a firearm by his side) barged into Ronald Johnson's house at 2627 Del Ray Drive in Clarksville where Cole was then staying with his girlfriend, Chadley Jewett. That location was provided to them by Chris Wilson, a Mongols hang-around, who accompanied Boylston and Meyerholz and who later entered the house after hearing a ruckus coming from within.

Unsurprisingly, the unannounced visit startled the residents who were ordered to sit down on the couch and keep quiet, although much sterner, colorful language was used. Cole was located in Jewett's bedroom, marched out of the house, and forced into Meyerholz's Mazda 3.

Once inside the vehicle, Boylston began beating Cole in the face, asking him about money and whether he was still on drugs. Cole denied the accusations to no avail. Wilson was dropped off at a Red Roof Inn where he was staying.

Eventually, Meyerholz, Boylston and Cole arrived at Nelper's house at 202 Cemetery Street and Cole was forced into a wooden shed on the property. At the time, Nelper was the Sergeant-at-Arms, meaning he was responsible for enforcing club rules and discipline. Also present at Nelper's house was his girlfriend, Jessie Decker, but she did not enter the shed.

Inside the shed, Cole was zip-tied and mercilessly tortured for hours. He was beaten so badly that his skin was falling off his face and a tent spike was driven into his head. At some point during

the beating, Nelper left to go to work but this did not stop Meyerholz or Boylston from continuing to beat and interrogate Cole. They managed to get Cole's PIN number for his ATM card but were unable to get any money because the account was empty. Cole died from the beating.

After Boylston and Meyerholz killed Cole, they contacted Christian Dykes, a hang-around, to help dispose of the body. Meyerholz picked up Dykes and drove him to Nelper's residence. There, Meyerholz, Boylston and Dykes picked up Cole's body and placed it into the bed of Meyerholz's pick-up. Meyerholz and Dykes then left with the body while Boylston stayed behind so that he could clean-up the bloody mess and prevent Decker from entering the shed and discovering what had happened.

Meyerholz and Dykes drove around for hours looking for a burial site but were unsuccessful. Consequently, Cole's body was left overnight underneath two or three bags of crushed cans in the back of the pickup truck in the driveway of 2930 Charlie Sleigh Road, Woodlawn, Tennessee where Meyerholz and Boylston were then living. The next morning, Meyerholz went to work at his plumbing job while Boylston and Dykes drove around scouting out potential burial sites. Ultimately, they dug a shallow hole behind an abandoned residence at 1456 Bend Road in Clarksville, and dumped Cole's body in it. Later, investigator would discover remnants of a logging chain, Sawzall® blades, a tarp, razor blades and a small sledgehammer in a burn pit at the back of Nelper's house on Cemetery Road.

After Cole's murder, Meyerholz was named President and Boylston was named Vice-President of the Clarksville Mongols. Dykes was promoted from being a hang-around to a Prospect.

The Grand Jury returned its first Indictment in this case on July 12, 2017 naming five Defendants, including Frazier and Santiago. In its final iteration, the 69-page, 72-count Third

22

Superseding Indictment named 21 Defendants. Most Defendants pled guilty before trial, although two (Cole and Nelper) died while charges were pending. As for those that went to trial, the jury returned the following verdicts based upon the above facts and others memorialized in the 39-volume trial transcripts:

## 1. <u>James Frazier</u>

Frazier was convicted of the RICO, drug, and money laundering conspiracies alleged in Counts One through Three. With respect to both the RICO and drug conspiracies, the jury found that it was foreseeable to Frazier that more than fifty grams of methamphetamine would be distributed. Further, as a part of finding that Frazier was guilty of the RICO conspiracy, the jury also found that he knowing and intentionally killed Stephanie Bradley in violation of Tennessee law. In relation to Bradley, the jury found that she (and Cooper) were kidnapped by Frazier and Bradley's kidnapping resulted in her death (Count Six); that the kidnappings and murder were in aid of racketeering (Counts Seven, Eight); that a firearm was brandished and discharged in those crimes of violence (Count Nine); and that such use resulted in her death (Count Ten). The jury found him not guilty, however, of using a firearm during and in relation to a drug trafficking crime when Bradley was murdered (Count Eleven).

In addition to the crimes related to Bradley's murder, Frazier was convicted of eight counts of distributing or possessing with intent to distribute methamphetamine (Counts Twelve, Twenty-Three, Twenty-Five, Twenty-Six, Twenty-Seven, Thirty-Two, Forty, Forty-Three), and three counts relating to the possessing or distributing Oxymorphone (Count Twenty-Nine), including conspiracy (Count Twenty-Eight) and attempted distribution (Count Thirty). Frazier was also convicted of carrying or using a firearm during and in relation to a drug trafficking crime (Counts Thirteen, Thirty-One, Thirty-Three, Forty-One, Forty-Three) and four counts of insterstate travel in aid of racketeering (Counts Twenty-Two, Twenty-Four, Thirty-Nine, Forty-Two).

## 2. <u>Aelix Santiago</u>

Santiago was found guilty of the RICO, drug and money laundering conspiracies (Counts One through Three) and that it was foreseeable to him that more than 50 grams of methamphetamine would be distributed during the course of the drug and RICO conspiracies. Additionally, the jury found that Santiago conspired and attempted to possess with intent to distribute Oxymorphone (Counts Twenty-Eight, Thirty) and that he used or possessed a firearm (including brandishing and

23

discharging) during both crimes (Counts Thirty-One). Santiago was also convicted of kidnapping (Count Fifty-Two). He was acquitted of possessing with intent to distribute alprazolam and carrying a firearm in relation thereto (Counts Thirty-Four, Thirty-Five), as well as conspiring to, and tampering with, a witnesses (Counts Fifty, Fifty-One).

### 3. Michael Forrester, Jr.

Forrester was found guilty of being a part of the RICO conspiracy alleged in Count One, the drug conspiracy alleged in Count Two, and the money laundering conspiracy alleged in Count Three, but the jury split on the special finding relating to drug quantity. With respect to the RICO count, the jury found that it was reasonably foreseeable to Forrester that 50 grams or more of methamphetamine would be involved, but on the drug conspiracy count, less that 5 grams was foreseeable. In addition, the jury found Forrester guilty of distributing or possessing with intent to distribute methamphetamine (Count Twelve) and using or carrying a firearm in relation to that crime (Count Thirteen). It also found Forrester guilty of robbery and conspiracy to commit robbery affecting interstate commerce (Counts Eighteen, Nineteen) and brandishing a firearm in relation thereto (Count Twenty-One). Forrester was also convicted of kidnapping (Count Twenty). He was acquitted on charges that he committed assaults with a dangerous weapon in aid of racketeering (Count Fourteen and Sixteen) and carried a firearm in relation to those crimes of violence (Count Fifteen and Seventeen).

### 4. Jamie Hern

In addition to finding Hern to be a part of the overall RICO and drug conspiracies alleged in Counts One and Two, the jury found that it was foreseeable to him that more than 50 grams of methamphetamine would be distributed as part of those conspiracies. Hern was also found guilty on the money laundering conspiracy alleged in Count Three, along with the following substantive counts: (a) assault with a dangerous weapon in aid of racketeering (Count Thirty-Six) and using or carrying a firearm in relation to that crime (Count Thirty-Seven); (2) accessory after the fact to assault with a dangerous weapon in aid of racketeering (Count Forty-Eight); (3) being a felon in possession of a firearm and ammunition (Count Forty-Nine); (4) conspiracy to tamper with a witness (Count Fifty) and tampering with a witness (Count Fifty-One); and (5) kidnapping (Count Fifty-Two). Hern was acquitted on Count Twenty-Six, charging him with possession and possession with intent to distribute methamphetamine on a specific date.

### 5. Derek Stanley

Stanley was found guilty on both the drug conspiracy alleged in Count Two and the money laundering conspiracy alleged in Count Three. As a part of Stanley's

24

conviction on Count Two, the jury also found that it was foreseeable to him that 50 grams or more of methamphetamine would be distributed. In addition, Stanley was convicted on two substantive counts of distributing or possessing with intent to distribute 50 grams or more of methamphetamine (Counts Twenty-Three, Twenty-Seven). Finally, Stanley was convicted in Count Thirty-Eight of interstate travel in aid of racketeering.

**6. William Boylston[11]**

Boylston was found guilty of the RICO conspiracy and, as a part of that conspiracy, the murder of Cole in violation of Kentucky law. He was also found guilty of assault with a dangerous weapon in aid of racketeering (Count Fifty-Five); kidnapping resulting in death (Count Fifty-Six) and kidnapping and murder in aid of racketeering (Counts Fifty-Seven and Fifty-Eight). Finally, the jury found that, during and in relation to the crime of violence, Boylston brandished a firearm (Count Fifty-Nine).

**7. Jason Meyerholz**

The jury found Meyerholz guilty of being a part of the RICO conspiracy alleged in Count One but also found that he did not murder Stephen Cole in violation of Kentucky state law. It did, however, find that (1) Meyerholz assaulted Cole with a dangerous weapon in aid of racketeering and brandished a firearm in so doing (Counts Fifty-Five, Fifty-Eight); and (2) he kidnapped and murdered Cole in aid of racketeering (Counts Fifty Six, Fifty-Seven, Fifty-Nine).

## III. Legal Analysis

### A. Procedural Issues

#### 1. Courtroom Configuration – Santiago (Doc. No. 2465)

A courtroom is only so big, including the ceremonial courtroom that was used for the trial in this case. Within the well of the courtroom, the Court had to accommodate 3 prosecutors, a paralegal, the agent who served as representative of the United States, 7 Defendants and 11 defense counsel. The prosecution side was seated at two tables that were placed horizontally, one behind the

---

[11] Again, Boylston's renewed requests for a judgment of acquittal or a new trial are not before the Court at this time. The verdicts as to him simply place some of the other facts and arguments in context.

other, both facing the bench.  On the other side of the aisle was an L-shaped table with another table

sitting horizontally behind it.  At the small end of the "L" two defendants (Forrester and Hern) were

seated, together with the lawyers.  At the long part of the "L" that extended towards the front of the

courtroom were two more Defendants (Meyerholz and Stanley) and the three lawyers who

represented them, all of whom faced the jury.  At the back table, six lawyers were seated with the

remaining three Defendants (Boylston, Santiago and Frazier) sitting on the bench directly behind

them.

The placement of the tables was not fortuitous.  Each had to be placed over covers in the

cement floor that housed electronic cables.  Those cables then snaked-up through conduits in the

tables and allowed counsel to use electronic devices such as laptops.  Those cables also supplied the

power for the real-time displays and evidence monitors placed on each table for the benefit of both

the lawyers and Defendants.

Schematically, the courtroom configuration looked roughly like this:



Santiago, one of the Defendants placed on the bench behind his two lawyers, complains that

the seating arrangement violated his right to due process and impeded the effectiveness of counsel.

Substantially similar arguments were raised by Santiago's counsel of record in a multi-defendant, multi-weeks long trial that the Court held in 2019 when the same counsel represented Marcus Burks.

In United States v. Darden, the Court rejected those arguments, writing :

> "[D]efendants (who have to sit somewhere, clearly) usually sit at counsel table to assist in their defense," United States v. Correa-Osorio, 784 F.3d 11, 20 (1st Cir. 2015), but neither the Sixth Amendment, nor federal law mandates that this is constitutionally required. To the contrary, . . . more restrictive seating arrangements have been approved by federal courts of appeal. For example, in United States v. Jones, 766 F.2d 994, 1004 (6th Cir. 1985), a case involving eighteen defendants, the Sixth Circuit found no Sixth Amendment violation where defendants "were seated in two rows immediately behind counsel table" because defendant were permitted to pass notes to their attorneys, counsel could get up and discuss matters with their clients, and no restrictions were placed on communications during recesses. Similarly, in United States v. Balsam, 203 F.3d 72, 82 (1st Cir. 2000), the First Circuit found no abuse of discretion where defendants were "seated in the front row of the spectator section ... only four to five feet from defense table" because "of the limited available space in the small courtroom, and by the obvious security concerns that might arise if ten people were to be seated at or behind the defense table," particularly because defendants could "freely communicate with their attorneys as they wished, either by walking the short distance to the defense table, or by passing written notes." In United States v. Levente, 277 F.3d 454, 465 (4th Cir. 2002), the Fourth Circuit approved a seating arrangement where defendants sat approximately six feet behind counsel and could only see the backs of witnesses because they were "permitted to consult freely with their counsel, either by leaning forward and speaking directly to counsel or by passing notes." To be clear, as stated on the record, in [Darden]: (1) each Defendant is less than four feet from counsel; (2) each Defendant can lean forward and easily talk to counsel; (3) each Defendant can pass a written note; (4) each Defendant can follow the testimony on the real-time transcript that appears on display screens in font large enough for each Defendant to read; and (5) each Defendant was invited to advise the Court if they had any problems communicating with counsel.

364 F. Supp. 3d 798, 800–01 (M.D. Tenn. 2019). The same is true here, and the Court reaches the same conclusion.

In rejecting Burks' argument in Darden, the Court considered arguments (like Santiago raises

here) about the "numerous problems inherent in having a defendant seated someplace other than counsel table for trial," including (1) it would restrict the communication between the defendant and counsel; (2) communication between counsel and client would take longer; (3) the jury would notice if defendant is trying to communicate with his lawyer; and (4) when defendant communicates with counsel, it would distract counsel from hearing the testimony as it is being given. Again, the Court rejected those arguments, writing:

> Burks' concerns might have some validity if the courtroom was configured like the one at the Judge's Trial of 1947 (Nuremberg), or like those in the colonial courts of old that utilized prisoner docks. But that is not the set-up in this case. Instead, Defendants are sitting directly behind counsel, literally within arm's reach and free to communicate with counsel, both verbally and in writing[.]

> Furthermore, juries are observant, and it would be naive to think that jurors do not notice when a defendant is whispering in his attorney's ear or passing a note. This is true whether the whisper or note comes from the side or behind. As for the "noise disturbance" that allegedly would distract counsel, this is a possibility that may occur in any multi-defendant case, whether a co-defendant is sitting next to counsel or behind counsel. Moreover, Burks' is represented by two court-appointed attorneys, meaning that one can stay focused on the questioning while the other is free to converse or receive notes from Burks, just as would occur if Burks were to sit at counsel table.

Id. at 801. Santiago is not entitled to a new trial as a result of the courtroom configuration.

**2. Trial Delays – Santiago and Hern (Doc. No. 2464), Meyerholz (Doc. No. 2468), and Frazier (Doc. No. 2478)**

Trial began on June 1, 2022 with jury selection, after a more than a year delay due to the COVID-19 pandemic that was wreaking havoc in this district and across the country. At the time trial finally commenced, COVID's lingering effects remained and all trial participants were fully aware that there could be shutdowns should a lawyer, Defendant, or a juror become ill. In addition, because the trial was expected to last in the neighborhood of three months, the Court built into the

28

schedule a week-off (the week of the Fourth of July) so that everyone could rest somewhat, counsel could attend to matters that needed attention, and the Court could address other cases that were pending in chambers.

The notion that COVID would rear its ugly head at trial was prescient. Not once, not twice, but several more times the trial was forced to shutdown either because a lawyer, a juror, or a Defendant got sick. Each shutdown was in accordance with the then-prevailing Centers for Disease Control ("CDC") protocol, and Defendants do not argue otherwise. They maintain, however, that this "constant 'stop and start' pace of this extraordinary trial created a 'manifest necessity' for a mistrial." (Doc. No. 2464 at 13 citing United States v. Atisha, 804 F.2d 920, 926 (6th Cir. 1986)). And, because the Court did not grant a mistrial when requested, they argue that a new trial is the appropriate remedy.

The motion for a mistrial was made by five Defendants after more than 100 witnesses had testified with less than two days remaining in the Government's case-in-chief. The Court denied the motion in a written opinion, United States v. Frazier, No. 3:17-CR-00130, 2022 WL 4073339 (M.D. Tenn. Sept. 5, 2022), the highlights of which bear repeating.

After noting that the trial had by then been delayed by COVID four or five times, the Court acknowledged the recommendations of the CDC and recognized a trial judge's "'grave responsibility,' to determine what safety measures are necessary to protect the judge, court personnel, the parties, the lawyers, the jurors, and the audience in and around the courtroom." Id. at *2 (quoting United States v. Smith, No. 21-5432, 2021 WL 5567267, at *2 (6th Cir. Nov. 29, 2021)). The Court then observed:

As dismal as this all sounds, however, it cannot be gainsaid that this trial was always

29

expected to last approximately three months and we are barely beyond that point now. Therefore, to the extent that Defendants complain about jurors forgetting the testimony of witnesses due to the mere passage of time, the same argument could have been made had the trial proceeded without any hiccups, or in any lengthy trial for that matter. No doubt, the jurors' recollection of earlier testimony may not be as clear as their remembrance of more recent testimony but that is not a basis for a mistrial. If it were, any trial of more than a few weeks would be grounds to abort.

Besides, most of the jurors in this case have taken copious notes, and all have been paying close attention as the evidence has been admitted. That, coupled with closing arguments will lessen the possibility that any evidence has been truly forgotten, as opposed to having been stored away in the memory bank for later retrieval.

Id.

Next, the Court recognized that any break in a trial increased the risk that an outside influence could come to bear on the jury, but discounted this concern writing:

[E]ach time a break from the proceedings has been necessary in this case, the Court has assiduously asked the jurors about outside influences. The Court has no basis or reason to suspect that any one or more of them was untruthful when they answered in the negative. Nor does the Court have any doubt that each of the jurors have taken to heart this Court's repeated admonitions that they keep an open mind and not reach any conclusions until the evidence has been concluded and they have been given the Court's final instructions. See Penry v. Johnson, 532 U.S. 782, 799, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (jurors are presumed to follow the court's instructions); Richardson v. Marsh, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (same).

Id.

In their present filings, Defendants point to no outside influence, other than that captured in a note the Court received on July 26, 2022. In open court the next day, the Court apprised the parties of the note, stating:

THE COURT: Before we bring the jury in, I want to share and put on the record that at the end of the day yesterday, Juror No. 17 advised the jury administrator that this past weekend on Sunday while he was at his baseball teams' baseball game, conversation was had where he was identified as a juror. And he did the right thing and said, well, I can't talk about that, but I am a juror. I said – I told him no problem

30

with that. During the process, perhaps another team member shared with his girlfriend, hey, this is the guy who's a juror in Judge Crenshaw's courtroom. And it became known that the girlfriend said – I'm sorry, the girlfriend said, oh, are you in Judge Crenshaw's case? And he said yeah, To which she said, I work in Katy Risinger's [the prosecutor's] office. And then that was the end of the conversation. The person who said – the girlfriend's name is Christin Smith.

(Doc. No. 2435 at 7-8). The Court then polled the Government and counsel for each of the Defendants, none of whom had an issue with that juror remaining. This is hardly the basis for a mistrial, let alone a new trial.

In its earlier written opinion denying a mistrial, the Court relied on other reported cases involving breaks in trial proceedings. One occurred during the COVID-era, specifically, United States v. Coversup, 2022 WL 2207309, at *1 (9th Cir. June 21, 2022), where the Ninth Circuit affirmed the denial of a motion for mistrial based upon the trial court granting a two-week recess to allow for testing and quarantining jurors in accordance with the CDC's recommendations. Other cases included denials of mistrials where what should have been a three week trial lasted almost two months, United States v. Van Dyke, 605 F.3d 220, 227 (6th Cir. 1979) and where there was a 32-day break in trial, United States v. Smith, 44 F.3d 1259, 1267-68 (4th Cir. 1995).

One of the delays in this case occurred during the cross-examination of Humiston, which was interrupted for three weeks after two of the seven defendant had an opportunity to cross-examine him. The Court addressed that issue, too, in its prior ruling:

> The Due Process Clause of the Fifth Amendment mandates a fair trial. United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," with the primary interest protected by the clause being the right to cross-examine witnesses. Kentucky v. Stincer, 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). That said, it is "axiomatic ... that a defendant is entitled to 'a fair trial, not a perfect one, because an error-free, perfect trial is not humanly possible.'" Smith,

31

2021 WL 5567267, at *1 (quoting United States v. Segines, 17 F.3d 847, 851 (6th Cir. 1994)). "This principle applies with even greater force during a public health emergency, where protective measures . . . upend traditional notions of what a 'normal' trial looks like. However, different does not necessarily mean unfair." Id.

As the Government concedes, "it is obviously preferable for cross-examination to follow closely after direct" (Doc. No. 2318 at 7), but it does not follow that cross-examination of a witness must immediately follow direct examination. Thus, for example, it was not error for the trial court "to permit[ ] the government to put on direct testimony of three of its witnesses without intervening cross-examination" in order to allow the government to comply with its obligations under the Jencks Act. United States v. Williams, 375 F. App'x 682, 685 (9th Cir. 2010). This remained so, notwithstanding defendants' argument "that this procedure was prejudicial because, on the eve of a four-day recess, the jurors only heard the government witnesses' version of Defendants' criminal conduct." Id. As previously mentioned, the same sorts of arguments were rejected by the Sixth Circuit in Van Dyke and the Fourth Circuit in Smith, and are rejected again here.

Moreover, the notion that the direct examination of Humiston will have been "cemented" in the jurors' heads is pure speculation. For one, it ignores that counsel for two Defendants have already completed their cross-examination of him, meaning this was the last thing the jurors heard before the recess, not the Government's direct. For another, this accepts as a given that the jurors will ignore this Court's consistent and repeated instructions during this case that the jurors keep an open mind and not come to any conclusion until they have heard all of the proof as well as the final instructions of the Court. Again, the Court cannot accept the cynical view that the jurors will abandon their oath and not follow this Court's instructions.

Frazier, 2022 WL 4073339, at *4.

Even though the Court denied the motion for a mistrial, it recognized that valid concerns had been raised and indicated that it would take certain remedial measures. These included (1) inquiring of the jury whether the delays during the trial had an effect on their ability to sit as a fair and impartial juror and to render a fair and just verdict based on the evidence; (2) questioning the jury on whether they had formed any opinions about the case, whether they had discussed the case with anyone, whether anyone has tried to discuss the case with them, and whether they continued to have an open mind; (3) re-instructing the jury they could not form opinions about the case until they had

heard all the witnesses, the closing arguments, and final instructions; (4) gauging whether the cross-examination of Humiston was effective, and (5) adding an additional one-half hour to the two hours allocated for each party for closing argument.

The Court employed each of these measures, but Defendants insist that this was not enough. Rather, in a joint filing, Santiago and Hern argue that "[t]he only way to determine if actual prejudice existed was to poll the jury in such a way as to encourage an honest self-assessment from each juror individually." (Doc. No. 2464 at 18). That is, without "an individual voir dire of each juror, on the record, in the courtroom, in the presence of each parties' counsel" any "faith in a verdict" would be nothing more than "whistling in the dark." Id.. They cite no authority for their position and ignore that "[t]he trial judge has broad discretion to determine the scope of proceedings necessary to determine whether there has been improper influence on a jury," United States v. Williams, 195 F.3d 823, 828 (6th Cir. 1999).

Santiago and Hern next point to a number of things in the transcript in an effort to drum-up the notion that the jury was somehow undergoing undue hardships. Almost all are mundane and are the type of things one would expect in a jury trial of any length. That a juror was caught nodding-off and later discharged for looking at his Smartwatch and not paying attention is nothing to write home about. Nor is having childcare issues, or inquiring into whether the trial would continue into the next month.

Two are only worthy of note because the incidents underlying them are entirely misconstrued. In one, the Court informed the parties that a juror was "very concerned that this trial is getting in the way of her pedicure," a quotation that Santiago and Hern deem worthy of highlighting in their brief. (Doc. No. 2464 at 7). That statement was made by the juror entirely in jest, and the Court expected

33

counsel to take it as such when it reported the comment to the parties. The same is true for another juror who was supposed to get married on Saturday, September 10, 2022 and said he would "walk out" if the trial was not concluded by then. How this could not have been taken as anything other than a joke is hard to fathom. The juror made known his wedding date during voir dire; at the conclusion of the last court session before the wedding, the Court wished him well on his upcoming nuptials; and the juror returned with his peers on Monday, September 12, 2022 with his honeymoon scheduled for a month later. Obviously, the juror did not walk out, nor was there any suggestion that he or others were unduly distracted by their own personal business.

Meyerholz insists that the Court erred in failing to give a curative instruction proposed by him, Boylston and the Government in relation to the hiatus in Humiston's testimony. He also claims that this error was compounded when the Court did not give the instructions before the break in that testimony.

Before Humiston retook the stand, the jury was asked a series of question, much like those that had repeatedly been asked in the past. This included whether they had formed any opinion about the case, done any research or investigation about the case, or had any discussions about the case. (Doc. No. 2441 at 12). The Court received no affirmative answers to those inquiries. Next, the jurors were asked if anything had occurred in their personal lives that "had or may have had an effect on [their] ability to sit as a fair and impartial juror and to render a fair and just verdict based upon all of the evidence presented." Again, no affirmative answers. Id. at 13. They were even invited to approach the bench if they wanted to speak privately with the Court. Id.. None did. Finally, the jury was instructed:

> Over the past weeks of trial you've hear multiple witnesses and the Court has

34

admitted many exhibits. Before we resume testimony, I want to remind you of something I said to you earlier before you heard the first witness. I've previously instructed you and I remind you now to keep an open mind. You are not to have any discussions with anyone about the evidence, form an opinion about the evidence or come to any conclusions about the guilt or innocence of any defendant until all of the evidence has been presented and I give you the law that you must apply. Only then can you begin your deliberations.

As I told you, one of the main reasons for this is that discussing the case, forming an opinion or coming to any conclusion is not appropriate because the last witness is just as important as the first witness.

Additionally, until I have given you the law, which you must apply even if you disagree with it, you cannot begin to determine what evidence to believe or how much weight, if any, you should give the evidence.

So please keep an open mind about all of the evidence. Do not begin to form any opinions about the evidence until the case is submitted to you and you begin your deliberations.

Id. at 13-14. With that, the cross-examination of Humiston resumed.

Whether to give a cautionary instruction is a matter of discretion. United States v. Woods, 613 F.2d 629, 635 (6th Cir. 1980). Likewise, decisions regarding the timing of when to provide a specific curative instruction to the jury and the form it takes are matters of discretion. United States v. Banks, 761 F.3d 1163, 1185 (10th Cir. 2014) (citing United States v. Moore, 376 F.3d 570, 577 (6th Cir.2004) ("A district court has broad discretion to supervise, control, and determine the issues the jury is to decide and the manner in which it is to do so.")). Such discretion might be abused where, for example, a cautionary instruction comes too late. See United States v. Hall, 979 F.3d 1107, 1120 (6th Cir. 2020).

Here, the Court gave its instruction immediately when the trial reconvened and intentionally chose not to address the matter before then, being of the view it would make more sense to check the jury's pulse after the break. The Court also exercised its discretion not to individually *voir dire*

35

the jury because they were given the opportunity to address the Court if they had already reached a decision or if they had been subjected to an improper influence.

Finally, Frazier laments that what was a "dysfunctional trial" due to COVID became even more so because of the Government's actions both in relation to its charging decisions and its presentation of proof. The Court is unpersuaded by either argument.

On the first point, Frazier insist – just as he has since practically the first status conference – that the Government federalized two state murders to serve as bookends for a purported RICO conspiracy. According to Frazier, this cobbling together of crimes, together with everything else that was federally charged, made a mockery of the trial.

Frazier is certainly entitled to his opinion, but the proof showed that the Bradley and Cole murders were basically the opening and closing chapters of the Clarksville Mongols activities and both were committed in furtherance of that organization, all of which is discussed more fully below in relation to the RICO conspiracy alleged in Count One. That the two murders were seemingly unrelated does not change things. See United States v. Sinito, 723 F.2d 1250, 1261 (6th Cir. 1983) ("It is unnecessary that the underlying predicate acts be interrelated as long as the acts are connected to the affairs of the enterprise.) Nor does it matter that there were assorted intervening acts between the two murders, so long as they are connected to the scheme. Id.

Regardless, what charges to bring and against whom are largely decisions for the prosecutor, not the Court. "[So] long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision of whether or not to prosecute and what charge to file . . . generally rests entirely in his [or her] discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 668–69 (1978). The same holds true when cases arise out of joint federal/state task forces

as long as the prosecutor makes the ultimate decision.  United States v. Davis, 15 F.3d 526, 530 (6th Cir. 1994); United States v. Allen, 954 F.2d 1160, 1166 (6th Cir. 1992).  This is not to say that the Government's charging decisions are never subject to review.  For example, "[i]t is now well established that a prosecutor violates the Due Process Clause of the Fifth Amendment by exacting a price for a defendant's exercise of a clearly established right or by punishing the defendant for doing what the law plainly entitles him to do."  United States v. Wilson, 262 F.3d 305, 314 (4th Cir. 2001) (citing United States v. Goodwin, 457 U.S. 368, 372, 102 S.Ct. 2485 (1982); North Carolina v. Pearce, 395 U.S. 711, 724, 89 S.Ct. 2072  (1969)).  It is to say, however, that Frazier has shown nothing improper with the charging decisions particularly in light of the way the proof was presented out at trial.

Frazier next raises it up several notches by arguing that the Government engaged in a "pattern of misconduct," and "presented . . . manipulated false testimony." (Doc. No. 2478 at 4).  He even goes so far as to accuse the government of suborning perjury.  (Doc. No. 2456 at 4).  Frazier continues his indignation by submitting that the "manipulation of evidence" was so prejudicial that a new trial is required "for the sake of justice."  Id. at 5.

The Government's allegedly improper conduct related primarily to Cooper and the question of whether she was really a kidnap victim during the Bradley murder, and the Government's purported zeal to "federalize" the crime.  Cooper and her testimony are discussed below in relation to Count Six.  Beyond that, the Court simply notes that counsel's suggestions regarding misconduct are quite serious, if not overblown, and the Court will let the record speak for itself on this issue.

37

**B. Count One – RICO Conspiracy – Meyerholz (Doc. No. 2468); Santiago (Doc. Nos. 2466, 2467), Hern (Doc. No. 2466); Frazier (Doc. No. 2477)**

In Count One of the Third Superseding Indictment, fourteen Defendants, including Frazier, Santiago, Hern, Forrester, and Meyerholz,[12] were charged with being a part of a RICO conspiracy in violation of 18 U.S.C. 1962. That statute, makes it "unlawful for any person to conspire to violate any of the provisions of [18 U.S.C. § 1962(c) ]" which, in turn, makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c),(d).

To establish a RICO conspiracy, the Government was required to prove beyond a reasonable doubt, that "two or more individuals 'agreed to participate in the conduct of an enterprise that would affect interstate or foreign commerce through a pattern of racketeering;' that the defendant knowingly joined that agreement; and 'the defendant, or another member of the conspiracy, agreed to commit at least two acts of racketeering activity.'" United States v. Iossifov, 45 F.4th 899, 915 (6th Cir. 2022) (quoting the statute and citing United States v. Fowler, 535 F.3d 408, 421 (6th Cir. 2008)). Despite numerous arguments to the contrary by Defendants, the Government proved each of these elements as to all trial Defendants, except Stanley who was not charged in Count One.

The primary argument raised by Defendants is that the Government's proof failed to show that an "enterprise" existed during the time specified in the Indictment, specifically March 2015 until the Indictment's return. After all, the Clarksville Mongols did not become even a probationary

---

[12]Each of these Defendants, except for Forrester, have filed post-verdict motions relating to Count One. Because of the significant overlap between the arguments raised, and to avoid unnecessary confusion, the Court addresses the issues collectively.

chapter until the July 2016 National Run in Palm Springs and did not become a full-fledged chapter

until the 2017 National Run.  This argument fails for at least two reasons.

First, the RICO statute defines an "enterprise" as "any individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact although

not a legal entity[.]" 18 U.S.C.A. § 1961(4).  "This enumeration of included enterprises is obviously

broad," "the very concept of an association in fact is expansive," and the use of the term "'any'

ensures that the definition has a wide reach."  <u>Boyle v. United States</u>, 556 U.S. 938, 944 (2009).

This is in keeping with the statute's policy statement that RICO is to be "liberally construed to

effectuate its remedial purposes for combating organized crime."  <u>Johnson v. United States</u>, 64 F.4th

715, 719 (6th Cir. 2023).  Hence,

> an association-in-fact enterprise is simply a continuing unit that functions with a
> common purpose.  Such a group need not have a hierarchical structure or a "chain of
> command"; decisions may be made on an ad hoc basis and by any number of
> methods – by majority vote, consensus, a show of strength, *etc*.  Members of the
> group need not have fixed roles; different members may perform different roles at
> different times.  The group need not have a name, regular meetings, dues, established
> rules and regulations, disciplinary procedures, or induction or initiation ceremonies.
> While the group must function as a continuing unit and remain in existence long
> enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose
> associates engage in spurts of activity punctuated by periods of quiescence.  Nor is
> the statute limited to groups whose crimes are sophisticated, diverse, complex, or
> unique; for example, a group that does nothing but engage in extortion through
> old-fashioned, unsophisticated, and brutal means may fall squarely within the
> statute's reach.

<u>Boyle</u>, 556 U.S. at 948.  Instead, "an association-in-fact enterprise 'must have at least three structural

features: a purpose, relationships among those associated with the enterprise, and longevity sufficient

to permit these associates to pursue the enterprise's purpose."  <u>Id.</u> at 946.

Overwhelming evidence at trial established each of those structural features for the

Clarksville Mongols enterprise during the time period specified in the Indictment. Its purpose was to sell drugs in the Middle District of Tennessee, protect its territory through violence when necessary, and establish itself as *the* outlaw motorcycle club in Clarksville. A lot of the criminal activity commited by its participants either affected interstate commerce or was conducted in interstate commerce, including drug trafficking, robbery, kidnapping, and murder.

The relationship amongst those associated with the group was readily apparent from a number of factors. This including the shared belief of their brotherhood, the wearing of soft colors in anticipation of becoming part of the Mongols Nation, and the wearing of vests signifying their arrival as full patched members.

The length of time feature is almost a given. The enterprise lasted for more than two years.

Second, controlling Sixth Circuit law supports the conclusion that the Clarksville Mongols was an enterprise for purpose of RICO, even if it began as a nascent organization in the Spring of 2015 only to flourish later that year. In a matter of first impression in the Sixth Circuit, the Court in United States v. Rich, 14 F.4th 489, 492 (6th Cir. 2021) joined several other circuits in holding that the Government is not required to prove the actual existence of the alleged enterprise to support a RICO conspiracy, and that proof of an agreement to create a racketeering enterprise in the future is sufficient. The Sixth Circuit wrote:

> Section 1962(d) is a conspiracy offense, which as Salinas [v. United States, 522 U.S. 52, 118 S. Ct. 469 (1997)] reminds us, criminalizes an agreement rather than any substantive criminal offense. In other words, an agreement to associate with and participate in a yet-to-be-formed racketeering enterprise that would affect interstate commerce constitutes a completed offense under § 1962(d). This is because an individual can "intend to further an endeavor which, if completed, would satisfy all elements of a [RICO offense]," Salinas, 522 U.S. at 65, 118 S. Ct. 469, even if the RICO enterprise is not yet formed. We heed the Supreme Court's instruction today.

40

<u>Rich</u>, 14 F.4th 489, 493 (6th Cir. 2021). With this understanding of RICO conspiracy, the Sixth

Circuit upheld convictions for several members of the "Devils Diciples [sic] Motorcycle Club" that

operated in Southwest Michigan, even though defendants argued that they "were engaged in illegal

activities for their own interest[,] . . .did not rise to the level of a 'continuing unit'" and the evidence

"establish[ed] nothing more than people making and dealing drugs independently and gathering for

other reasons." <u>United States v. Rich</u>, No. 18-2268, 2021 WL 4144059, at *21, 22 (6th Cir. Sept.

13, 2021).

    <u>Rich</u> also resolves another issue raised by Defendants having to do with this Court's jury

instructions. Specifically, the Court instructed the jury that, to establish a RICO conspiracy, the

Government was required to prove the following elements beyond a reasonable doubt:

> First: The Clarksville Mongols existed or would exist as an enterprise during the relevant dates;
>
> Second: The Clarksville Mongols affected interstate commerce through a pattern of racketeering activity;
>
> Third: A conspiracy or agreement existed between two or more persons to participate in the affairs of the Clarksville Mongols;
>
> Fourth: Defendant deliberately joined or became a member of the conspiracy or agreement with knowledge of its purpose;
>
> Fifth: Defendant intended to conduct or participate, directly or indirectly, in the conduct and affairs of the Clarksville Mongols through a pattern of racketeering activity; and
>
> Sixth: Defendant committed or knowingly agreed that at least one other member of the conspiracy would commit at least two acts of racketeering.

(Doc. No. 2393 Final Jury Instructions at 43-44).

    Some defendants argue that the "would exist" language in element one is improper, but

41

several concede that it is in keeping the "future tense language" affirmed in <u>Rich</u>. Either way, they point out, however, that <u>Rich</u> did not consider whether such language was a constructive amendment to, or variance from, the underlying indictment and argue that affirmance of their convictions on Count One would violate the Fifth Amendment.

"The Fifth Amendment guarantees that an accused be tried only on those offenses presented in an indictment and returned by a grand jury." <u>United States v. Manning</u>, 142 F.3d 336, 339 (6th Cir. 1998). After an indictment has been returned, its charges may not be broadened except by amendment by the grand jury itself. <u>Stirone v. United States</u>, 361 U.S. 212, 217-18, 80 S. Ct. At 270 (1960). "An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or court after a grand jury has passed upon them." <u>United States v. Cusmano</u>, 659 F.2d 714, 717 (6th Cir. 1981). That is to say, an improper amendment may either be actual (*i.e.* explicitly changed by the prosecutor or the judge) or by "constructive amendment" which occurs when "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of an offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.' " <u>Manning</u>, 142 F.3d at 339 (quoting <u>United States v. Hathaway</u>, 798 F.2d 902, 910 (6th Cir. 1986)).

The reason for the rule preventing amendment of an indictment by anyone other than a grand jury has been explained as follows:

> The purposes underlying the rule against amendments and constructive amendments include notice to the defendant of the charges he will face at trial, notice to the court so that it may determine if the alleged facts are sufficient in law to support a conviction, prevention of further prosecution for the same offense, and finally, of "paramount importance," the assurance that a group of citizens independent of

42

prosecutors or law enforcement officials have reviewed the allegations and determined that the case is worthy of being presented to a jury for a determination of the defendant's guilt or innocence.

United States v. Beeler, 587 F.2d 340, 42 (6th Cir. 1978); see also Stirone, 361 U.S. at 218, 80 S.Ct. 270 ("The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either the prosecuting attorney or judge.").

In contrast to an amendment, a variance "occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." United States v. Budd, 496 F.3d 517, 521 (6th Cir. 2007). Further, unlike an amendment which is prejudicial *per se*, a variance is not and requires a showing of the substantial deprivation of a defendant's rights for reversal. Id. Where, however, a variance "infringes too strongly upon the defendant's Sixth Amendment right to be informed of the nature and cause of the accusation, the variance is considered a 'constructive amendment.'" United States v. Prince, 214 F.3d 740, 757 (6th Cir. 2000). It may be said then that the difference between a constructive amendment and a variance is "merely in degree," Budd, 496 F.3d at 522, and that the distinction between the two "is sketchy," United States v. Chilingirian, 280 F.3d 704, 712 (6th Cir.2002) or "at best shadowy," United States v. Hathaway, 798 F.2d 902, 910 (6th Cir.1986).

Regardless of whatever distinctions there may be between a constructive amendment and a variance, Defendants are not entitled to relief because neither occurred here. The Third Superseding Indictment, the proof presented at trial, and the Instructions given to the jury were all in sync.

The Third Superseding Indictment made clear that the Clarksville Mongols did not exist until the Spring of 2015. In pertinent part, paragraph four reads:

43

Defendants . . . were prospective and/or founding members of the Clarksville, Tennessee, Chapter of the Mongols Motorcycle Gang, which became the first mongols Motorcycle Gang chapter in Tennessee. In or about March 2015, some of the defendants became recruit or "prospect' of the Mongols Motorcycle Gang and all but . . . Forrester . . . received their Mongols Motorcycle Gang Patches in July 2015, in Palm Springs, California at the "National Run," an annual gathering of Mongols Members. Before receiving their Patches, they were prospective/probational associates supervised by Mongols Motorcycle Gang's Harbor Chapter in California, which sponsored the Clarksville, Tennessee, Chapter. . . . In July 2017, some members of the Clarksville Chapter traveled to Palm Springs, California, for the Mongols "national Run," where they were allowed to remove their diamond-shaped patches with the letter "P" in the middle.

(Doc. No. 484, Third Superseding Indictment at 4-5). Those allegations underlying the formation of the Clarksville Mongols were proven at trial.

In an effort to show otherwise, Defendants point to some evidence that could be viewed as showing that the Clarksville Mongols did not exist in March 2015, and did not come into fruition until July 2016 (at the earliest), when Clarksville became a probationary chapter of the Mongols. For example, (1) Frazier and others were members of the Sin City Motorcycle Club up until May 2015; (2) Justin Daye testified that (a) the purpose of the July 2015 trip to California was "[j]ust to hang out and be around Mongols and get to meet Mongols and just kind of see what it was like," and (b) upon their return they were just "wannabe Mongols . . . that hung out and rode motorcycles together"; and (3) Nieves testified that nobody joined the group to be involved in criminal activity - - they joined it for "brotherhood, camaraderie, and their love of motorcycles." (Doc. No, 2477 at 7-8). Hern summarizes the July 2015 trip as being "a bunch of guys going to a big Mongols party trying to look cool." (Doc. No. 2466 at 4).

The problem with these arguments is that they ignore the standards of review. The question on a motion for a judgment of acquittal is whether any rational trier of fact could have found beyond

a reasonable doubt that the essential elements of a crime when the evidence is viewed in a light most favorable to the government. Fisher, 648 F.3d at 450. The question on a motion for a new trial is whether the jury's verdict was against the manifest weight of the evidence such that a miscarriage of justice occurred.

Defendants snippets do not come close to even raising a question about whether the Clarksville Mongols were functioning as an enterprise in the Spring of 2015. This Court's recitation of the facts makes abundantly clear that they were. And, even if March 15, 2015 was not exactly the start date as alleged in the Third Superseding Indictment, the Clarksville Mongols were without question operating as an enterprise by May 2015 when they began wearing soft colors; shot up a rivals home; burned down two clubhouses; and kidnapped and murdered Stephanie Bradley, among other things. An "indictment's mention of 'on or about' does not require the government to prove that the crimes happened on that exact date 'as long as a date reasonably near that named . . . is established.'" United States v. Roberge, 565 F.3d 1005, 1008 (6th Cir. 2009) (quoting United States v. Ford, 872 F.2d 1231, 1236 (6th Cir.1989)). "One to two months is reasonably near." Id. (citing United States v. Manning, 142 F.3d 336, 340 (6th Cir.1998).

Santiago and Hern also argue that the fifth element of the Court's jury instruction was incomplete because it failed to include language that the Defendant intended to conduct or participate "*in the management and operation*" of the Clarksville Mongols through a pattern of racketeering. Defendant insists this was error because the Sixth Circuit requires either that a Defendant "knowingly carry[] out the orders of the enterprise" or have "some part in 'directing the enterprise's affairs." (Doc. No. 2464 at 10) (citing United States v. Fowler, 535 F.3d 408, 419 (6th Cir. 2008); Ouwinga v. Benistar 419 Plan Servs., 694 F.3d 783, 793 (6th Cir. 2012). This omission is fatal,

45

Defendants insist, because "[t]he management and operation test is a significant section of one of the elements that the government has the burden of proving beyond a reasonable doubt" and "[m]erely conducting or participating in the affairs of an enterprise can be qualitatively different from directing or knowingly carrying out the orders of the enterprise."  (Doc. No. 2464 at 12).

This argument ignores the cardinal rule that "no single provision of the jury charge may be viewed in isolation; rather, the charge must be considered as a whole." United States v. Ross, 502 F.3d 521, 527 (6th Cir.2007).  It also ignores the well-settled principle that "[a] trial court has broad discretion in crafting jury instructions and does not abuse its discretion unless the jury charge fails accurately to reflect the law."  United States v. Geisen, 612 F.3d 471, 485 (6th Cir.2010).

The Jury Instructions were 212 pages long.  After setting forth the elements of a RICO conspiracy, the Court set forth definitions for each, including "An Enterprise (Association-in-Fact)"; "Nexus to Interstate or Foreign Commerce"; "Associated With the Enterprise"; "To Conduct, or Participate in the Conduct of, the Affairs of the Enterprise"; and "Pattern of Racketeering."  As it pertained to the fifth element, the Court instructed the jury:

> The government must prove beyond a reasonable doubt that a Defendant intended to conduct or participate, directly or indirectly, in the management and operation of enterprise's affairs through a pattern of racketeering activity or agreed that a conspiracy would do so.
>
> A person conducts or participates in the conduct of the affairs of an enterprise  if he or she has a position or role in the enterprise that involves the operation or management of the enterprise.  In order to have conducted or participated in the conduct of the affairs of an enterprise, a person need not have participated in all of the activity alleged in the RICO count(s).
>
> A defendant may be convicted of a RICO conspiracy offense even if he did not personally participate in the operation or management of the enterprise when the evidence establishes that the defendant knowingly agreed to facilitate a plan which, if completed, would involve at least one conspirator who would participate in the

46

operation or management of the enterprise.

An enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management or carry out upper management's orders. An enterprise also might be operated or managed by one who exerts control over the enterprise.

(Doc. No. 2393 at 50). This is a correct statement of the law and Defendants do not show otherwise.

Moreover, the management and operation language in <u>Fowler</u> and <u>Ouwinga</u> on which Defendants rely was written in the context of a substantive RICO charge under 18 U.S.C. § 1962(c), not a RICO conspiracy charge under Section 1962(d). This can be a distinction with a difference because in <u>Salinas</u> the Supreme Court held that a RICO "conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." 552 U.S. at 63. For liability to attach, therefore, a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." <u>Id.</u> at 52. "<u>Salinas</u> thus indicates that an individual defendant need not himself participate in the operation or management of an enterprise in order to be liable for conspiracy under § 1962(d)." <u>United States v. Wilson</u>, 605 F.3d 985, 1019 (D.C. Cir. 2010); <u>see also</u>, <u>United States v. Rosenthal</u>, 805 F.3d 523, 532 (5th Cir. 2015) (stating that "'operation or management'" test does not apply to conspiracy to commit a RICO offense under § 1962(d)" but "[i]nstead, § 1962(d) applies to 'any person' who conspires to violate RICO" and thus it "suffices that a defendant adopts the goal of furthering or facilitating the criminal endeavor); <u>United States v. Fernandez</u>, 388 F.3d 1199, 1230 (9th Cir. 2004) (joining the Third Circuit in <u>Smith v. Berg</u>, 247 F.3d 532, 537–38 (3d Cir.2001) by holding that the operation or management test applies only to substantive RICO charges, not RICO conspiracy charges).

47

Regardless of whether the management and operation test applies to both substantive and RICO conspiracy crimes (an issue which neither Fowler nor Ouwinga addressed), the Sixth Circuit made clear in Fowler that, even though the "'operation or management' test does place limits on the scope of activity that is criminalized under RICO, it does not require proof of a managerial role." 535 F.3d at 48. Rather, the Government need "prove simply that the defendant had 'some part in directing the enterprise's affairs'" either "by making decisions on behalf of the enterprise or by knowingly carrying them out." Id.; see also Ouwinga, 694 F.3 at 793("Fowler makes clear that knowingly carrying out the orders of the enterprise satisfies the 'operation or management' test.").[13] The Government met that burden with respect to each Defendant charged in Count One as being part of a RICO conspiracy.

**C. Count Two – Drug Conspiracy – Frazier (Doc. No. 2472); Stanley (Doc No. 2250)**

Count Two alleges an overarching drug conspiracy in violation of 18 U.S.C. §846 for the same time period of the RICO conspiracy charged in Count One, to wit, March 2015 to June 2018. To obtain a conviction, it was incumbent upon the Government to prove each of the following elements beyond a reasonable doubt: (1) an agreement to violate the drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy. United States v. Layne, 192 F.3d 556, 567 (6th Cir.1999) (citing United States v. Welch, 97 F.3d 142, 148–49 (6th Cir.1996)).

---

[13] Meyerholz's argument that he should be acquitted on Count One because he did not come to Tennessee until the tail-end of the conspiracy and "[t]he proof is clear that he did not have knowledge of the *Clarksville* Mongols purpose when he joined" (Doc. No 2532 at 2) (emphasis added) is both legally and factually unsound. It is legally unsound because a conspiracy "may be completed in the brief period needed for the formation of the agreement and the commission of a single overt act in furtherance of the conspiracy." Boyle, 556 U.S. at 950. It is factually unsound because when Meyerholz moved to Tennessee he was already a full-patched member of an organization that had common beliefs and he transferred here specifically to clean up the problems with the local chapter, or so the jury could find.

These elements could be proved by either direct or circumstantial evidence. United States v Avery, 128 F.3d 966, 971 (6th Cir.1997).

Unlike some conspiracy statutes, Section 846 does not require proof that a conspirator committed an over act in furtherance of the conspiracy. United States v. Shabani, 513 U.S. 10, 11 (1994). Furthermore, "[t]he government need not prove that the conspirators completed their agreed-upon drug crime." United States v. Wheat, 988 F.3d 299, 306 (6th Cir. 2021) (citing United States v. Robinson, 547 F.3d 632, 638 (6th Cir. 2008)). Rather, the underlying crime of a drug conspiracy is the agreement to commit a drug crime, with the Government required "to show that each member of a conspiracy agreed to participate in what he knew to be a collective venture directed toward this common goal." Salinas v. United States, 522 U.S. 52, 65 (1997). This understanding of a conspiracy is in keeping with the Supreme Court's repeated observation that the essence of a conspiracy is "an agreement to commit an unlawful act," and that this agreement "is a 'a distinct evil,' which 'may exist and be punished whether or not the substantive crime ensues.'" United States v. Jimenez Recio, 537 U.S. 270, 274–75, 123 S. Ct. 819, 822 (2003) (collecting cases) (citations omitted).

Notwithstanding that he was in the thick of things relating to the Clarksville Mongols drug conspiracy from the time it began at least until he was arrested on federal charges in July 2017 in relation to the Bojangles incident, Frazier first argues that the Government's presentation of proof relating to the first substantive drug dealing charges was an effort to mislead the jury so as to shore up the start date of the conspiracy. This is because in two Counts – Four and Five – Aldridge was charged with possessing with intent to distribute methamphetamine on March 16 and 20, 2015, but Aldridge testified at trial that those crimes had nothing to do with the Mongols.

49

It is true that Aldridge, who Frazier characterizes as a "sociopathic murderer" (Doc. No. 2472 at 5 n.4), stated as much on cross-examination, but the jury was hardly presented with only his version of events. Rather, the jury had evidence that, in the spring of 2015 and through that summer at least, Frazier, Ort, Forrester, and Aldridge were involved together in the distribution of methamphetamine.

The precise beginning period of the conspiracy aside, Frazier argues that the Government failed to prove an overarching conspiracy to sell methamphetamine. He posits, instead, that there were at least three separate conspiracies. First, there was the so-called "Green Valley conspiracy," which takes its name from the residence where Ort, Frazier, Forrester, and Aldridge were living from April 2015 until mid-June of that year and where drugs were bought and sold. Second, there was the "Chavez conspiracy," named for the period (September 2015 to October 2016) when he was the source of pound weights of methamphetamine for the Clarksville Mongols. Third and finally, Frazier asserts that there was a "Post-Chavez conspiracy" that began with Chavez's death on October 25, 2016 and "morphed into multiple independent dysfunctional operations with different financing, players, sources, and agreements." Id. at 12.

Frazier's depiction of three separate conspiracies is one way to look at the evidence. Since time immemorial, however, it has been understood that "[t]he jury are the exclusive judges of the facts." Sparf v. United States, 156 U.S. 51, 82, 15 S. Ct. 273, 286 (1895). The same is true for conspiracies. "[W]hether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury." United States v. Adams, 722 F.3d 788, 806 (6th Cir. 2013)(quoting United States v. Smith, 320 F.3d 647, 652 (6th Cir.2003)). The exception to this general rule occurs if "the evidence can reasonably be construed only as supporting a finding of multiple conspiracies"

50

when the evidence is viewed in a light most favorable to the government.  United States v. Caver, 470 F.3d 220, 235–36 (6th Cir. 2006) (quoting United States v. Warner, 690 F.2d 545, 548 (6th Cir.1982)).  That is not the case here.  Moreover, the jury was instructed at length about single and multiple conspiracies in the jury instructions (Doc. No. 2393 at 42) and Frazier does not challenge those instructions.

To be sure, the drug conspiracy in this case changed over time (with the amount of drugs ebbing and flowing), as did some of the players.  But, the "mere fact that a conspiracy can be subdivided . . . does not mean that multiple conspiracies existed." United States v. Fields, 763 F.3d 443, 468 (6th Cir. 2014) (citation omitted).  "As long as the different sub-groups are committing acts in furtherance of one overall plan, the jury can still find a single, continuing conspiracy."  United States v. Wilson, 168 F.3d 916, 924 (6th Cir.1999).  Here, there was plenty of evidence from which a jury could conclude that Frazier was a part of the drug conspiracy alleged in Count Two and that determination is not against the manifest weight of the evidence.

For his part, Stanley has presented a wholly underdeveloped argument in relation to Counts Two and Three (discussed next).  He writes:

> The essence of Mr. Stanley's argument regarding the two conspiracy charges set out in Count Two and Count Three is that the government has not presented any proof, direct or circumstantial, that would enable any rational tier of fact to find beyond a reasonable doubt that Mr. Stanley entered to an agreement with anyone to participate in the conspiracy or conspiracies that the government has alleged existed.  Even if the court concludes, viewing the claim in the light most favorable to the government, that a conspiracy existed as charged in these two counts[:]
>
>> "To be found guilty of conspiracy, the government must prove that [the defendant] was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its object."  United States v. Gibbs, 174 F.3d 762, 775-78, citing United States v. Hodges, 935 F.2d 776, 772 (6th Cir. 1991).

(Doc. No. 2250 at 2-3). The next four and one-half pages of Stanley's brief quote, verbatim, language from Gibbs, some of which is bolded by Stanley as being what "[h]e considers to be applicable point of law," id. at 3, notwithstanding (and not acknowledging) that Gibbs has been amended and superseded. United States v. Gibbs, 182 F.3d 408 (6th Cir. 1999).

The Court is at a loss as to how best to address Stanley's argument if for no other reason than it is not the Court's duty to match-up the facts to the "applicable point of law" and argue the interplay between the two. In fairness to Stanley, however, the Court has undertaken the effort to try to divine the underlying premise of his arguments and notes the following.

Unlike the others indicted in this case, Stanley was never shown to be a Mongols or hang-around. Consequently, it could be that he is arguing that the evidence, at best, establishes he was in a buy-sell relationship with Frazier. This would not be a conspiracy because "two parties cannot conspire to commit a substantive crime when the crime itself requires two parties for its completion (such as dueling or prostitution)." Wheat, 988 F.3d at 307 (6th Cir. 2021).

Stanley bolds language from Gibbs that "a buyer/seller relationship alone is not enough to establish participation in the conspiracy," (Doc. No. 2250 at 3) but leaves unbolded the remainder of the sentence: "but further evidence indicating knowledge of and participation in the conspiracy can be enough to link the defendant to the conspiracy." Gibbs, 174 F.3d at 776. Evidence linking a defendant to the conspiracy includes "repeated purchases of large quantities of a drug from a seller"; "the method of payment for the buyer-seller transaction"; and "evidence of an enduring arrangement." Wheat, at 308-09.

Extraction from Stanley's own cell phone records make the necessary evidentiary link. Those records show links to lower level Mongols; the need to make payments after money was stolen;

threats to take the thefts to "the Mongols"; and demands for payment of fronted drugs. (Ex. 749). Extractions from the cellphones of other Defendants add confirmation to Stanley's knowledge and participation in the conspiracy with repeated texts between Stanley and Frazier and Stanley and lower-level dealers. (Ex. 991) .

The testimony at trial also indicated that Stanley conspired with, at a minimum, Frazier, Adrianna, Miles, Cobb and Heade. Even his own relative, Lee, testified against him regarding the sales she made with Adrianna from methamphetamine that they got from "Unk."

Stanley also bolds language from Gibbs (Doc. No. 2250 at 4) that "mere association with conspirators is not enough to establish participation in a conspiracy," a point "especially important today when so many prosecutors seek to sweep the drag-net of conspiracy all those who may have been associated in any degree whatever with the main offenders." Id. Stanley also emphasizes the language from Gibbs that (a) "[e]vidence that a particular defendant sold [drugs in a particular area] is insufficient to prove membership in the conspiracy" and that (b) "evidence that the defendants knew each other, grew up together, sold [drugs] in the same area, or on occasion sold [drugs] together fails to prove membership in the conspiracy." Id. at 6.

The concern in Gibbs, as in any conspiracy case, is "the need to guard against findings of guilt by association." Id. From the evidence introduced at trial, that is not a concern in relation to the drug conspiracy and Stanley's involvement therein. The facts clearly showed a knowing agreement between Stanley and others to distribute large quantifies of methamphetamine in the Clarksville/Owensboro area.

Neither a judgment of acquittal nor a new trial will be granted on Count Two for either Frazier or Stanley.

53

**D. Count Three – Money Laundering Conspiracy – Stanley (Doc. No. 2250)**

In addition to the argument raised for Count Two, Stanley argues with respect to Count Three that "[e]ven if there was money laundering in this case, the government has presented absolutely no evidence whatsoever that Mr. Stanley was aware of it, and knowingly and willingly agreed with anyone to participate in it." (Doc. No. 2250 at 7). He then repeats Gibb's statement that "one's mere association with others who may have formed a conspiracy to commit money laundering does not imply that one is a part of that conspiracy." Id..

For many, "money laundering" evokes images of bundles of cash in briefcases and secret bank accounts in Switzerland or the Cayman Islands. A promotional money laundering conspiracy, as charged in this case, is not so exotic, however.

"To prove conspiracy to commit promotional money laundering, the government had to show that [defendant] knowingly and voluntarily joined an agreement between two or more people to (1) conduct a financial transaction from the proceeds of illegal activity, (2) knowing the money came from illegal activity, and (3) intending to promote that activity." United States v. Tolliver, 949 F.3d 244, 248 (6th Cir. 2020). "The theory behind criminalizing promotional money laundering is that using money gained from drug sales to buy more drugs promotes the conspiracy by allowing it to continue or grow." Id. (citing United States v. Crosgrove, 637 F.3d 646, 654 (6th Cir. 2011)). "In a sense, the defendant reinvests the proceeds into the conspiracy, thus promoting it. It's a bit like reinvesting a stock dividend, or 'letting it ride' after a lucky gambling win." Id. Indeed, "[t]he paradigmatic example" of promotional money laundering "is a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales." United States v. Warshak, 631 F.3d 266, 317 (6th Cir. 2010).

54

To prove Stanley conspired with other Defendants, the Government only needed to show "a tacit or material understanding among the parties," United States v. Deitz, 577 F.3d 672, 677 (6th Cir. 2009), and that he was "a party to the general conspiratorial agreement." United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986). One way to accomplish this would be to show that Stanley sent large sums of money to Frazier, that he received large amounts of methamphetamine in return, and that he distributed some of that methamphetamine only to go back for more. United States v. Miller, 531 F. App'x 569, 573 (6th Cir. 2013). There was plenty of evidence from which the jury could conclude that this was exactly the relationship between Stanley and Frazier and, to a lesser extent, between Stanley, Adrianna and Lee. (Doc. No. 2420 at 66-75, 2435 at 164, 170-180). Moreover, the extracts from Stanley's phone referenced previously show repeated efforts to be paid for drugs that he had provided so that more drugs could be purchased. (Tr. Ex. 749 at 22-34).

### E. Count Six – Kidnapping – Frazier (Doc. No. 2476)

Count Six of the Third Superseding Indictment charges the following:

On or about May 22, 2015, in the Middle District of Tennessee, [**1**] **JAMES WESLEY FRAZIER, a/k/a "SLO-MO," a/k/a "SPECIAL," [6] JOEL ALDRIDGE, a/k/a "SLEEZY," a/k/a "SPOON**," and Jacob Ort, now deceased, together with others known and unknown to the Grand Jury, did knowingly and unlawfully kidnap, abduct, carry away, and hold Victim S.B., and Victim B.C., for the purpose of witness intimidation and murder, and in committing or in furtherance of the commission of the offense, used any means, facility, and instrumentality of interstate or foreign commerce, to wit: cellular telephones, and in the course of kidnapping, did cause the death of Victim S.B.

In violation of 18, United States Code, Sections 1201(a)(1) and 2.

(Third Superseding Indictment, Doc. No. 485,Third Superseding Indictment at 27).

The statute referenced in Count Six punishes "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any

person," and the person so kidnapped is "willfully transported in interstate or foreign commerce." 18 U.S.C. § 1201(a)(1). Frazier moves for a judgment of acquittal under Rule 29 or a new trial under Rule 33, insisting that the Government did not establish a *federal* crime in relation to this Count.

Until the passage of the Adam Walsh Child Protection and Safety Act in 2006, Pub. L. No. 109–248, 120 Stat. 616, federal law prohibited kidnapping only where the victim was transported across state line. With passage of the Act, however, interstate nexus was expanded to include where "the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a)(1).

Cell phones and telephones, "even when used interstate, constitute instrumentalities of commerce. United States v. Weathers, 196 F.3d 336, 341 (6th Cir. 1999); see also, United States v. Windham, 53 F.4th 1006, 1013 (6th Cir. 2022) ("The issue is therefore whether . . . cell phones are instrumentalities of interstate commerce, not whether they were used interstate. This Court has held repeatedly and unambiguously . . . phones are instrumentalities of interstate commerce.").

Count Six is the preamble to Bradley's murder at the Kingins-Brandon Cemetery. Recall that, earlier, Aldridge burst into the trailer on Lafayette Road in Clarksville, forcibly removed Bradley, and placed her in the Durango where Frazier and Ort were sitting. Thereafter, the Durango was driven to pick up Cooper and then to the cemetery.

The evidence at trial established that cell phones were used to commit (or in furtherance of) the kidnappings alleged in Count Six. This included testimony from Aldridge, Wallace, and Cecilia Rodriguez who all testified (albeit in different ways) that cell phones where used to locate Bradley. (Doc. Nos. 2413 at 243-244; 2414 at 160-162; 2415 at 69-70).

56

Seemingly acknowledging as much, Frazier nevertheless points out the discrepancies in the testimony, the witnesses' credibility, and the overall weight of the evidence on this issue. He claims that "evidence of cellphone use was circumstantial at best" and that "[t]he quality of the evidence and credibility of the witnesses is as bad as possible." (Doc. No. 2476 at 13). And, because no pertinent cell phone records were introduced, "the entire proof is uncorroborated contradictory testimony by active drug addicts." (Doc. No. 2529 at 2).

If anything, Frazier's assertions sound like closing arguments. As stated at the outset, however, the Court's scope of review is severely limited. The Rule 29 standard for a judgment of acquittal "is so demanding that a defendant who challenges the sufficiency of the evidence is said to face a nearly insurmountable hurdle." United States v. Benton, 700 F. App'x 424, 430–31 (6th Cir. 2017) (citing Davis v. Lafler, 658 F.3d 525, 534 (6th Cir. 2011) (en banc); United States v. Oros, 578 F.3d 703, 710 (7th Cir. 2009)). A Rule 33 motion for a new trial is granted only "in the extraordinary circumstance where the evidence preponderates heavily against the verdict." United States v. Hughes, 505 F.3d 578, 593 (6th Cir. 2007). Because a reasonable jury could conclude from the evidence presented at trial that a cell phone was used "in committing or in furtherance of the commission of the offense" alleged in Count Six and because such a finding would hardly be against the manifest weight of the evidence, Frazier is not entitled to relief on Count Six.

**F. Count Seven – Kidnapping and Count Seven – Kidnapping in Aid of Racketeering -- Frazier (Doc. No. 2475)**

In addition to being charged with kidnapping in Count Six, Frazier was charged in Count Seven with kidnapping in aid of racketeering:

> On or about May 22, 2015, in the Middle District of Tennessee, for the purpose of gaining entrance to, and maintaining and increasing position in, the Clarksville

Mongols, an enterprise engaged in racketeering activity,  **[1] JAMES WESLEY FRAZIER, a/k/a "SLO-MO," a/k/a "SPECIAL," [6] JOEL ALDRIDGE, a/k/a "SLEEZY," a/k/a "SPOON,"** and Jacob Ort, now deceased, together with others known and unknown to the Grand Jury, did knowingly and unlawfully kidnap Victim S.B., and Victim B.C. in violation of Tennessee Code Annotated Sections 39-11-401, and 39-13-301 to 39-13-305.

In violation of 18, United States Code, Sections 1959(a)(1) and 2.

(Third Superceding Indictment, Doc. No. 485, Third Superseding Indictment at 27-28).

Common to both Counts Six and Seven is the allegation that "S.B." (Stephanie Bradley) and "B.C." (Brandi Cooper) were both kidnapped.  Because Frazier believes that the evidence did not show that Cooper was kidnapped, he maintains that he is entitled to acquittal or a new trial on both Counts.  For two reasons, the motion will be denied.

First, while it is true that the evidence surrounding the question of whether Cooper was kidnapped could be interpreted two ways, the decision of what to believe was for the jury to make.  See United States v. Bailey, 444 U.S. 394, 414–15 (1980) ("It is for [the jury], generally, . . . to say that a particular witness spoke the truth or fabricated a cock-and-bull story."); Blackmon v. Booker, 696 F.3d 536, 554 (6th Cir. 2012)  ("Which side to believe was the jury's call."); United States v. Hatch, 434 F.3d 1, 6 (1st Cir. 2006) ("The jury's duty is to decide what to believe [and any] credibility dispute must be resolved in favor of the verdict.").  Thus, even though (1) Aldridge testified that Cooper was not kidnapped to his knowledge and that "as far as he knew, she was there willingly" (Doc. No. 2414 at 87); (2) Rodriguez testified that she, Cooper and Aldridge  met up and dropped Cooper off at her house (with the inference being Cooper did not feel coerced in Aldridge's presence) (Doc. No. 2415 at 76); and (3) Cooper testified that "initially" she was "down to be there," id. at 180, is irrelevant if sufficient evidence existed for the jury to determine that Cooper was

58

kidnapped. There was, in the form of Cooper's own testimony.

Cooper testified that she freely went with Aldridge when he arrived at her house. She also testified, however, once she saw what was going on, she no longer wanted to be there and did not have the ability to leave. (Doc. No. 2415 at 180). Circumstantial evidence supports this testimony. Cooper thought Aldridge was picking her up so they could get drugs but her hope suddenly changed when she was told by Aldridge to get in the "effing truck." Id. at 181. Once inside she saw Bradley sitting with three armed men and Bradley later began to cry and beg for her life. At the cemetery, Frazier positioned himself so that he could keep an eye on Cooper, while others killed Bradley. Cooper also overheard conversation between the men that "she wasn't suppose to leave and that [she] didn't need to go anywhere." Id. at 181. The details at trial were much more heartrending and a jury could conclude from that evidence that a person in Cooper's position would not be free to leave, lest she be killed.

Second, to the extent that Frazier is correct that the Indictment is duplicitous because both Cooper and Bradley were named as victims in Count Six and Seven,[14] he still is not entitled to relief.

---

[14]  It is not altogether clear that naming two victims in a single count makes the Indictment duplicitous, although a couple of district courts have so held, see United States v. Mattia, No. CR2000664001PHXGMS, 2021 WL 2012698, at *2 (D. Ariz. May 20, 2021), or suggested as much, see United States v. Stringer, No. S 10 CR 632 GEL, 2012 WL 11269, at *12 (S.D.N.Y. Jan. 3, 2012), aff'd, 730 F.3d 120 (2d Cir. 2013). On the other hand,

> [t]he [Supreme] Court has long recognized that an indictment may charge numerous offenses or the commission of any one offense in several ways. As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime.

United States v. Miller, 471 U.S. 130, 135, 105 S. Ct. 1811, 1815 (1985). Here, Count Six and Seven are arguably not duplicitous because they each charged a single offense that could be committed by different means, to wit, kidnapping Cooper, Bradley, or both. Given the other grounds for denial of Frazier's motion, the Court need not resolve this issue.

"The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both.'" United States v. Anderson, 605 F.3d 404, 414 (6th Cir. 2010) (citing United States v. Washington, 127 F.3d 510, 513 (6th Cir. 1997)). A duplicitous "charge is not prejudicial per se, because proper jury instructions can mitigate the risk of jury confusion and alleviate the doubt that would otherwise exist as to whether all members of the jury had found the defendant guilty of the same offense." United States v. Savoires, 430 F.3d 376, 380 (6th Cir. 2005).

Here, and contrary to the Government's request, the jury was repeatedly instructed in the conjunctive "Stephanie Bradley and Brandi Cooper" with respect to the kidnapping in Count Six and the kidnapping in aid of racketeering in Count Seven. (Doc. No. 2393 at 101-107). Consequently, to convict Frazier on each of the Counts, the jury had to conclude that he kidnapped both Bradley and Cooper, not that he kidnapped one or the other. See Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727 (2000) ("A jury is presumed to follow its instructions."). Those instructions were in keeping with the Indictment's language for those Counts.

In deciding to deny Frazier's motion, the Court has considered his entreaty that, if an outright acquittal is not warranted, at least a new trial is. The Court has also considered his quotation from one of its prior opinions in Darden (later reversed on appeal in a split decision):

> The Court does not know whether Burks killed Wright[.] What the Court does know, however, is that proof beyond a reasonable doubt is a standard not to be trifled with. "When the government has presented enough evidence for a conviction but the judge disagrees with the jury's resolution of conflicting evidence, a reversal is appropriate on the ground that the verdict is against the manifest weight of the evidence." United States v. Lyimo, 574 F. App'x 667, 671 (6th Cir. 2014) (citing United States v. Lutz, 154 F.3d 581, 589 (6th Cir. 1998)). That is the case with respect to Burks' convictions on the counts relating to the murder of Wright and those convictions will be vacated pending a new trial.

60

United States v. Darden, No. 3:17-CR-00124, 2019 WL 3946133, at *25 (M.D. Tenn. Aug. 20, 2019), *rev'd sub nom.* United States v. Burks, 974 F.3d 622 (6th Cir. 2020).

To this day, the Court does not know who murdered Malcolm Wright at C-Rays and maintains that the reasonable doubt standard is not a gimcrack. However, the situation here is nothing like that presented in Darden. Quite frankly, acting as a thirteenth juror, the Court would have to say that the jury got it right in this case.

## G. Count Seven – Kidnapping in Aid of Racketeering and Count Eight – Kidnapping in Aid of Murder – Frazier (Doc. No. 2475)

Like Counts Six and Seven, Count Eight again involves Bradley with the charge in this Count being that Frazier committed a violent crime in aid of racketeering ("VICAR") when he was involved in her murder. He seeks a judgment of acquittal or new trial, but most of the grounds he covers have already been plowed by the Court.

Frazier argues that Bradley's murder could not be a VICAR crime because there was no Clarksville Mongols racketeering enterprise at the time she was murdered on May 22, 2015. This Court has already found that the Clarksville Mongols existed at this time in relation to the RICO conspiracy charged in Count One, but Frazier adds a new twist to the argument. He notes that an association requires three structural features (as discussed previously), specifically a purpose, relationship among the associates, and longevity sufficient to allow those associates to pursue the enterprises purpose. He argues that, even if the Government is to be believed and the Clarksville Mongols began in the Spring of 2015, the organization at that time had no longevity.

For a couple of reasons, the Court cannot accept Frazier's premise. For one, there is no hard-and-fast time period for satisfaction of the longevity prong. "Continuity is both a closed- and

61

open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition" H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241, 109 S.Ct. 2893 (1989) (internal quotation marks omitted). Here, and as the Court has already found, the time from March 15, 2015 until the return of the Indictment is more than sufficient to establish longevity. See United States v. Nicholson, 716 F. App'x 400, 406 (6th Cir. 2017) (stating that "several years" is sufficient to establish longevity); United States v. Harris, 695 F.3d 1125, 1136 (10th Cir. 2012) (concluding that longevity was satisfied when the evidence supported a "pattern of activity ... over a period of years"). Accepting Frazier's premise would mean that there could be no predicate RICO crimes until the organization had been around for a year or more, something that would be contrary to the "declared purpose of Congress 'to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." United States v. Turkette, 452 U.S. 576, 589, 101 S. Ct. 2524, 2532 (1981) (citation to Congressional Record omitted).

For another, Frazier's premise ignores binding Sixth Circuit law. As noted previously, participating in a yet-to-be-formed racketeering enterprise that would affect interstate commerce violates the RICO statutes. Rich, 14 F.4th at 493.

Next, Frazier argues that the Government failed to establish an essential element of a VICAR crime, specifically that he participated in the murder to gain entrance to, maintain, or increase his position in the Clarksville Mongols. He characterizes the Government's "theory" as being a "manipulated fantasy that goes something like this: Frazier killed a drug addicted prostitute in order

to impress the California Mongols who he had not yet met." (Doc. No. 2473 at 8). This, according to Frazier, is "[p]ure nonsense, supported by nothing but the prosecutions unconscionable quest to federalize the murder." Id.. Frazier submits what really happened is that Bradley "was the victim of a very dangerous sociopath and a heroin laced mentally damaged ex-soldier [Ort] who 'went off.'" Id. at 11.

As with so many of his arguments, Frazier ignores the requirement that the proof at trial be viewed in a light most favorable to the verdict, with the question being whether sufficient evidence supports the jury's decision. It does. A jury could easily find that Bradley's kidnapping and murder was done so that Frazier and his crew would be recognized by the California Mongols and feared locally. It could also find that the murder increased Frazier's standing in the group as it was beginning to take shape. On this score, it must be remembered that, just a day or two earlier, Bradley was suspected of being somehow involved in missing money or drugs, was interrogated about the same, and thereafter decided to post derogatory comments about the Mongols on Facebook. This led to a second session of intense questioning when the group did not get the answers they wanted. It is hardly far-fetched to conclude that they killed Bradley to send a message to others that the Mongols were not to be fiddled with, disrespected, or ignored.

The verdicts on Counts Seven and Eight will not be disturbed.

**H. Count Thirteen – Firearm Use During a Drug Trafficking Crime Frazier (Doc. No. 2457)**

Count Thirteen charged Frazier and Forrester with using a firearm during and in relation to a drug trafficking crime, or aiding and abetting in the same. The alleged drug trafficking crime was the sale of methamphetamine out of a room at the Oak Haven Hotel on June 16 and 17, 2015, as charged in Count Twelve. Neither Frazier nor Forrester challenge their convictions on Count

Twelve, and only Frazier challenges his conviction on Count Thirteen.

The evidence was undisputed that, on those two days in June, Frazier rented a room at the hotel out of which methamphetamine was sold in small amounts by Frazier, Ort and Forrester. Also present at times were Cooper and Patterson, both of whom testified at trial.

Patterson testified that she saw Ort and Forrester with guns at the motel (a green revolver and a chrome pistol), but could not recall whether Frazier had a gun. Cooper said that "all three of them" had guns (Doc. No. 2415 at 196), meaning Frazier, Ort and Forrester.

Frazier cites the Seventh Circuit decision in United States v. Delay for the proposition that "where the evidence as to an element of a crime is equally consistent with a theory of innocence as with a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." 440 F.2d 566, 568 (7th Cir. 1971). This is a correct statement of the law but what Patterson said and what Cooper said are not necessarily equal. The jury could have believed one and not the other, as was its prerogative. Besides, Frazier was charged as a principal and as an aider and abettor. It does not take a lot of speculation to assume that he had constructive possession of the weapons in the small hotel room, even if he was not personally armed. Nor is it speculative to assume that Frazier knew what was in the lockbox (a gun) when he dispatched Cooper with a small amount of meth and money to Aldridge and told her to bring back the box. There was more than sufficient evidence to conclude Frazier used (or aided and assisted in the use of) a firearm during in relation to his dealing drugs out or the room at the Oak Haven Hotel.

Count Thirteen stands as decided by the jury.

## I. Count Twenty-One – Aiding and Abetting Firearm Use – Forrester (Doc. No. 2463)

Unlike his confederates, Forrester has not taken a shotgun approach in attempting to overturn

his convictions. Instead, he moves for a judgment of acquittal only on Count Twenty-One that charges him with brandishing a firearm during and in relation to a crime of violence, or aiding and abetting in the same. The crime of violence was the Hobbs Act Robbery of Orten at his home in the early morning hours of July 4, 2015.

The evidence at trial showed Ort brandished a firearm and chased one of the victims with a gun during the takeover at Orten's residence. There was no evidence, however, that Forrester carried or used a firearm in relation to that incident. Rather, he was carrying a knife that he held to one of the victim's neck during the robbery.

In Rosemond v. United States, the Supreme Court explained the *mens rea* necessary to satisfy § 924(c)'s intent requirement under an aiding and abetting theory:

> An active participant in a [crime of violence] has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope – that the plan calls not just for a drug sale [or robbery], but for an armed one. In so doing, he has chosen . . . to align himself with the illegal scheme in its entirety – including its use of a firearm. And he has determined . . . to do what he can to "make [that scheme] succeed." [Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766 (1949)]. He thus becomes responsible, in the typical way of aiders and abettors, for the conduct of others. He may not have brought the gun to the [crime] himself, but because he took part in that deal [or robbery] knowing a confederate would do so, he intended the commission of a § 924(c) offense—i.e., an armed [crime].

572 U.S. 65, 78, 134 S. Ct. 1240, 1248 (2014). Pursuant to Rosemond, the Government was not required to prove that Forrester had advanced knowledge that Ort would brandish a gun as opposed to using it in some other way. Rather, so long as Forrester "decided to join in the criminal venture . . . with full awareness of its scope . . . including its use of a firearm," Forrester is liable as an aider and abettor under § 924(c), regardless of whether Ort ultimately brandished the gun.

65

As a preliminary matter, the Court rejects the Government's contention that the evidence presented to the jury was sufficient for conviction because "Forrester did not attempt to withdraw from the robbery after Ort brandished a firearm, nor did Forrester refuse to flee the scene of the robbery with Ort and Miles after Ort brandished a gun and things went South." (Doc. No. 2505 at 11). Not only does this argument run afoul of <u>Rosemond</u>, it is unrealistic and a bit illogical.

<u>Rosemond</u> teaches that the "intent standard cannot be satisfied if a defendant charged with aiding and abetting a § 924(c) offense learns of a gun only <u>after he can realistically walk away</u> – *i.e.*, when he has no opportunity to decide whether 'he wishes to bring about' (or make succeed) an armed [robbery], rather than a simple [robbery]." 572 U.S. 65, 81 n.10. (emphasis added) This is because a "defendant manifests [a] greater [criminal] intent, and incurs the greater liability of § 924(c), when he chooses to participate in a transaction knowing it will involve a firearm; but he makes no such choice when that knowledge comes too late for him to be reasonably able to act upon it." <u>Id.</u> at 81. Here, so far as the evidence showed, Forrester only became aware of Ort's possession of a firearm once the robbery was in full swing. Furthermore, Forrester's decision to flee with his cohorts was perforce an all but foregone conclusion, otherwise he would be stranded in Kentucky at a home he had just robbed whose occupants were still around.

The Government's reliance on <u>Steiner v. United States</u> does not counsel a different conclusion because there the Eleventh Circuit held that "[w]hile continued participation can support an inference of advance knowledge under <u>Rosemond</u>, the government must 'prove that the defendant learned about the gun with enough time to try to change his confederate's plan or to remove himself from the venture altogether.'" 940 F.3d 1282, 1290 (11th Cir. 2019). In <u>Steiner</u>, the jury could reasonably conclude that a 924(c) conviction was warranted under an aiding and abetting theory

66

because the defendant "still had an opportunity to 'quit the crime' after he learned of the guns' presence." Id. at 1292. No such proof was offered to the jury in this case.

The Government also argues that Forrester was involved in the planning of the Orten robbery and that he, Ort, and Cooper exchanged messages in advance of the commission of the offense. However, the Government offers no evidence or text messages to show any discussion about Ort carrying a firearm and the Court recalls none.[15]

Finally, the Government argues that those associated with the up-and-coming Clarksville Mongols were known to carry firearms, and that Forrester pulled a firearm on Smith during the Woodlawn Utility water bill incident only ten days earlier. Furthermore, just hours before the Orten robbery, a firearm was used during the Stateline Road robberies. True, Forrester was acquitted of *federal* charges in relation to the latter incident (Counts Fourteen and Sixteen), but the record contains evidence that a firearm was used in those robberies.

"[P]articipation in . . . prior armed robberies with . . . the same codefendants is strong circumstantial evidence that [defendant] was aware of the group's modus operandi of using firearms in the commission of robberies." United States v. Gooch, 850 F.3d 285, 289 (6th Cir. 2017). The problem with the government's theory here, however, is that the *modus operandi* it points to shows *Forrester* – not his co-defendants – carrying the firearm. It was he who pulled a gun on Smith, and it was he who allegedly carried a firearm during the Stateline Road robberies.

_____

[15] The Court has reread Cooper's testimony relating to the Orten home invasion. While she testified in a state court proceeding that guns were not used, she testified in this case that Ort had a pistol, which the jury was obviously entitled to believe. She also testified that the gun was carried by Ort "underneath a bandana." (Doc. No. 2415 at 234). As for the actual planning of the robbery, Cooper testified that this was "mostly" between her and Ort, Id. at 215, that the plan was hers to begin with, and that she and Ort "hatched the plan," (Doc. No. 2416 at 40). Nowhere did Cooper say that their discussion involved the use of guns or that Forrester was privy to such discussions.

This begs the question of whether Forrester *not* carrying a gun meant that he *knew* his co-defendant would carry one in his stead. More likely than not he did, unless he was disinclined to follow the adage that it is best not to carry a knife to a potential gunfight. But here proof beyond a reasonable doubt is required. Specifically, "an aiding and abetting conviction requires not just an act facilitating one or another element, but also a state of mind extending to the entire crime," that being, the predicate crime and the gun use. <u>Rosemond</u>, 572 U.S. at 75–76. "Under that rule, a defendant may be convicted of abetting a § 924(c) violation only if his intent reaches beyond a simple [robbery], to an armed one," <u>id</u> at 76, and the advanced knowledge element of <u>Redmond</u> must be proven beyond a reasonable doubt, <u>United States v. Henry</u>, 797 F.3d 371, 377 (6th Cir. 2015). Because the Government failed to carry its burden of proof, a judgment of acquittal will be entered on Count Twenty-One in favor of Forrester.

**J. Count Twenty-Two – Interstate Travel In Aid Of Racketeering – Frazier (Doc. No. 2457)**

The evidence presented at trial relating to Count Twenty-Two did not rise to the level of more likely or not (the preponderance) standard, let alone the beyond a reasonable doubt standard necessary for conviction. That Count charged:

> Between in or about October 2015 and on or about December 12, 2015, in the Middle District of Tennessee and elsewhere, **[1] JAMES WESLEY FRAZIER, a/k/a "SLO-MO," a/k/a "SPECIAL," and [13] MICHAEL LEVI WEST, a/k/a "SMURF," a/k/a "BLUE,"** traveled in interstate commerce from the State of Tennessee to the State of California with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is, Conspiracy to Possess with Intent to Distribute Methamphetamine, a Schedule II controlled substance in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and thereafter performed and attempted to perform an act to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment, and carrying on of such unlawful activity.

> All in violation of Title 18, United States Code, Section 1952(a)(3) and 2.

68

(Third Superseding Indictment, Doc. No. 485 at 36).

West was called as a witness for the Government. He testified that he was in jail in the summer of 2015, was released on September 17, 2015, met Frazier in November of that year, and met Chavez in January 2016. He also testified that he traveled to California on Mongols' business twice, once in January and once in February 2016. (Doc. No. 2434 at 101-106). More specifically, West testified that the first time he went to California with Frazier was around January 27, 2016 when Frazier got out of jail. (Doc. No. 2212 at 50). Frazier did not testify, as was his right.

Undeterred by its own witness's clear and repeated testimony, the Government attempts to salvage Frazier's conviction by arguing that he could have gone to California by himself during the relevant time period covered by Count Twenty-Two. The Government asserts:

> Based on the evidence presented at trial, the reasonable inference was that Frazier traveled to California to meet Chavez and obtain more methamphetamine, as he often did during this time frame. Indeed, on or about December 10, 2015, Frazier sold methamphetamine to Joel Aldridge and Frazier told Aldridge that he was getting his methamphetamine from California. (D.E. 2413, PageID #: 18912-14.) Especially given all of the other circumstantial evidence presented, including evidence of multiple other trips to California for the purpose of meeting with Chavez and reupping his supply of methamphetamine, and the fact Chavez lived in California, it was reasonable to infer that Frazier had traveled there to meet Chavez to obtain the methamphetamine. All of the evidence pointed to Frazier – as he had many times – traveling to California to meet Chavez and "re-up" when he told people he was going out of town in November 2015. (See D.E. 2434, PageID #: 22673-74 (testifying that Frazier was getting methamphetamine from "Chacho in California" during that time period).) Moreover, subsequent events also provide additional support for this inference. Approximately two weeks after Frazier's late November trip, Frazier and Santiago paid Chavez back for the methamphetamine that Chavez had fronted to them; and Chavez was then arrested on December 14, 2015, in Tennessee with drug proceeds.

(Doc. No. 2504 at 7).

What the Government characterizes as reasonable inferences is really nothing more than

speculation. It is equally speculative (but probably much more likely) to say that the evidence suggested Chavez came to Tennessee with methamphetamine during the time period covered by Count Twenty-Two if for no other reason than Chavez was caught in Tennessee with drug proceeds in December of that year.

Regardless, the Government massages the record in an effort to reach its desired conclusion. While West testified "that Frazier was getting methamphetamine from 'Chacho' in California during that time period," with the referenced "time period" being between November 2015 and January 15, 2016, (Doc. No. 2434 at 102) this is far different than saying Frazier went to California to get the drugs during the first month of that time period. Indeed it was within the pages cited by the Government that West reaffirmed when he first went to California:

> Q. And you learned during that period of time that he's getting his meth from a guy named Chacho in California?
>
> A. Yes.
>
> Q. And you don't meet Chacho until later in January when this thing starts to unravel at Meredith Way?
>
> A. Yes.

Id. Further, that Aldridge testified Frazier "was talking [to him] about getting hooked up from California" in mid-December of 2015 is not proof that Frazier traveled to California to get the meth at that time, let alone that he traveled there with West "[b]etween in or about October 2015 and on or about December 12, 2015" as charged in Count Twenty-Two. Rather, according to this Court's recollection and review of the record, the evidence was that Frazier first traveled to California with DeCarlo and Cole sometime around Christmas 2015. (Doc. No. 2438 at 182-92).

The evidence presented at trial was not sufficient for a jury to conclude that Frazier engaged

in interstate travel in aid of racketeering during the dates set out in Count Twenty-Two. Accordingly, a judgment of acquittal will be entered on that count.

### K.  Count Twenty-Three – Possess with  Intent to Distribute Methamphetamine – Frazier (Doc. No. 2457), Stanley (Doc. No. 2250)

Frazier and Stanley move for a judgment of acquittal on Count Twenty-Three, which charges:

On or about December 12, 2015, in the Middle District of Tennessee and elsewhere, **[1] JAMES WESLEY FRAZIER, a/k/a "SLO-MO." a/k/a "SPECIAL," [14] ADRIANNA FRAZIER, a/k/a "ADRIAN MILES,"** and **[15] DEREK LEIGHTON STANLEY**, did knowingly and intentionally distribute and possess with intent to distribute fifty (50) grams or more of Methamphetamine, a Schedule II controlled substance.

All in violation of Title 21, United States Code, Section 841(1)(1) and Title 18, United States Code, Section 2.

(Doc. No. 485, Third Superseding Indictment at 37).

Possession with intent to distribute narcotics as charged in Count Twenty-Three is the grist for a federal prosecutor's mill.  Usually it is proven by pointing to a specific incident and showing that, on a given date (or thereabouts), Johnny possessed drugs at a certain place with the intent to distribute them.  Thus, for example, one would expect this case to contain evidence something along the lines of Frazier meeting with and/or coordinating with Stanley and/or Adrianna to exchange money for methamphetamine on the bar top at the "Dew Drop Inn" on December 12, 2015.  Not so here.

In its response to both Defendants' motions, the Government argues that "the evidence of Frazier's ongoing distribution of methamphetamine was overwhelming" and that even Frazier "acknowledges that (1) there was evidence Frazier met Stanley in the fall of 2015, and (2) Frazier distributed methamphetamine with Stanley in December 2015."  (Doc. No. 2504 at 9).  The

71

Government also notes that "[d]uring the course of trial, multiple witnesses, including, but not limited to Theresa Cobb, Janie Lee, and Kyle Heade, testified that Frazier was supplying other individuals, such as Stanley, with large quantities of methamphetamine – sometimes pound quantities at a time" – and that "Stanley was himself a large scale methamphetamine distributor in Owensboro, Kentucky." Id. As for drug dealing on the date specified in Count Twenty-Three, the Government points to Cobb's testimony that Frazier and Stanley dealt in large-weight methamphetamine transaction, and relies on text messages confirming that on December 28 and 29, 2015, Stanley traveled to Clarksville to pick up methamphetamine from Frazier. (Tr. Ex. 991). The Government asserts this date is close enough to the date charged in the indictment.[16]

Earlier, this Court discussed the phrase "on or about" and noted "[o]ne to two months is reasonably near." Roberge, 565 F.3d 1005 at 1008. That discussion was in the context of the RICO conspiracy alleged in Count One, however.

A criminal conspiracy is an inchoate offense, United States v. Robinson, 547 F.3d 632, 638 (6th Cir. 2008), often with nebulous margins as to its beginning and end dates. The substantive crime of possessing with intent to distribute narcotics is different because it either did, or did not happen, on a given date. True, where the date is not an essential element of the crime, "proof of the exact date of an offense is not required as long as a date reasonably near that named in the indictment is established." Ford, 872 F.2d at 1236. After all, "the 'on or about' language is meaningless if it doesn't expand the time-frame one day [or two]." United States v. Fields, 2000 WL 1140557, at *4 (6th Cir. Aug. 4, 2000).

---

[16] By this logic, a month is sufficient to meet the "on or about" requirement for a discrete crime. That is, if two weeks after the given date is sufficient, then two weeks before must be sufficient as well.

The Government criticizes Frazier for not discussing cases that deal with the "on or about" issue. It then relies on United States v. Hettinger, 242 F. App'x 287 (6th Cir. 2007) for the proposition that "the Sixth Circuit has upheld convictions where the proof established that a crime was committed within weeks of the date alleged." (Doc. No. 2504 at 9). Being unpublished, Hettinger is not controlling. Moreover, a closer reading of the opinion reveals that it is actually not that helpful to the Government after all.

In Hettinger, defendant was convicted of manufacturing methamphetamine "on or about" August 22, 2002. He sought reversal because the evidence at trial indicated the actual manufacturing occurred around August 8, 2002. The Sixth Circuit affirmed his conviction. In doing so, however, the court began by noting that it had "excused differentials of one or two days." Id. at 295 (citing United States v. Morelli, 643 F.2d 402, 411 n. 5 (6th Cir. 1981) (one-day); United States v. Heard, 443 F.2d 856 (6th Cir. 1971) (two-days). It also noted that the court had also "held that admitting evidence of a meeting that took place thirty-three days before the *conspiracy's* start-date, as alleged in the indictment, did not constitute a variance." Id. (emphasis added) (citing Manning, 142 F.3d at 339–40). Applying that same logic to the case before it, the Sixth Circuit found the date alleged was proximate enough but, in doing so specifically observed that "the government did not attempt to show multiple acts of manufacturing methamphetamine in August 2002." Id. Therein lies the rub for the Government.

Throughout its response, the Government's theme is the same: in and around December 2015 Frazier and Stanley bought and sold drugs on almost a daily basis. That, however, does not answer the question of whether, on or about December 12, 2015 they knowingly and intentionally "distribute[d] fifty (50) grams or more of Methamphetamine" as charged by the Grand Jury in Count

73

Twenty-Three.

The Fifth Amendment guarantees that an accused be tried only on those offenses presented in an indictment and returned by a grand jury. <u>Stirone,</u> 361 U.S. 212, 217–19. The Court has no confidence (beyond a reasonable doubt) that was the case with respect to Count Twenty-Three and a judgment of acquittal will be entered in favor of Frazier and Stanley on this Count.

**L. Count Twenty-Seven – Possession with Intent to Distribute – Stanley (Doc. No. 2322)**

The entirety of Stanley's argument on this Count is as follows:

> Precisely the same argument applies to the charge in Count Twenty-seven as in Mr. Stanley's challenge to the allegations in Count Twenty-three, except for the date allegation Count Twenty-seven alleges that the offense conduct occurred on or about January 13, through on or about January 15, 2016. The Government has presented no evidence to support this allegation. Accordingly, Mr. Stanley asks this court to issue a judgment of acquittal on this count.

(Doc. No. 2250 at 8). Resolution of this argument can be just as short.

As noted, the record established that towards the end of December 2015 and through the middle of January 2016, Frazier and Stanley were regularly dealing in large-scale methamphetamine transactions. Indeed, the evidence showed that Frazier acted as Stanley's main source of methamphetamine during this period when thousands of dollars were exchanged for pounds of methamphetamine.

Unlike with Count Twenty-Three, however, there was evidence to support the allegation in Count Twenty-Seven that "[b]etween on or about January 13, 2016, through on or about January 15, 2016" Frazier and Stanley possessed with intent to distribute fifty grams or more of methamphetamine. Stanley's own texts and Frazier's response thereto were sufficient to do them in. Those texts show Frazier was starting to run low on methamphetamine on January 14, 2015, that

he only had one pound and three cuties,[17] and that Stanley should come get them. (Ex.991 at 292-300). In response to the texts Stanley indicated he only had $5,000 at the time, complained that the shortage in supply was going to make him raise prices, and suggested that he and Frazier should come up with a "backup plan." Id. The next day, January 16, 2015, Stanley texted Frazier to tell him he was en route to pick-up the pound. Id. In the context of this case and the evidence presented, this was more than sufficient for the jury to conclude that between January 13 and 15, 2016, Frazier sold Stanley more than 50 grams of meth. As such, Stanley is not entitled to an acquittal or new trial on Count Twenty-Seven.

**M. Counts Twenty-Eight – Drug Conspiracy; Count Thirty – Possession with Intent to Distribute – Santiago (Doc. No. 2467); Thirty-One – Aiding and Abetting Use of a Firearm – Frazier (Doc. No. 2457), Santiago (Doc. Nos. 2465, 2467)**

Counts Twenty-Eight, Thirty, and Thirty-One are related, with the keystones being (1) the Bojangles incident and (2) Frazier, Santiago and Heade named as Defendants. Count Twenty-Eight alleges a conspiracy with intent to distribute or possess with intent to distribute Oxymorphone from on or about January 1, 2016 until January 16, 2016. Count Thirty alleges attempted possession with intent to distribute Oxymorphone on January 16, 2016. Count Thirty-One alleges that, with respect to those drug trafficking crimes, Defendants used, carried, brandished and discharged, a firearm, specifically a Smith and Wesson 9mm handgun, or aided and abetted in the same.

Both Frazier and Santiago were convicted on each of these counts. However, with respect to Count Thirty-One, the jury found that Frazier did not brandish or discharge a firearm (or aid or abet in the same ) in relation to Count Twenty-Eight, but that he did so in relation to Count Thirty. As for Santiago, the jury found that he brandished or discharged a firearm (or aided and abetted the

---

[17] A "cutie" or "QT" is slang for a quarter pound of marijuana.

same) in relation to both Counts Twenty-Eight and Thirty.

The facts presented to the jury in relation to these crimes was relatively straight-forward and came mostly from the testimony of Cobb and Heade. It showed that, during this time period, Cobb lived at the Meredith Way residence where Frazier also had a room and Heade (who was then Cobb's boyfriend) would stay there when he was not on post at Fort Campbell. Santiago, though not living in the residence, would visit there often.

During this period, Cobb and Heade purchased Opana pills and other drugs for Frazier, oftentimes acting as a middleman between Frazier and Stanley. Cobb and Heade also used those drugs.

In mid-January 2016, a deal was struck whereby 90 Opana-40 pills for $5,400 would be purchased from Timothy Grant, a local drug dealer that Cobb knew. (Doc. No. 2415 at 216; 2435 at 207-210). On January 15, 2016, Cobb and Heade went to Cobb's residence where Frazier supplied them the money for the purchase. Santiago arrived after Cobb and parked his Charger behind her car. As the conspirators were discussing the upcoming plan to meet Grant at the Bojangles, Heade asked Frazier for a weapon to use as protection, but Frazier said his gun was out of ammunition. Santiago then removed a 9mm pistol from his waistband, checked the chamber to confirm it was loaded, and handed it to Heade. Heade and Cobb then left the residence in Santiago's car and went to Bojangles. Unbeknownst to any of them, however, Grant and McCracken had decided to rob Cobb of the money. This resulted in the shootout described earlier, with Heade firing the 9mm when he noticed a struggle in the red Jetta over the moneybag.

Santiago argues that the evidence was insufficient for his convictions on Counts Twenty-Eight and Thirty because he was not shown to have been a conspirator and he only arrived at the

76

residence shortly before Heade and Cobb went to consummate the supposed drug deal. He also argues that he did not provide a gun in furtherance of a drug trafficking crime because no such crime took place. Santiago's arguments ignore basic conspiracy, attempt, and aiding and abetting law. They also ignore the requirement that the facts be construed in favor of the verdict.

"The elements of a drug conspiracy are (1) an agreement by two or more persons to violate the drug laws, (2) knowledge and intent to join in the conspiracy, and (3) participation in the conspiracy." United States v. Paige, 470 F.3d 603, 608 (6th Cir. 2006). "A conspirator need not be an active participant in every phase of a conspiracy, so long as he is a party to the general conspiratorial agreement." Id. "A defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances, including a close relationship between alleged conspirators, but participation requires more than 'mere association with conspirators.'" United States v. Brown, 332 F.3d 363, 372–73 (6th Cir. 2003).

To prove that a defendant aided and abetted in a drug transaction, the Government was required to establish that he "'participated in the venture as something [ ] he wished to bring about and sought to make succeed.'" United States v. Sadler, 24 F.4th 515, 544 (6th Cir. 2022) (quoting United States v. Ward, 190 F.3d 483, 487 (6th Cir. 1999)). And, "[w]here the conviction is for an attempt, the government must have proved that the defendant both intended to commit the underlying offense and committed a 'substantial step' towards the commission of that offense." United States v. Ferguson, 65 F.4th 806, 811 (6th Cir. 2023) (citing United States v. Wesley, 417 F.3d 612, 617 (6th Cir. 2005)).

The evidence presented at trial showed more than mere association by Santiago in the conspiracy alleged in Count Twenty-Eight, and that he aided and abetted the attempted distribution

of Oxymorphone as alleged in County Thirty.  Not only did he provide Heade the 9mm pistol, he also allowed Cobb and Heade to use his car.  Moreover, both Heade and West testified that Santiago was present for at least some of the discussion about the planned purchase of Opanas from Grant. (Doc. Nos. 2435 at 176-180; 2419 at 119).  That the intended drug deal turned into a robbery matters not a wit because substantial steps had been taken by Heade and Cobb in setting up the transaction and going to the meet; by Frazier agreeing to the plan and providing the money; and by Santiago providing the gun and transportation to be used in the intended drug transaction.

Turning to Count Thirty-One, Santiago first argues that his conviction must be set aside because he was not guilty of the underlying predicate crimes set forth in Counts Twenty-Eight and Thirty.  That fails for the reasons already stated.  As for Frazier, he argues that the evidence is insufficient to support his conviction on this count because "the evidence is clear that Aelix Santiago provided the firearm to Kyle Heade and it was later used by Heade," and, therefore, "no reasonable jury should have found beyond a reasonable doubt that Frazier committed the crime as charged. (Doc. No. 2457 at 9).  Just as with Forrester's argument in relation to Count Twenty-One, Rosemond resolves this issue, albeit in the opposite way.

As previously discussed, Rosemond set forth the requisite *mens rea* for aiding and abetting the use of a firearm in relation to a violent or drug trafficking crime.  In the passage this Court quoted in relation to Forrester's argument, the Supreme Court held that (1) "[a]n active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun"; and (2) while "[h]e may not have brought the gun to the drug deal himself . . . because he took part in that deal knowing a confederate would do so, he intended the commission of a § 924(c) offense – *i.e.*, an armed drug sale."  Rosemond, 572 U.S. at 78.  This fits

78

Frazier's participation precisely.

Frazier was asked by Heade to give him a gun but declined only because his gun was out of bullets. Frazier then witnessed Santiago hand Heade a 9mm. Frazier did not object or otherwise try to stop the planned drug deal. And, when Cobb and Heade returned from the botched drug deal, Frazier said it was time "to get the sisters [guns] ready because someone dropped the hammer for the Mongols." (Doc. No 2419 at 21). In other words, there was more than enough for the jury to conclude that Frazier knowingly aided and abetted in Heade's use of a gun during what was intended to be a drugs for money exchange.

Finally in relation to Count Thirty-One, Santiago asserts his conviction should be overturned or a new trial granted because of purportedly inconsistent verdicts. He complains that the jury found him liable as an aider and abetter for brandishing and discharging a firearm in relation to both Counts Twenty-Eight and Thirty, but only found Frazier liable for such actions in relation to Count Thirty.

"'The Supreme Court has repeatedly held that a jury may announce inconsistent verdicts in criminal cases.'" United States v. Lawrence, 555 F.3d 254, 261 (6th Cir. 2009) (quoting United States v. Clemmer, 918 F.2d 570, 573 (6th Cir. 1990)). It did so in Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189 (1932), and reiterated that conclusion in United States v. Powell, 469 U.S. 57, 105 S.Ct. 471 (1984). The rationale for such holdings is that "[i]t is unclear whose ox has been gored," Powell, 469 U.S. at 65, inasmuch as "'[a] jury that inconsistently convicts the defendant of one offense and acquits him of another is as likely to have erred in acquitting him of the one as in convicting him of the other,'" Lawrence, 555 F.3d at 261–62 (quoting United States v. Johnson, 223 F.3d 665, 675 (7th Cir. 2000)).

Based on Dunn and Powell, the Sixth Circuit has "repeatedly recognized the proposition that

79

inconsistent verdicts in a criminal case generally are not reviewable." United States v. Randolph, 794 F.3d 602 610 (6th Cir. 2015) (citing United States v. Smith, 749 F.3d 465, 498 (6th Cir. 2014)). There are, however, two limited exceptions to this rule: "where jury verdicts 'are marked by such inconsistency as to indicate arbitrariness or irrationality,'" or "where a guilty verdict on one count necessarily excludes a finding of guilt on another.'" Id. at 610-11 (quoting Lawrence, 555 F.3d at 263. Neither exception applies here.

The differences in the verdicts as between Frazier and Santiago are not necessarily arbitrary or irrational because "[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on [one] offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion" on the other as between the two Defendants. Powell, 469 U.S. at 65. Though not necessarily supported in the law, but still rational and not arbitrary, the jury may have differentiated the two's conduct and roles given that Santiago actually supplied the gun and then cleaned it after the crime, whereas Frazier only supplied the money. Nor can it be said that a special finding of liability for brandishing and discharging on one count excluded such a finding on the other such that the two are inconsistent. In any event, purported inconsistencies are largely academic because there will only be one enhancement under Count Thirty-One.

Neither a judgment of acquittal nor a new trial will be entered in favor of either Frazier or Santiago in relation to Counts Twenty-Eight, Thirty or Thirty-One.

**N. Count Thirty-Eight – Interstate Travel in Aid of Racketeering  – Stanley (Doc. 2250)**

Count Thirty-Eight alleges the following:

On or about January 26, 2016, in the Middle District of Tennessee and elsewhere **[15] DEREK LEIGHTON STANLEY,** with others known and unknown to the Grand Jury traveled in interstate commerce from the State of Tennessee to the States

of California and Colorado, with the intent to promote, manage, establish, carry on and facilitate the promotion, management establishment, and carrying on of an unlawful activity, that is, Conspiracy to Distribute and Possess with intent to Distribute Methamphetamine in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and thereafter performed and attempted to perform and act to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment, and carrying on of such unlawful activity.

All in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

(Doc. No. 485, Third Superseding Indictment at 43-44). In moving for a judgment of acquittal on this Count, Stanley does not claim that he did not travel to California and Colorado as alleged. Nor could he and remain credible.

At trial, the Government called four officers from the Aurora, Colorado police department who testified about the January 26, 2016 traffic stop of a rental Chevrolet Cruze bearing Rhode Island license plates on I-70 East and North Airport Drive. Stanley was driving the vehicle. A drug dog was called to the scene and canine Deuce alerted on the vehicle. A subsequent search of the vehicle uncovered close to 500 grams of methamphetamine and assorted drug paraphernalia.

Those discoveries aside, Stanley insists acquittal is warranted because his interstate travel was not in aid of racketeering activity. To accept that position, the Court would have to agree that Stanley was not a part of the drug conspiracy alleged in Count Two, a position that the Court has already rejected. To that discussion, the Court would simply add that Stanley's travel to California and Colorado followed on the heels of Frazier's January 16 arrest and was in keeping with Stanley's text that the two devise a "backup plan" to keep the methamphetamine pipeline open. He is not entitled to any relief on Count Thirty-Eight.

## O. Count 48 – Accessory After the Fact – Hern (Doc. No. 2508)

Count 48 alleges that Hern was an accessory after the fact to the attempted murder and

81

assault of Michael Finley by Humiston.  Humiston, who testified at trial, pled guilty to the substantive crimes of attempting to murder (Count Forty-Five) and assault with a deadly weapon of Finley (Count Forty-Six), both of which are VICAR crimes.

"An individual is guilty of being an accessory after the fact when he, 'knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment.'" United States v. Boyd, 640 F.3d 657, 662 (6th Cir. 2011) (quoting 18 U.S.C. § 3).  The "statute does not require a nexus to a pending or ongoing investigation or judicial proceeding and reaches conduct preceding an investigation or proceeding." Silva v. Garland, 27 F.4th 95, 104 (1st Cir. 2022).

"[B]eing an accessory after the fact is neither a complete defense to the charged crime nor a lesser-included offense, United States v. Weadick, 15 F.4th 1, 15 (1st Cir. 2021), but the potential punishment is halved by statute.  Being an accessory is also different from being an aider and abettor: "One who acts as an accessory after the fact does not participate in the commission of the primary offense." United States v. Taylor, 322 F.3d 1209, 1211 (9th Cir. 2003).

"The elements of accessory after the fact under 18 U.S.C. § 3 are (1) commission of a specified offense by some person, (2) the defendant's knowledge of the crime's commission and the principal's participation in it, and (3) the defendant's assistance to the principal 'with the specific purpose or plan to hinder or prevent' the principal's 'apprehension, trial, or punishment.'" United States v. Snype, 441 F.3d 119, 142 (2d Cir. 2006) (quoting Leonard B. Sand, et al., 1 MODERN FEDERAL JURY INSTRUCTIONS: Criminal, Instruction 12–2 (2002)).  Thus, part of the requirement for an aiding and abetting conviction is that the Government prove commission of the underlying offense. United States v. Boyd, 640 F.3d 657, 668 (6th Cir. 2011).  In other words, "[b]ecause the

accessory after the fact statute specifically requires that the defendant have acted with knowledge that 'an offense against the United States has been committed,' . . . the government must prove beyond a reasonable doubt that the accessory was aware that the offender had engaged in conduct that satisfies the essential elements of the primary federal offense. To put it more precisely, the accessory must know that the offender had engaged in the conduct that constitutes the federal offense–though not necessarily that such conduct constitutes a federal offense." United States v. Graves, 143 F.3d 1185, 1186 (9th Cir. 1998); accord United States v. Head, 707 F.3d 1026, 1033 (8th Cir. 2013).

What this all means in the context of this case is that the government had the burden of proving beyond a reasonable doubt that: (1) Humiston had committed a VICAR assault with a dangerous weapon or attempted murder; (2) Hern had actual knowledge of the VICAR crime; and (3) with that knowledge, Hern in some way assisted Humiston in order to hinder or prevent his apprehension, trial, or punishment. See United States v. Rux, 412 F.2d 331, 333 (9th Cir. 1969). And because the underlying offenses were allegedly VICAR crimes, part-and-parcel of that proof requirement was that Humiston shot Finley to increase or maintain his position in the Mongols.

Notwithstanding that Humiston pled guilty to the underlying VICAR crimes and consequently admitted to all of the elements, Hern argues that "[t]he alleged attempted murder and assault with a deadly weapon of Michael Finley was not in aid of racketeering" and, therefore, the suggestion that Hern "could have been [an] accessory after the fact to a VICAR crime is *a fortiori* false." (Doc. No. 2466 at 6-7). He points out that, prior to becoming a Mongols member, Humiston had problems with the Iron Order Motorcycle Club and argues that, in contravention of a cease and desist order relating to the Iron Order, the shooting of Finley was "a rogue act by Robert Humiston

83

for personal revenge or personal vendetta." Id. at 8. That is one way to construe the evidence but not the one permitted when review is under Rule 29 or 33.

Clearly, Humiston had a history with the Iron Order. On May 31, 2016, just a week before he was asked to transition from the Raiders Motorcycle Club to the Mongols, Humiston and Pytyak got into a fight with Iron Order members behind a Hooters restaurant in Clarksville. During the fight, Humiston kicked one of the Iron Order members in the face and hit the Club's President in the mouth, knocking him to the ground. Later that night, Iron Order members returned to Hooters, threatening to kill Humiston and saying that they were looking for him. This prompted Humiston to "lay low" for a couple of months. (Doc. No. 2440 at 66-69).

The shooting of Finley occurred the very day after the Mongols and Diablos got into the brawl at Wize Guys. By that time, there had been several other run-ins with Iron Order members apart from those involving Humiston, including an incident in Colorado where a Mongols member was killed by an Iron Order member. Id. at 377. Nevertheless, because Humiston was a known hot-head, he was instructed by Hines (then-President of the Clarksville chapter) to leave the Iron Order alone. The rationale underlying the directive was that the Iron Order had police officers as members and the Mongols did not need unnecessary heat.

Against this backdrop, Hern argues that Finley's shooting could not have been done to maintain or advance Humiston's position as a Mongol. Quite the contrary, Humiston's actions defied a direct order. In fact, after the shooting, Humiston tried to keep the shooting quiet because he knew he had done wrong.

Hern's argument ignores Humiston's additional testimony that, while he was told to leave the Iron Order alone, he was also instructed, "[i]f it comes to you, handle it." Id. at 77. Hern's

84

argument also ignores that Humiston saw the directive as "kind of as a rule to be broken." Id. at 377. Further, the argument ignores Humiston's testimony that the Iron Order had "threatened his life" and that he was "going to prove a point." Id. at 203. More fundamentally, it ignores the Mongols' utter disdain towards being disrespected and their credo, Respect Few, Fear None.

To be sure, VICAR does not encompass all violent conduct by gang members. As the Sixth Circuit has explained:

> We agree with the Ninth Circuit that VICAR does not extend "to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang[.]" United States v. Banks, 514 F.3d 959, 968 (9th Cir.2008). Otherwise, in gang cases, the purpose element would be nearly a tautology. Nor is it enough if the defendant's gang-related purpose was "merely incidental" to his action. Id. at 969. But neither is the government required to prove the defendant acted "solely" or "primarily" for a gang-related purpose. See id. at 965–66 (collecting cases from five circuits). Instead, . . . we conclude that VICAR's "purpose" element is met if the jury could find that an "animating purpose" of the defendant's action was to maintain or increase his position in the racketeering enterprise. Cf. United States v. Faulkenberry, 614 F.3d 573, 586 (6th Cir.2010).

United States v. Hackett, 762 F.3d 493, 500 (6th Cir. 2014).

The jury could easily make that determination here. Simply put, Humiston was not going to let threats to a Mongols member go unanswered. See United States v. Rich, No. 18-2268, 2021 WL 4144059, at *25 (6th Cir. Sept. 13, 2021) ("'[A] jury can reasonably infer' that the animating purpose of a killing is to increase stature in a gang 'where the evidence shows that a defendant committed the violent crime because he knew it was expected of him by reason of his membership in the enterprise'" and this includes "retaliating violently in response to disrespectful behavior[.]").

It may be true, as Hern argues, that he did not know exactly what happened when Humiston arrived bleeding on his doorstep on the night of July 14, 2016. But Hern's assistance was not limited

85

to caring for Humiston's wounds. To the contrary, Hern helped conceal evidence by disposing of Humiston's firearm and he lied to the police by saying he did not know anything about the shooting. A jury could easily find this was done to protect a fellow Mongols, just as Hern's and other Clarksville Mongols' attempt to hide Humiston and dissuade Pytyak from talking to the police was to protect the brotherhood.

Hern is not entitled to a new trial or judgment of acquittal on Count Forty-Eight.

**P. Count Fifty – Conspiracy to Tamper With a Witness – Count Fifty -One – Tampering With a Witness – Hern (Doc. No. 2466)**

In these Counts, Hern, Santiago and others were charged with violating 18 U.S.C. § 1512 in relation to Pytyak. Subsection (b)(3) of that statute punishes one who "intimidat[es], threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. §§ 1512(b)(3). The statute goes on to provide that "no state of mind need be proved with respect to the circumstance . . . that the law enforcement officer is an officer or employee of the Federal Government[.]" Id. § 1512(g)(2). Finally, the statute provides that "an official proceeding need not be pending or about to be instituted at the time of the offense," and that "[w]hoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." Id. §§ 1512(f)(1).

Count Fifty alleges that, between on or about July 14, 2016, through on or about August 31, 2016, Defendants conspired to use threats and physical force to prevent Pytyak from communicating

86

with law enforcement about the possible commission of a federal offense in violation of Section 1512(k). Count Fifty-One alleged the substantive offense of tampering with a witness in violation of Section 1512(b)(3). Santiago was acquitted on those charges. Hern was not.

In his initial brief, Hern argued that, if Humiston's shooting of Finley was not in aid of racketeering, then his conviction for witness tampering (or conspiracy to commit the same) cannot be sustained because there was no VICAR crime to report to the authorities. (Doc. No. 2466 at 10). This argument fails for two reasons. First, the Court has already found that Humiston's shooting of Finley was a racketeering act. Second, Section 1512 only requires the hindrance or delay of "information relating to the commission or *possible commission* of a Federal offense[.]" 18 U.S.C. §§ 1512(a)(1)(C) (emphasis added).

In his reply brief, Hern argues afresh that "[t]here was no evidence that Hern acted to acted [sic] with knowing intent to prevent, hinder, or delay communication to a *federal law enforcement officer* or a federal judge information relation to the *commission of, or possible commission of,* a federal offense." (Doc. No. 2524 at 2) (emphasis in original). This argument is new and should not have been raised in the first instance in a reply brief. See, Sanborn v. Parker, 629 F.3d 554, 579 (6th Cir. 2010) (stating that arguments not raised until a reply brief are generally waived); Am. Trim, L.L.C. v. Oracle Corp., 383 F.3d 462, 477 (6th Cir.2004) (same). Nevertheless, the issue is one that should have been anticipated by the Government because the Court discussed it at length in a recent case involving the Gangster Disciples styled United States v. Hardison, No. 3:17-CR-00124, 2022 WL 1572380 (M.D. Tenn. May 18, 2022). In fact, although not acknowledging Hardison, the Government in a footnote to its response brief to Hern's motion cites the Supreme Court's decision in United States v. Fowler, 563 U.S. 668 (2011) which was the foundation of this Court's decision

in <u>Hardison</u>.

In <u>Hardison</u>, the Court wrote:

In analyzing the parties' argument on this issue, the Court need go no further than the Supreme Court's decision in [<u>Fowler</u>]. In that case, defendant and his accomplices planned to rob a bank. As they were meeting in a cemetery prior to the robbery, a local police officer happened upon the group. Noticing that they were wearing dark clothing and gloves, the officer pulled his weapon and demanded that the men identify themselves. The officer was then overpowered, his gun was taken, and he was killed.

Defendant was charged with, and convicted of, violating Section 1512. On appeal, defendant argued . . . that the evidence was "insufficient to show that he had killed [the officer] intending to prevent [him] from communicating with a federal officer." <u>Id.</u> at 570-71. The Eleventh Circuit disagreed and, like several other circuits, held that all that was necessary for conviction was a showing of a "'possible or potential communication to federal authorities[.]'" <u>Id.</u> at 671 (quoting <u>United States v. Fowler</u>, 603 F.3d 883, 888 (11th Cir. 2010)).

In resolving a split among the circuits, the Supreme Court began by quoting the statutory language in Section 1512(g)(2) about no state of mind being required "with respect to the circumstance" and framed the "not necessarily rare" issue as follows:

The question here is how this language applies when a defendant (1) kills [or threatens] a victim, (2) with an intent (a) to prevent a communication (b) about the commission or possible commission of a federal offense but (c) to law enforcement officers in general rather than to some specific law enforcement officer or set of officers which the defendant has in mind.

<u>Id.</u> at 672 The Court held:

The Government need not show that such a communication, had it occurred, would have been federal beyond a reasonable doubt, nor even that it is more likely than not. . . . But the Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical.

<u>Hardison</u>, 2022 WL 1572380, at *8.

Ultimately, this Court in <u>Hardison</u> held that it was too remote and hypothetical to conclude

88

that Amanda Wayand was murdered by Hardison to prevent her from communicating with federal law enforcement. At the time of her murder, "neither the ATF or any other federal law enforcement agency was poking around the Gangster Disciples or investigating its affairs." Id. at *9.

The same can be said about the threats to Pytyak from the Mongols in July and August 2016. There was no evidence that the Court recalls, nor cited by the Government, suggesting that the Mongols were being investigated by the federal authorities at the time, and the first Indictment was not returned until fully a year later. The result might be different if the crime sought to be hidden was a federal offense, but the crime at issue was a shooting, which happens far too often everywhere, including in Clarksville, Tennessee.

To be sure, there was always some possibility that some federal agency would investigate the Mongols or the Finley shooting, at some point, but "a 'mere possibility' standard is precisely what the Supreme Court rejected in Fowler." Lobbins v. United States, 900 F.3d 799, 802 (6th Cir. 2018). On this point, the Supreme Court could not have been any clearer:

> Often, when a defendant acts in ways that violate state criminal law, some or all of those acts will violate federal criminal law as well. And where a federal crime is at issue, communication with federal law enforcement officers is almost always a possibility. Thus, to allow the Government to show only a mere possibility that a communication would have been with federal officials is to permit the Government to show little more than the possible commission of a federal offense. (That is to say, the latter showing by itself would almost automatically show the statutorily necessary connection with a federal law enforcement officer.) The "possibility" standard would thereby weaken or eliminate the independent force of the separate statutory requirement that the defendant, in killing [or threatening] the victim, must intend to prevent communication with one who is "a law enforcement officer or judge of the United States."

> Moreover, because of the frequent overlap between state and federal crimes, the use of a standard based on the word "possible" would transform a federally oriented statute into a statute that would deal with crimes, investigations, and witness tampering that, as a practical matter, are purely state in nature.

89

Fowler, 563 U.S. at 676-78 (internal citations omitted).

The likelihood that "had the victim communicated with law enforcement, at least one relevant communication would have been made to a federal law enforcement officer," as required by Fowler is more than remote. At the time Hern, Santiago and others were allegedly intimidating Pytyak, they knew he had been questioned at the Clarksville police station and even had a copy of his signature on the Miranda form he had signed.

A judgment of acquittal will be entered in favor of Hern on Counts Fifty and Fifty-One.

**Q. Count Fifty-Two – Kidnapping – Hern (Doc. No. 2466); Santiago (Doc. No. 2467)**

Count Fifty-Two charges:

> Between on or about October 26, 2016, through on or about November 9, 2016, in the Middle District of Tennessee and elsewhere, **[2] AELIX SANTIAGO, a/k/a "GOON," a/k/a/ "BIG O," a/ka/ "Big OFFIT," [7] JAMES HINES, a/k/a "FESTER," [10] JAMIE HERN, a/k/a "J-Roc," [11] ROBERT HUMISTON, a/k/a "BRIC," a/k/a "BRICHANDS," [13] MICHAEL LEVI WEST, a/k/a "SMURF, a/k/a "BLUE"** and STEPHEN COLE /a/k/a "LURCH," now deceased, together with others known and unknown to the Grand Jury, did unlawfully kidnap, abduct, carry away, and hold Victim S.P. for questioning about the death of T.C. a male member of the Mongols Harbor Chapter in California, and  in committing or in further of the commission of the offense, did unlawfully transport Victim S.P. in interstate commerce from Tennessee to Kentucky.
>
> In violation of Title 18, United States Code, Section 1201(a)(1) and (2).

(Doc. No. 485, Third Superseding Indictment at 52).  "S.P" refers to Sharon Priess; "T.C." refers to Thomas Chavez.

To establish this crime, the Government was required to prove an agreement (for purposes of the conspiracy) or that Defendants aided and abetted in the kidnapping of Priess.  Kidnapping requires proof of the following four elements: "1) the defendant unlawfully seized, confined, inveigled, decoyed, abducted, or carried away the victim, 2) the defendant held the victim, 3) the

holding was for ransom or reward or otherwise, and 4) the defendant did so in a manner to create federal jurisdiction."  United States v. Ferguson, 65 F.4th 806, 811 (6th Cir. 2023).

Hern and Santiago challenge their convictions on Count Fifty-Two solely on the grounds that the Government did not establish the third element.  Santiago writes:

> The reasons for detaining and questioning Sharon Priess by the Mongols was to find out how Thomas Chavez died.  The inquiries provided no benefit to the group.

(Doc. No. 2467 at 20).  Hern parrots this language but adds that learning "how Chavez died would not bring him back alive."  (Doc. No. 2466 at 11).  Both argue that the facts here are distinguishable from United States v. Kerns, 9 F.4d 342 (6ᵗʰ Cir. 2021) because "detaining Priess was not due to any [romantic] relationship with her."  (Doc. No. 2466 at 11; Doc. No. 2456 at 20).

Defendants' citation to Kern is curious.  There, defendant challenged the "or otherwise" language in the federal kidnapping statute as being void for vagueness.  Rejecting the argument, the Sixth Circuit noted "[t]he Supreme Court has explained that 'or otherwise' encompasses any benefit which a captor might attempt to obtain for himself."  Id. at 351 (citing Gooch v. United States, 297 U.S. 124, 128, 56 S.Ct. 395 (1936); United States v. Healy, 376 U.S. 75, 82, 84 S.Ct. 553 (1964)).  The Sixth Circuit went on to explain that the "or otherwise" language has "an expansive reach" and was broad enough to include defendant's "emotional ties to the victim, with whom he had a "romantic relationship."  Id. at 345, 347.  Nowhere, however, did the Sixth Circuit even intimate that such a relationship was necessary.  To the contrary, the court noted that it had previously  "held that the federal kidnapping statute's 'otherwise' clause is satisfied where the government 'show[s] that the defendant acted for *any* reason which would in *any* way be of benefit' to the defendant."  Id. at 349 (emphasis in original) (quoting United States v. Small, 988 F.3d 241, 250 (6th Cir. 2021)).

91

Indeed, Small had noting to do with a romantic relationships. Rather that case involved a home invasion by strangers who unlawfully confined an elderly victim by binding her to a chair in order to "steal . . . [her] possessions and escape without any interference or resistance." Small, 988 F.3d at 250.

Contrary to the arguments raised by Hern and Santiago, Priess's kidnapping was a benefit to them. By kidnapping her they were able to interrogate her over a matter of days about Chavez's death. This was important to them for at least two reasons. First, they might learn what actually happened to their "patch daddy." Second, and more importantly, they would be able to explain to the Harbor Chapter Mongols what happened to one of its longtime members when he was in the home territory of the Clarksville Chapter.

Neither a judgment of acquittal nor a new trial will be granted on Count Fifty-Two.

**R. Count Fifty-Five – Assault With a Dangerous Weapon; Count Fifty-Seven – Kidnapping in Aid or Racketeering; Count Fifty-Eight – Unlawful Use of a Firearm; Count Fifty-Nine – Murder in Aid of Racketeering – Meyerholz (Doc. No. 2468)**

All of these crimes relate to Cole's murder and the events leading up thereto. All are VICAR crimes and, in each, both Meyerholz and Boylston are named as principals and aiders and abettors.

Count Fifty-Five alleges that they assaulted Johnson and Jewett when they burst into Johnson's home and took Cole from therein. Count Fifty-Six alleges that Cole was kidnapped when he was taken from Tennessee to Kentucky, during which cellphones were used. Count Fifty-Eight alleges that a firearm was used in relation to Cole's kidnapping. Finally, Count Fifty-Nine alleges that Cole's murder was in aid of racketeering and in violation of Kentucky state law. Meyerholz was

92

convicted on each of these counts.[18]

Meyerholz argues that he is entitled to an acquittal on each of these charges because the Government did not prove the "purpose element" of a VICAR crime in relation to any of them. That is, Meyerholz submits that the Government failed to show that these crimes were committed "for the purpose of . . . maintaining or increasing [his] position" in the Mongols. 18 U.S.C. § 1959(a). Put bluntly, this is nonsense.

The evidence showed that, after Cole's murder, Meyerholz became President, Boylston became Vice President, and Dykes became a Prospect of the Clarksville Mongols. While Meyerholz argues that the "very angry, and highly motivated" Humiston who testified about the promotions was not credible, (Doc. No. 2468), that was a determination for the jury to make.

Leaving aside the promotions, Meyerholz was also charged as an aider and abetter. Because Boylston did not have a running bike, he risked being drummed out of the Mongols, a potential fall from grace he blamed on Cole and his drug use. True, and as Meyerholz argues, killing Cole would not give Boylston a running motorcycle. But it is also true, and as this Court previously pointed out, the Mongols did not take kindly to being disrespected. Not only had Cole purportedly sold Boylston's motorcycle so he could feed his habit, he lied and said he would pay Boylston for the motorcycle but did not. Worse yet, he told others that he was not going to pay Boylston. Such effrontery could not go unpunished in the world of the Mongols.

_____

[18] In relation to Count One – the RICO conspiracy charge – the jury checked "No" in response to the question of whether Meyerholz was guilty of murdering Cole in violation of Kentucky law. This is not incongruous with the jury finding him guilty of murder in aid of racketeering in Count Fifty-Nine because the special finding in relation to Count One did not address his potential liability as an aider and abetter. Indeed, the jury found that Boylston, as part of the RICO conspiracy, killed Cole in violation of Kentucky law and the evidence at trial may have led the jury to conclude that Boylston was responsible for the death blow.

93

Meyerholz is not entitled to a new trial on Counts Fifty-Five, Fifty-Seven, Fifty-Eight, or Fifty-Nine.

## IV.  Conclusion

For the most part, the Motions for Judgment of Acquittal and/or a New Trial filed by Frazier, Santiago, Forrester, Hern and Meyerholz will be denied.  The Court will, however, enter a judgment of acquittal in favor of (1) Forrester on Count Twenty-One – Aiding and Abetting the Use of a Firearm; (2) Frazier on Count Twenty-Two – Interstate Travel In Aid of Racketeering; (3) Frazier and Stanley on Count Twenty-Three – Possession with  Intent to Distribute Methamphetamine; and (4) Hern on Counts Fifty and Fifty-One – Conspiracy to Tamper With, and Tampering With a Witness.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

94